IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

             Plaintiff,

        v.

EDWARD LEE FILER, ROBERT
JOSEPH GEREG, and PAUL
MICHAEL KELLY,

             Defendants.

Case No. 19 CR 565

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

The Government's motion to exclude and/or limit expert witness testimony (Dkt. No. 96) is granted in part and denied in part.

## I. BACKGROUND

Defendant Edward Filer has been charged in a 21-count Second Superseding Indictment (the "Indictment") with 12 joint counts of wire and bankruptcy fraud (Indict., Counts 1–7, 9–11, 13–14, Dkt. No. 64), an individual count of bankruptcy fraud (*id.*, Count 8), and a single count of making a false statement under penalty of perjury. (*Id.*, Count 15.)

The joint wire and bankruptcy fraud charges allege a scheme with co-defendants Robert Gereg and Paul Kelly to defraud the creditors of Kelly's company, Barsanti Woodwork. (*Id.*, Count 1, ¶

3.) At the time, Barsanti Woodwork had approximately $1.6 million in debt with Harris Bank, which was secured by Barsanti Woodwork's assets. (*Id.* ¶ 1(e).) By late 2012 Barsanti Woodwork was facing lawsuits from various creditors, including Harris Bank and the Carpenters' Trust Funds. (*Id.* ¶¶ 1(i), (k).) In February 2013, Kelly retained Filer, an attorney, and his law firm to represent Barsanti Woodwork. (*Id.* ¶ 1(l).) In March 2013, Kelly engaged Gereg to identify sources of financing for Barsanti Woodwork. (*Id.* ¶ 1(m).) According to the Indictment, Defendants used the mechanisms of corporate law, tax law, and bankruptcy law to defraud Barsanti Woodwork's creditors and eventually continue operations under a different name, all in an effort to minimize Kelly's financial risk.

According to the Indictment, in April 2013 Defendants formed a shell company called BWC Capital LLC. (*Id.* ¶¶ 5(a), 6–21.) Gereg held himself out as the sole owner of BWC Capital and concealed Kelly's interest in the company. (*Id.* ¶¶ 12, 19.) Kelly then provided Gereg with funds from Barsanti Woodwork's accounts receivables, which Gereg then used to purchase Barsanti Woodwork's own debt at a discount from Harris Bank and acquire the bank's priority security interest. (*Id.* ¶¶ 5(b), 22–25.) In May 2013, Defendants drafted and backdated a change of terms agreement between Barsanti Woodwork and BWC Capital that inserted a

confession of judgment provision into the contracts governing the acquired Harris Bank notes. (*Id.* ¶¶ 5(c), 28-33.) Defendants, through BWC Capital, used the confession of judgment clauses to obtain a state court judgment against Barsanti Woodwork. (*Id.* ¶¶ 41-46.) This judgment allowed Defendants to transfer all of Barsanti Woodwork's assets to BWC Capital. (*Id.* ¶¶ 47-58.)

Having extracted the assets and capital out of Barsanti Woodwork, Defendants created Barsanti Millwork LLC and represented that the new entity was owned solely by Gereg, again concealing Kelly's ownership interest. (*Id.* ¶¶ 5(d), 26-27, 34-40.) Barsanti Millwork then operated as Barsanti Woodwork's successor entity. (*Id.* ¶ 34.) In August 2013, Barsanti Woodwork filed for Chapter 7 bankruptcy. (*Id.* ¶ 59.) During the course of the bankruptcy proceedings, Defendants: (1) concealed the asset transfer to BWC Capital, (2) falsely represented BWC Capital as a creditor and misrepresented the remaining balance on the Harris Bank debt, (3) concealed various records evidencing the scheme, and (4) testified falsely under oath. (*Id.* ¶¶ 5(d), 59-68.) Counts 1-8, 11, 12, 14, and 15 all relate to the conduct detailed in Count 1.

In Counts 9, 10, and 13, the Government details additional conduct in furtherance of the scheme. Specifically, the Government alleges that Kelly's woodworking business continued to experience financial difficulties when operating as Barsanti Millwork. (*Id.,*

Count 9, ¶¶ 68–69.) To alleviate some of the financial burden, in 2015 Gereg twice advised Kelly to recharacterize wages and other taxable income as deductible expenses, thereby lowering Barsanti Millwork's tax liability. (*Id.* ¶¶ 70, 73.) In mid-2015, Gereg also transferred $5,000 from Barsanti Millwork to Force 5 Holdings, an account controlled by Gereg. (*Id.*, Count 10, ¶ 2.) According to the Indictment, Kelly kept Filer informed regarding Barsanti Millwork's financial struggles in 2015. (*Id.* ¶ 69.)

Filer has identified three expert witnesses he may call at trial. (*See* Expert Disclosure, Dkt. No. 82.) Pursuant to FED. R. CRIM. P. 16(b)(1)(C)(i), Filer filed a summary of the witnesses' qualifications, anticipated opinions, and the bases and reasons for these opinions. Based on Filer's Rule 16 disclosure, the Government now moves to limit or exclude the testimony of Filer's three expert witnesses. (Dkt. No. 96.)

## II. <u>LEGAL STANDARD</u>

FED. R. EVID. 702 permits opinion testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education." Under the rule established in *Daubert v. Merrell Dow Pharms., Inc.*, the Court acts as a gatekeeper, only admitting expert testimony that is reliable and relevant. *See* 509 U.S. 579, 589–91 (1993). In its gatekeeping role the Court applies a three-part test to determine whether: (1) the expert is

qualified; (2) the expert's methodology is reliable; and (3) the proffered testimony is relevant. *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

A witness may be qualified as an expert based on their "knowledge, skill, experience, training, or education." FED. R. EVID. 702. In assessing reliability, the Seventh Circuit gives the Court "great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009). Generally, the Court considers whether the testimony is based on "sufficient facts or data . . . [and] is the product of reliable principles and methods . . . [which have been] applied to . . . the facts of the case." FED. R. EVID. 702. The Court's evaluation considers "the proposed expert's full range of experience and training." *Pansier,* 576 F.3d at 737. Finally, the Court must conclude that the testimony is relevant such that it will "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers,* 629 F.3d at 644.

As the proponent of the experts, Filer "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." FED. R. EVID. 702 advisory committee's note to 2000 amendment (citing *Bourjaily v. United States,* 483 U.S. 171 (1987)). The Government, however, "bear[s]

the burden of bringing to the Court's attention any specific opinions with deficiencies." *Goldberg v. 401 North Wabash Venture LLC,* 2013 WL 212912, at *2 n.1 (N.D. Ill. Jan. 18, 2013). The Court will therefore "only address those opinions brought to the Court's attention." *Cage v. City of Chicago,* 979 F.Supp.2d 787, 799 (N.D. Ill. 2013). As a result, the Court will not make admissibility determinations regarding any opinions that the Government has not specifically alleged to be defective. *Id.*

## III. <u>DISCUSSION</u>

Filer seeks to rely on testimony from three expert witnesses: Neil J. Bivona, William J. Factor, and Robert A. Chapman. The Government's *Daubert* challenges are based on Filer's Rule 16 disclosures. Rule 16 only requires that Filer "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." FED. R. CRIM. P. 16(b)(1)(C). The summaries called for by Rule 16 are meant to provide the Government with a "fair opportunity to test the merit of the expert's testimony through focused cross-examination. FED. R. CRIM. P. 16 advisory committee's note to 1993 amendment. *Daubert,* however, compels the Court to take a detailed look the expert's qualifications, reliability, and relevance to determine the admissibility of their opinions. *Daubert,* 509 U.S. 592–93. Given the disparity between the details demanded by Rule 16 and those

required to perform a *Daubert* analysis, Filer's failure to include certain information in his expert disclosure is not a basis for this Court to exclude the proffered expert testimony. Instead, the Court will also consider any additional information regarding the experts' analyses included in Filer's opposition to this motion.

For this reason, the Court rejects the Government's argument that the expert testimony should be excluded because the Rule 16 disclosure did not include a list of materials that were reviewed in connection with the proffered opinions. This alleged deficiency in Filer's Rule 16 disclosure cannot independently form the basis for excluding expert testimony. In addition, a list of materials considered is not required under Rule 16, so the Government's objection does not even identify an alleged deficiency or that such information has been requested and withheld. Indeed, this argument is now moot because in response to this Motion Filer's counsel provided the Government with a list of the documents each expert relied upon when forming their opinions. (Opp'n at 6, Dkt. No. 110.)

The Court now turns to the Government's challenges related to each individual expert.

### A. Neil J. Bivona

Neil J. Bivona has 29 years of experience working in commercial banking and restructuring. (Bivona CV at 1, Expert

Disclosure, Ex. 1, Dkt. No. 81-1.) Filer anticipates Mr. Bivona will offer up to 12 opinions that will help the jury understand the various financial transactions at issue, the relationship between BWC Capital and Barsanti Woodwork, and the changing valuation of Barsanti Woodwork during the course of the alleged scheme. (Expert Disclosure at 3–7.) The Government challenges Mr. Bivona's qualifications as an expert and raises specific objections to Opinions 4, 7, and 10.

The Government offers no argument in support of its assertion that Mr. Bivona is not qualified as an expert. Mr. Bivona has nearly 30 years of experience in commercial banking. (Bivona CV at 1.) After review of his extensive work representing borrowers, lenders, and creditors in bankruptcy and out-of-court negotiations, (*id.*), the Court concludes that Filer has established by a preponderance of evidence that Mr. Bivona is qualified as an expert on commercial debt and restructuring transactions, including bankruptcy.

### *1. Bivona Opinion 4*

In Opinion 4, Mr. Bivona opines that "Harris Bank had access to the information a bank would consider pertinent when selling a loan note to a third party." (Expert Disclosure at 4.) The Government first challenges the reliability of this Opinion. The Government contends there is no methodology supporting Opinion 4

because there is no link between the facts of this case and Mr. Bivona's conclusion. In response, Filer explains that "[b]ased on his experience in the commercial banking and restructuring industry, [Mr. Bivona] is familiar with the information that banks consider pertinent when selling a loan." (Opp'n at 9.) Mr. Bivona "links his opinion to the facts of the case by identifying the pertinent information that was presented to Harris Bank. (*Id.*)

Where experience is the basis for an expert opinion, the proponent must establish the expert's relevant experience and then connect that relevant experience to the facts of the case. *See Metavante Corp. v. Emigrant Sav. Bank.,* 619 F.3d 748, 761–61 (7th Cir. 2010). Mr. Bivona's experience includes decades of work and dozens of loan sales, including transactions similar to Harris Bank's sale of Barsanti Woodwork's debt to BWC Capital. (Opp'n at 8.) This relevant experience gives Mr. Bivona a basis to offer an opinion about the information banks generally deem important in a loan sale. In his opposition to this motion, Filer explains how Mr. Bivona's experience will connect to this case. Specifically, the opposition lists the relevant information considered, including the deal documents and communications between Harris Bank and the Defendants in reaching his Opinion. (*Id.* at 9–10.) Filer has established a sufficient connection between Mr. Bivona's experience and the facts of this case. Accordingly, the Court

concludes that Filer has established by a preponderance of evidence that Opinion 4 is based on a reliable methodology.

The Government also contends that Opinion 4 is irrelevant, because Filer could call a witness from Harris Bank to testify to "what the bank would or would not consider pertinent." (Mot. at 11.) In response, Filer argues that Opinion 4 goes to the materiality of the alleged misstatements to Harris Bank. (Opp'n at 10.)

The elements of a wire fraud charge are: (1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme. *United States v. Leahy,* 464 F.3d 773, 786 (7th Cir. 2006). The Government must also establish that any allegedly false statements were material. *Neder v. United States,* 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). The determination of "whether a statement is material depends on its effect on 'a reasonable person.'" *United States v. Betts-Gaston,* 860 F.3d 525, 532 (7th Cir. 2017). The jury therefore cannot measure materiality based on Harris Bank's subjective testimony regarding what the bank deemed pertinent at the time of the sale. Accordingly, the Court concludes that Filer has also established by a preponderance of evidence that Opinion 4 is relevant.

## 2. Bivona Opinion 7

In Opinion 7, Mr. Bivona Opines that "[i]t is not uncommon to backdate agreements to reflect the effective date of the agreement, and in this case, the backdating had no impact on the transfer of assets from Woodwork to BWC Capital." (Expert Disclosure at 5.) The Government contends that this Opinion is "hypothetical and abstract" and fails to consider "Filer's state of mind in backdating certain documents within the context of the evidence in this case." (Mot. at 12.) In response, Filer argues that Opinion 7 connects Mr. Bivona's experience that backdating documents is common to the present case, concluding that here the act of backdating had no impact on the relevant transactions. The lack of impact is important, Filer contends, because "it cuts against the Government's theory that backdating furthered the scheme to defraud." (Opp'n at 11.)

Commercial debt is not an area the average juror is likely to be knowledgeable about. As a result, it is appropriate for a party to offer expert testimony about "tools of the trade" and the ways in which commercial debt transactions are carried out. *See U.S. v. Brown,* 7 F.3d 648, 653 (7th Cir. 1993) (recognizing that courts routinely permit expert testimony where the jury is unlikely to be knowledgeable about relevant industry methods of operation). Here, the Government's theory is that Filer caused certain agreements to

be backdated in order to conceal the Defendants' allegedly fraudulent scheme. (*See e.g.,* Indict., Count 1 ¶¶ 28, 56.) Filer disputes this theory and offers Opinion 7 in rebuttal. By educating the jury on backdating and its lack of impact on the disputed transactions, Opinion 7 provides an alternate theory of intent by evidencing that Filer's conduct was consistent with industry norms and did not conceal his conduct. Expert testimony of this nature is appropriate provided Mr. Bivona does not express a direct opinion concerning Filer's mental state. *Brown,* 7 F.3d at 651. Accordingly, the Court concludes that Filer has established by a preponderance of evidence that Opinion 7 is relevant.

### *3. Bivona Opinion 10*

In Opinion 10, Mr. Bivona opines that "[i]t was accurate to list BWC Capital as a creditor on Schedule D of [Barsanti] Woodwork's bankruptcy petition. At the time the bankruptcy petition was filed on August 26, 2013, [Barsanti] Woodwork still owed BWC Capital approximately $362,077 under the two notes." (Expert Disclosure at 6.) The Government argues that Opinion 10 impermissibly offers a legal conclusion as to whether BWC Capital was a Barsanti Woodwork creditor. The Government further argues that Mr. Bivona's calculation of the outstanding debt on the Harris Bank notes is irrelevant because his calculated figure was not listed on any of the at-issue filings. In response, Filer argues

that Opinion 10 is relevant because it evidences that at the time of its bankruptcy, Barsanti Woodwork owed BWC Capital money under the Harris Bank loans, which is contrary to the Government's view of the facts.

Counts 4-7 allege misstatements related to: (1) BWC Capital's status as a Barsanti Woodwork creditor and (2) the size of the remaining debt. (*See* Indict., Counts 4-7.) Based on these allegations the issue of whether BWC Capital was properly listed as a creditor is one for the jury. But under Rule 704, an expert "opinion is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704(a). The exception to this general rule is expert opinions related to the defendant's state of mind. FED. R. EVID. 704(b). Opinion 10 does not opine on Filer's intent, only that characterizing BWC Capital as a creditor was proper.

Mr. Bivona reaches a conclusion about BWC Capital's status as a creditor based on a financial analysis. (*See* Harris Bank Loan History Reconstruction at 10-20, Expert Disclosure, Ex. 2, Dkt. No. 81-2.) The Government does not dispute that these calculations are wrong, only that "[Mr.] Bivona has thought of something that didn't happen." (Mot. at 13.) Indeed, Opinion 10 concludes that Barsanti Woodwork still owed approximately $362,077 under the two notes, a figure that was not reported in any of the company's filings during the course of the relevant time period. This portion

of Opinion 10 may not help Filer defend against the misstatements regarding the size of the outstanding debt. But the fact that there was an outstanding debt supports Mr. Bivona's opinion and is therefore likely to assist the jury in evaluating whether BWC Capital was a Barsanti Woodwork creditor. Remaining disputes on the factual basis for characterizing BWC Capital as a creditor are based on the facts and thus go to the weight to be given to Opinion 10, not its admissibility. For these reasons, Filer has established by a preponderance of evidence that the Opinion 10 is relevant.

## B. William J. Factor

William J. Factor is an attorney with 30 years of experience representing debtors, secured and unsecured creditors and creditors' committees in bankruptcy proceedings and out of court restructurings. (Factor CV at 1, Expert Disclosure, Ex. 3, Dkt. No. 81-3.) Filer may call Mr. Factor to offer up to 8 opinions on bankruptcy process and procedure. The Government does not challenge Mr. Factor's qualifications to serve as an expert on these topics. The Government does, however, raise specific objections to Opinions 1-4, 7 and 8. The Court addresses each challenged Opinion below.

### *1. Factor Opinion 1*

In Opinion 1, Mr. Factor opines that "[t]he filing of the Barsanti Woodwork Corporation . . . bankruptcy petition . . . provided no benefit" to the Defendants and in fact placed greater scrutiny on the transactions at issue. (Expert Disclosure at 8.) The Government challenges the relevance of Opinion 1. In its motion, the Government agrees that the Defendants did not benefit, but argues that whether the bankruptcy was "wise or unwise" is not relevant to whether the charged conduct occurred. (Mot. at 16.) The Government further contends that the evidence will show the Defendants actions were motivated, in part, by a "desire to stay the enforcement of a judgment by one of Barsanti Woodwork's unsecured creditors." (*Id.*) In response, Filer argues that Opinion 1 goes to intent. Specifically, the Government alleges that filing bankruptcy was the fifth step in Defendants' scheme to defraud. Therefore, if filing made it more likely that the fraud would be discovered, the jury may weigh that evidence in determining whether the conduct was in furtherance of a scheme to defraud.

To start, the average juror is unlikely to have significant knowledge of the bankruptcy process. Mr. Factor's testimony will help the jury understand this process. Second, there is nothing inherently fraudulent about a debtor using legal processes to navigate financial hardship. The issue here is whether Filer and

his co-Defendants used these legal processes to defraud Barsanti Woodwork's creditors. Accordingly, the fact that the bankruptcy petition drew greater scrutiny to Barsanti Woodwork's finances and the Defendants' pre-bankruptcy conduct may assist the jury as they weigh the evidence regarding Filer's intent. Indeed, the parties' dispute regarding the Defendants' motive goes to the weight the jury should give Opinion 1, not its admissibility. For these reasons, Filer has established by a preponderance of evidence that Factor Opinion 1 is relevant.

### 2. Factor Opinion 2

In Opinion 2, Mr. Factor opines that "[t]he filing of the Chapter 7 bankruptcy petition did not harm Barsanti Woodwork's creditors and in fact benefitted them." (Expert Disclosure at 9.) The Government argues that Opinion 2 is based on incomplete facts, specifically that Barsanti Woodwork's creditors benefitted because Filer's former firm, Freeborn & Peters, paid a settlement to the bankruptcy estate. In response Filer argues that Opinion 2 establishes that the act of filing bankruptcy was a benefit to the creditors, which weighs against the existence of a scheme to defraud the creditors. Filer contends that testimony regarding the settlement is irrelevant and he will not solicit testimony from Mr. Factor on this topic.

Consistent with the Court's ruling on Factor Opinion 1, Mr. Factor's explanation of the ways that creditors benefit from bankruptcy may assist the jurors understand this unfamiliar process. Also consistent with the ruling on Opinion 1, the Jury may consider any specific benefits that fell to Barsanti Woodwork's creditors as they weigh the evidence of Filer's intent in causing the company to file for bankruptcy. As pointed out by the Government, however, the Freeborn & Peters settlement is integral to this analysis. For these reasons, Filer has established by a preponderance of evidence that Factor Opinion 2 is relevant. If this Opinion is offered, the Government is free to cross examine Mr. Factor on the Freeborn & Peters settlement and how it impacted his analysis.

### 3. Factor Opinion 3

In Opinion 3, Mr. Factor opines that "[d]etermining what should be included in a corporate bankruptcy petition and the nuances of how and where it should be included is oftentimes complex and requires bankruptcy law expertise." (Expert Disclosure at 10.) Mr. Factor goes on to state that "[i]t is not uncommon for [the appointed bankruptcy] trustee to advise counsel for a debtor that amendments to the schedules are required." (*Id.*) The Government argues that Opinion 3 is irrelevant because while mistakes can happen, it is also true that petitions may include

deliberately false information. In response, Filer argues that Opinion 3 will assist the jury in understanding the complexity of a bankruptcy petition and why he delegated its preparation to his former law partner Thomas Fawkes. Filer further argues that Mr. Factor's third Opinion will "help the jury to understand why an experienced bankruptcy practitioner like Fawkes might make this mistake and why someone without that expertise—like Mr. Filer—would not catch it." (Opp'n at 20.)

Factor Opinion 3 will help the jury understand bankruptcy procedure and what goes into particular filings—a process they are unlikely to be familiar with. The jury may also consider the commonness of amendments and the presence of errors by even experienced practitioners when deliberating on Filer's intent. The Government's argument that there are also instances where information is deliberately provided, as it alleges was the case here, goes to the weight the jury should give Opinion 3, not its admissibility. For these reasons, Filer has established by a preponderance of evidence that Factor Opinion 3 is relevant.

### 4. Factor Opinion 4

In Opinion 4, Mr. Factor opines that "[s]ufficient information was disclosed in the [Barsanti] Woodwork bankruptcy petition to provide the [appointed bankruptcy] trustee the information he needed to identify potential causes of action and

further areas of inquiry." (Expert Disclosure at 10.) First, the Government argues that the proper witness to testify to "what the [appointed bankruptcy] trustee 'needed' is the [appointed bankruptcy] trustee." (Mot. at 14.) In response Filer argues that in a criminal fraud case the intent of the defendant is not measured by "the subjective belief of the recipient of the information." (Opp'n at 16.)

As discussed above in connection with Bivona Opinion 4, under the wire fraud statute the Government must establish that any allegedly false statements were material. *Neder,* 527 U.S. at 25. And materiality is measured by its effect on a reasonable person. *Betts-Gaston,* 860 F.3d at 532. The jury therefore cannot measure materiality based on the trustee's subjective testimony regarding what they deemed necessary.

Second the Government challenges Mr. Factor's conclusion related to the Statement of Financial affairs, filed as part of Barsanti Woodwork's bankruptcy petition. The Government alleges that the Defendants filed a Statement of Financial Affairs that "falsely represented that Barsanti Woodwork had made no transfers of property outside the ordinary course of its business in the two years prior to filing bankruptcy" despite having paid $575,000 in connection with BWC Capital's purchase of the Harris Bank Debt. (Indict., Count 1 ¶ 61.) The Government specifically takes issue

with Mr. Factor's conclusion that "[w]hether the parties should have referenced the $575,00 paydown of the Harris Bank debt in the . . . Statement of Financial Affairs is arguable." (Mot. at 14.) According to the Government, in reaching this conclusion Mr. Factor "materially mischaracterizes the transfer as a 'paydown'" when there is no evidence to support that the payment was a paydown. (*Id.* at 15) As a result this aspect of Opinion 4 is improper and likely to confuse the jury. (*Id.*) Filer disagrees, arguing that "numerous documents in the record show that Woodwork **was** given credit for the $575,000 paydown." (Opp'n at 15 (emphasis in original).)

Shortly after buying BWC Woodwork's debt from Harris Bank, BWC Capital filed the Complaint and Confession of Judgment in state court. Those documents give Barsanti Woodwork credit for the $575,000 loan purchase price that was paid from the company's accounts receivables. (Compl. and Conf. of J. at 5, Opp'n, Ex. A, Dkt. No. 110-1.) Indeed, the Government alleges an overstatement of the outstanding loan balance, not a failure to record the $575,000 payment for the purchase price of the debt. (*See, e.g.,* Indict., Count 1 ¶ 60.) Thus, whether Barsanti Woodwork's $575,000 payment was properly characterized as an ordinary payment of debt or an asset transfer that should have been referenced in the Statement of Financial Affairs is relevant and likely to help the

jury understand this issue. For these reasons, Filer has established by a preponderance of evidence that Factor Opinion 4 is both reliable and relevant.

### *5. Factor Opinion 7*

In Opinion 7, Mr. Factor opines that "[t]he backdating of the Assignment and Conveyance of Title was inconsequential with respect to its impact on the trustee's investigation." (Expert Disclosure at 12.) The Government argues that this opinion is irrelevant because the issue is whether the Defendants acted with an intent to defraud, not whether the act was unwise or unnecessary. In response, Filer argues that testimony that backdating had no impact makes it less probable that the documents were backdated with an intent to defraud.

To start, included in Mr. Factor's testimony on Opinion 7 is an explanation of the "90-day preference period"—which permits the appointed bankruptcy trustee to recover payments made to creditors within 90 days of the bankruptcy filing. Consistent with the Court's rulings on the prior Factor Opinions in this Opinion, this testimony is likely to help the jury further understand the Bankruptcy process, specifically the work being done by the trustee after a petition is filed.

Related to backdating, the Government's theory is that the Defendants backdated the conveyance of title to avoid the trustee

determining the transfer was done on the eve of bankruptcy. In the context of the "90-day preference period" Mr. Factor's testimony will inform the jury that backdating the documents did not remove the transactions from the preference period. As a result, these transactions were still subject to scrutiny by the trustee. Such testimony provides a relevant rebuttal to the Government's theory that Defendant's intent was to backdate documents in order to avoid scrutiny and conceal their fraud. For these reasons, Filer has established by a preponderance of evidence that Factor Opinion 7 is relevant.

### 6. Factor Opinion 8

In Opinion 8, Mr. Factor opines that "[w]hether a lien is enforceable is a legal question with gray areas." (Expert Disclosure at 12.) The Government argues that Opinion 8 is flawed because it is not relevant and "premised on circumstances that are not consistent with the factual record." (Mot. at 15–16.) In response Filer argues that his first Motion in Limine sought to preclude the Government from presenting arguments regarding the enforceability of BWC Capital's lien on Barsanti Woodwork's assets. If that motion were denied, however, Opinion 8 is relevant because it establishes that "the enforceability of a lien is a complicated legal question upon which reasonable minds could

differ." (Opp'n at 17.) The complexity of this question thus makes it less likely Filer acted with the requisite intent.

In response to Filer's Motion in Limine 1, the Government conceded that the enforceability of the lien is not the subject of a genuine dispute because "[t]he lien was enforced after all." (Opp'n to Mot. in Limine at 13, Dkt. No. 115.) As a result, at the parties' pre-trial conference on May 27, 2021, the Court concluded that the topic was not relevant and orally granted this aspect of Filer's Motion in Limine 1, thereby precluding argument or evidence regarding the enforceability of the lien. (See 5/27/21 Order, Dkt. No. 137.) Consistent with that ruling, the Court concludes that this Opinion is not relevant and grants the Government's motion as to Factor Opinion 8.

### C. Robert A. Chapman

Robert A. Chapman is an attorney with more than 25 years of experience representing attorneys and law firms in professional liability disputes, including conflict of interest claims. (Chapman CV at 1, Expert Disclosure, Ex. 4, Dkt. No. 81-4.) In addition to his legal practice, Mr. Chapman has previously served the Illinois Attorney Disciplinary Commission as both a Hearing Board member and a member of the Oversight Committee. (*Id.*) Mr. Chapman has also previously served as the Chair of the Chicago Bar Association's Committee on Preventing Attorney Malpractice. (*Id.*)

Filer may call Mr. Chapman to offer up to 10 opinions on legal ethics. The Government challenges Mr. Chapman's qualifications as an expert. The Government also challenges the relevance of Mr. Chapman's testimony as whole, in addition to raising specific objections to Opinions 1, 2 and 4.

The Government argues that Mr. Chapman is not qualified to serve as an expert because he has not "disclosed expertise on bankruptcy transactions and it appears has not provided previous testimony on bankruptcy matters." (Mot. at 18.) In response Filer argues that Mr. Chapman is not offering opinions that require bankruptcy expertise, instead his opinions arise out of the legal ethics that apply to all lawyers.

Mr. Chapman has spent more than 25 years representing individual and corporate plaintiffs and defendants in professional liability actions. In addition, Mr. Chapman worked with the Illinois Attorney Registration and Disciplinary Commission for nearly 10 years adjudicating issues of professional misconduct. The totality of this experience makes him thoroughly qualified to opine on the standard of legal ethics applicable to all lawyers, regardless of their practice area or specialty, as well as the way law firms operate in light of these ethical obligations. For these reasons, Filer has established by a preponderance of the evidence

that Mr. Chapman is an expert in the field of legal ethics and professional responsibility.

### *1. All Chapman Opinions*

The Government argues that all of Mr. Chapman's Opinions on Filer's adherence to Illinois's Rules of Professional Conduct are irrelevant to this action. According to the Government, Filer "intends to silo out hypothetical situations and profess they do not run afoul to professional conduct rules in the hopes of undercutting fraudulent intent." (Mot. at 20.) These opinions, the Government contends, will not assist the jury because Filer is not being sued for malpractice or a violation of the standard of care. In response, Filer argues that Mr. Chapman's opinions regarding Filer's adherence to ethical standards are relevant to his intent to defraud.

The jury cannot be expected to know how an attorney must conduct themself during the course of a client representation. Mr. Chapman's testimony can thus "give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct." *Jimenez v. City of Chicago,* 732 F.3d 710, 721–22 (7th Cir. 2013). The same is true in the reverse situation. While adherence to ethical standards is not dispositive of Filer's guilt or innocence, it is relevant to

intent. Specifically, the jury can evaluate whether Filer acted within the confines of the legal profession to advocate for his client or with criminal intent to defraud. As to the Government's contention that Mr. Chapman's opinions are only based on certain conduct, this argument goes to the weight the jury should give these opinions. Indeed, the Government is free to cross examine Mr. Chapman on conduct that was not included in his direct examination. For these reasons, Filer has established by a preponderance of the evidence that Mr. Chapman's testimony is relevant.

### 2. Chapman Opinion 1

In Opinion 1, Mr. Chapman opines that it was not a conflict of interest for Filer and Freeborn & Peters to represent both Gereg and Barsanti Woodwork. The Government's theory of the case is that Kelly controlled BWC Capital and later Barsanti Millwork. Despite this alleged reality, Gereg held himself out as an unaffiliated third-party creditor, in order to conceal Kelly's control and advice the Defendants' alleged fraud. The Government therefore argues that Mr. Chapman's opinion on whether Filer could represent both Gereg and Barsanti Woodwork is a hypothetical situation where Barsanti Woodwork and BWC Capital, and thus Gereg, are independent entities. These opinions are thus irrelevant and testimony on this collateral issue will confuse the jury. In response, Filer argues

that the facts will show Gereg controlled BWC Capital, not Kelly. As a result, Opinion 1 is not based on a hypothetical situation. Opinion 1, Filer explains, will show that his actions were consistent with his ethical obligations and not a basis for inferring fraudulent intent.

The parties' disagreement over the factual basis for Opinion 1 goes to the weight the jury should ascribe to this Opinion and is not a basis for excluding this testimony. The Court therefore disregards these arguments.

Filer also points out that the Government's own theory of the case makes Filer's adherence to ethical duties regarding conflicts of interest relevant. For example, Filer notes that the Indictment alleges that he took actions in furtherance of the fraud that were adverse to Kelly. (Opp'n at 26–27 (citing Indict., Count 1 ¶¶ 31, 42, 43.) The Government has also previously argued the Kelly must have owned BWC Capital, otherwise Filer's actions on behalf of BWC Capital would have been adverse to his clients, Barsanti Woodwork and Kelly. (*Id.* at 26.)

The Government's use of Filer's allegedly adverse actions as proof that the parties were acting with a fraudulent intent makes Opinion 1 probative of Filer's intent. Moreover, because the Government has put Filer's adherence to ethical standards at issue, this is not a collateral issue likely to confuse the jury. Instead,

Mr. Chapman's testimony will provide the framework for the jury to measure the abstract concept of legal ethics. For these reasons, Filer has established by a preponderance of evidence that Chapman Opinion 1 is relevant.

### 3. Chapman Opinion 2

In Opinion 2, Mr. Chapman opines that "[i]t is not an ethical violation to backdate documents to reflect the date of an agreement." (Expert Disclosure at 16.) The Government argues that this Opinion lacks a sufficient basis other than that backdating is a "common practice" and fails to offer any evidence that in this case an agreement was reached prior to the date on which the document was signed. In response Filer repeats the evidence Mr. Chapman relied upon which was referenced in the Rule 16 disclosure, including the backdated documents and statements by expected Government witnesses.

Mr. Chapman's conclusion is not just that backdating is commonplace. Based on his 25 years of experience, he explains that backdating is common practice in order to reflect the date of an oral agreement or to reflect the parties' agreement that an agreement be effective retroactively. (*Id.* at 16–17.) This context is likely to help the jury understand when backdating is an appropriate act, a topic many are unlikely to be familiar with.

Filer's Expert Disclosure and his opposition to this motion both clearly articulate the evidence Mr. Chapman relied upon when rendering his opinion that in this case there is evidence of prior oral agreements and therefore backdating was not an ethical violation. The evidence includes but is not limited to: expected testimony that Filer's former law partner Ashley Brandt confirmed with Kelly that a prior oral agreement was in place, correspondence showing that Brandt suggested backdating the assignment and title conveyance, and correspondence showing that Fawkes agreed. (*Id.* at 17.) The Government's contention that "there is no such evidence" challenges the sufficiency of this evidence, which goes to the weight the Opinion 2 should be given by the jury. For these reasons, Filer has established by a preponderance of the evidence that Chapman Opinion 2 is reliable and relevant.

### 4. Chapman Opinion 4

In Opinion 4, Mr. Chapman opines that "[t]he conclusion that the K Family Trust documents were not responsive to the bankruptcy trustee's document subpoena to Freeborn [& Peters] was reasonable, appropriate, and consistent with the Firm's ethical obligation to zealously represent Kelly." (Expert Disclosure at 18.) The Government first argues that Opinion 4 is "unfounded" because Filer's disclosure does not describe what was reviewed as a basis for this Opinion. In response Filer points out that the Expert

Disclosure quotes from various documents including the relevant subpoena, the K Family Trust documents, and emails.

Filer has provided adequate bases for Opinion 4. The Rule 16 disclosure provides summaries of the relevant professional standards, the typical practice for evaluating responsiveness based on Mr. Chapman's experience, and the documents he reviewed in reaching his opinion. In addition, the summary of Mr. Chapman's proposed testimony adequately connects Mr. Chapman's experience to the disputed conduct in this case. This establishes by a preponderance of evidence that the methodology employed by Mr. Chapman was reliable.

The Government also contends that Opinion 4 "trends toward an ultimate issue of fact of whether Filer was acting with the requisite intent to defraud." (Mot. at 21.) In response, Filer argues that Mr. Chapman is not offering an opinion on a question of law for the jury. The issue for the jury is whether Filer acted with the intent to defraud. Mr. Chapman's testimony is that Mr. Filer's decision was reasonable and consistent with his ethical obligations.

Evaluating documents for responsive to a subpoena is not something the average juror is likely to have experience with. Mr. Chapman's proffered Opinion 4 provides a concrete framework for the jury to evaluate his decision making when determining whether

he acted with an intent to defraud. Specifically, Opinion 4 may assist the jury in determining whether he was acting in accordance with the professional and ethical considerations or with the intent to conceal the K Family Trust documents. For these reasons, Filer has established by a preponderance of the evidence that Chapman Opinion 4 is relevant.

## IV. CONCLUSION

For the reasons stated herein, the Court grants in part and denies in part the Government's motion to exclude and/or limit expert witness testimony (Dkt. No. 96).

**IT IS SO ORDERED.**

_____
          Harry D. Leinenweber, Judge
          United States District Court

Dated: 5/27/2021