**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

v.

EDWARD LEE FILER, ROBERT JOSEPH
GEREG, and PAUL MICHAEL KELLY

Case No. 19-CR-565

Honorable Harry D. Leinenweber

**MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

I.     Woodwork's Background and Filer's Retention. ............................................. 3

II.    The Harris Deal. ............................................................................................. 4

      A.    Kelly Retains Gereg and Reaches a Deal With Harris. ......................... 4

      B.    The Original Plan: BWC Holdings as Newco. ...................................... 5

      C.    The Actual Deal: BWC Capital as Newco. ........................................... 5

      D.    The BWC Capital/K Family Trust Agreements ..................................... 6

III.   The Next Set of Problems for Woodwork and the Formation of Millwork ...... 7

IV.   Woodwork's Bankruptcy. ............................................................................... 9

LEGAL STANDARD .............................................................................................. 10

I.     Motion for Judgment of Acquittal. ................................................................. 10

II.    Motion for a New Trial. .................................................................................. 11

ARGUMENT ........................................................................................................... 12

I.     Mr. Filer is Entitled to Judgment of Acquittal. .............................................. 12

      A.    The Government Presented Insufficient Evidence to Prove Beyond a
            Reasonable Doubt That BWC Capital Did Not Hold a Valid Lien. .......... 13

           1.    BWC Capital Held a Valid Lien as a Matter of Law. ............... 14

           2.    Even if Left to the Jury, the Government Presented Insufficient
                 Evidence for a Jury to Find that BWC Capital's Lien Was
                 Extinguished *and* That Mr. Filer Knew the Lien Was Extinguished ........ 16

      B.    Even if BWC Capital's Lien Was Extinguished Based on Some Unknown
            Legal Principle, No Reasonable Jury Could Find That Mr. Filer Acted With
            Intent to Defraud. ................................................................................. 19

      C.    Application of the Wire Fraud Statute as Applied to the Circumstances of
            This Case Violates Mr. Filer's Due Process Rights. ............................... 21

D.     No Reasonable Juror Could Find That the Alleged Misstatements in Connection with BWC Capital's Enforcement of its Lien Were Material. .......... 23

E.     No Reasonable Juror Could Find That the Wire Transmissions Were Made for the Purpose of Executing the Alleged Scheme. ............................................... 25

    1.     The Email Charged in Count 1 Did Not Execute the Alleged Fraud ........ 26

    2.     The Email Charged in Count 2 Did Not Execute the Alleged Fraud ........ 27

II.     Alternatively, Mr. Filer Is Entitled to a New Trial. .......................................................... 29

A.     Bruce Markell's Improper and Unfairly Prejudicial Testimony Warrants a New Trial. ........................................................................................................... 29

    1.     The Late Disclosure of Markell's Testimony Was Fundamentally Unfair. ........................................................................................... 29

    2.     Timing Aside, Markell's Testimony Was Improper and Prejudicial ........ 31

       a)     Improper Opinion that Woodwork's Debt Was Extinguished Because Kelly Owned BWC Capital. ............................................. 33

       b)     Improper Opinion that Woodwork's Debt Was Extinguished Because an Agent Cannot Hold the Debt of a Principal. .............. 37

       c)     Improper Opinion that BWC Capital Was Not an Arm's Length Third Party. ........................................................................ 38

       d)     Improper Opinion that BWC Capital Was Not a Creditor ............ 39

       e)     Improper Opinion that Insufficient Information Was Disclosed to Harris Bank. ............................................................ 40

       f)     Improper Opinion Regarding Bad-Faith Assertion of a Lien. ...... 40

B.     The Jury's Verdict is Contrary to the Weight of the Evidence. ............................. 41

    1.     The Complete Lack of Motive Weighs Heavily Against Intent to Defraud. ........................................................................................... 41

    2.     The Evidence Demonstrated that Mr. Filer Took Actions Inconsistent with Fraudulent Intent. ............................................................... 42

    3.     No Credible Witness Testified That Mr. Filer Did Anything Wrong ....... 44

C.     Other Misleading, Confusing, and Prejudicial Evidence Presented to the Jury Casts Serious Doubt on the Verdict and Further Supports a New Trial. ...... 48

1.     The Government's Shifting Position on the Lien. .................................... 48

2.     The Government Confused the Jury About Alleged
       Misrepresentations to Harris Bank............................................................ 50

3.     Other Misleading and Prejudicial Evidence and Arguments. ................... 51

CONCLUSION....................................................................................................................... 52

# **TABLE OF AUTHORITIES**

Page

**CASES**

*7841 Pines Boulevard, LLC v. 114 Church St. Funding, LLC*,
  No. 18-CV-07405, 2020 WL 5502328 (N.D. Ill. Sept. 11, 2020) ..........................................39

*Access Realty Grp., Inc. v. Kane*,
  2019 IL App 1st 180173 (2019) ...........................................................................................17

*In re Charles Crook Wholesale Produce*,
  7 F.3d 222 (4th Cir.1993) ...................................................................................................14

*Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co., Inc.*,
  826 F.2d 725 (7th Cir. 1987) ..............................................................................................15

*Cromeens, Holloman, Sibert, Inc v. AB Volvo*,
  349 F.3d 376 (7th Cir. 2003) ..............................................................................................34

*Davis v. Duran*,
  277 F.R.D. 362 (N.D. Ill. 2011) ..........................................................................................32

*Fields v. Gen. Motors Corp.*,
  932 F. Supp. 212 (N.D. Ill. 1996), *aff'd*, 121 F.3d 271 (7th Cir. 1997) .................................39

*Good Shepherd Manor Foundation, Inc. v. City of Momence*,
  323 F.3d 557 (7th Cir. 2003) ..............................................................................................32

*Higgins v. Conopco, Inc.*,
  No. 06 C 7077, 2008 WL 216380 (N.D. Ill. Jan. 23, 2008) ..................................................34

*Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*,
  356 F.3d 731 (7th Cir. 2004) ..............................................................................................15

*Jones v. Hoosman*,
  No. 05 C 2909, 2006 WL 1302524 (N.D. Ill. May 9, 2006) ..................................................15

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
  529 F.3d 371 (7th Cir. 2008) ..............................................................................................15

*In re Kids Creek Partners, L.P.*,
  200 B.R. 996 (Bankr. N.D. Ill. 1996) ..................................................................................14

*In re Kreisler*,
  331 B.R. 364 (Bankr. N.D. Ill. 2005) ..........................................................................14, 15, 17

*Matter of Lifschultz Fast Freight*,
132 F.3d 339 (7th Cir. 1997) ........................................................................37

*Lineas Aereas Comerciales S.A. de C.V. v. Jet Support Servs., Inc.*,
No. 17 C 8666, 2020 WL 1974377 (N.D. Ill. Apr. 24, 2020).................................34

*Lundy v. Cath. Health Sys. of Long Island Inc.*,
711 F.3d 106 (2d Cir. 2013)...........................................................................43

*Panter v. Marshall Field & Co.*,
646 F.2d 271 (7th Cir.1981) ...........................................................................32

*Pivot Point Int'l, Inc. v. Charlene Prod., Inc.*,
932 F. Supp. 220 (N.D. Ill. 1996) ...................................................................31

*Skilling v. United States*,
561 U.S. 358 (2010)......................................................................................21

*Specht v. Jensen*,
853 F.2d 805 (10th Cir. 1988) ........................................................................32

*Town & Country Bank of Quincy v. E. & D. Bancshares, Inc.*,
172 Ill. App. 3d 1066 (4th Dist. 1988)..............................................................24

*United States v. Bonansinga*,
773 F.2d 166 (7th Cir. 1985) ..........................................................................43

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005).............................................................................11

*United States v. Delay*,
440 F.2d 566 (7th Cir. 1971) ..........................................................................11

*United States v. Farinella*,
558 F.3d 695 (7th Cir. 2009) ..........................................................................31

*United States v. Johnson*,
592 F.3d 749 (7th Cir. 2010) ..........................................................................11

*United States v. Jones*,
713 F.3d 336 (7th Cir. 2013) ..........................................................................11

*United States v. Kwiat*,
817 F.2d 440 (7th Cir. 1987) ......................................................................25, 27

*United States v. Lanier*,
520 U.S. 259 (1997)......................................................................................21

*United States v. Maze*,
  414 U.S. 395 (1974)............................................................................................25, 28, 43

*United States v. McClain*,
  934 F.2d 822 (7th Cir. 1991) ...........................................................................26, 27

*United States v. Morales*,
  910 F.2d 467 (7th Cir. 1990) ...........................................................................12, 41

*United States v. Morales*,
  902 F.2d 604 (7th Cir. 1990) .................................................................................12

*United States v. Murphy*,
  406 F.3d 857 (7th Cir. 2005) .................................................................................10

*United States v. Noel*,
  581 F.3d 490 (7th Cir. 2009) ...........................................................32, 35, 37, 40

*United States v. Reed*,
  875 F.2d 107 (7th Cir. 1989) .................................................................................12

*United States v. Seward*,
  272 F.3d 831 (7th Cir. 2001) ...........................................................................25, 27, 29

*United States v. Staszcuk*,
  502 F.2d 875 (7th Cir. 1974) ...........................................................................25, 28

*United States v. Tin Yat Chin*,
  476 F.3d 144 (2d Cir. 2007)...................................................................................31

*United States v. Van Eyl*,
  468 F.3d 428 (7th Cir. 2006) ...........................................................................11, 33

*United States v. Washington*,
  184 F.3d 653 (7th Cir. 1999) ...........................................................................12, 44

*United States v. Weimert*,
  819 F.3d 351 (7th Cir. 2016) ...........................................................................23, 38

*Wardius v. Oregon*,
  412 U.S. 470 (1973)...............................................................................................31

*Warner Agency, Inc. v. Doyle*,
  133 Ill. App. 3d 850 (4th Dist. 1985).....................................................................24

**STATUTES**

18 U.S.C. § 1343 ...............................................................................................22, 25

**RULES**

Federal Rule of Criminal Procedure 16 ............................................................30

Federal Rule of Criminal Procedure 29 ........................................................ *passim*

Federal Rule of Criminal Procedure 33 ....................................................1, 11, 30

**OTHER AUTHORITIES**

1 Restatement of Contracts § 75 (1932) ...........................................................39

3 Williston on Contracts § 7:20 (4th ed.)........................................................39

Defendant Edward Filer, through his undersigned counsel and pursuant to Federal Rules of Criminal Procedure 29 and 33, respectfully requests that the Court enter an order granting judgment of acquittal on Counts 1 and 2 of the Second Superseding Indictment (Dkt. 64) ("Indictment"), or, in the alternative, granting a new trial.

## INTRODUCTION

What was the fraud? What was the evidence that Mr. Filer knew there was a fraud scheme and intended to further it? The Government had an ever-changing approach to these questions as theory after theory was defeated by the evidence at trial. Ultimately, there was neither proof of a fraud nor proof of Mr. Filer's knowing and intentional participation in that fraud. The Government's case devolved into a series of conclusions from witnesses that the transactions were "unusual," "improper," or "in bad faith." That is no substitute for proof of a fraud scheme and proof that Mr. Filer participated in that scheme. The Government's proof failed and a judgment of acquittal should be entered.

The Indictment describes a series of transactions and attaches a plethora of pejorative labels. But the theory of what exactly Mr. Filer was defending against was vague and constantly shifting, as discussed in detail below. If the lien that was transferred from Harris Bank to BWC Capital was valid—or if Mr. Filer thought it was valid—there is no fraud. How did the Government seek to prove the lien's invalidity beyond a reasonable doubt?

At first, the Government's theory of invalidity hinged on the use of Barsanti Woodwork's funds to purchase the lien. But it was forced to abandon that approach because third-party consideration, of course, does not affect the legality of a transaction. It then asserted that Paul Kelly was actually the owner of BWC Capital because Bob Gereg assigned his ownership interest in BWC Capital to the K Family Trust through a membership transfer agreement. The Government initially offered testimony from Kelly and Freeborn & Peters attorney Samuel Lichtenfeld that the

1

membership assignment was valid and enforceable when signed. But the Government was forced by the credible evidence—including Kelly and Licthenfeld's own testimony on cross examination—to abandon that theory as well, acknowledging during the Rule 29 argument at the close of its case that the assignment agreements were unenforceable and that no one was contending anyone could sue to enforce them—despite having elicited that precise scripted testimony. The Government then shifted course again, apparently, although without expressly doing so, to a theory that BWC Capital's lien was extinguished/invalid under the merger doctrine because Kelly controlled BWC Capital. This theory failed as a matter of fact and law because Kelly admitted that he did not control BWC Capital, and in any event, his control would not legally extinguish the debt. The Government chose not to call Gereg, its cooperating witness, to testify that he believed the membership transfer agreements were enforceable and there was no evidence ever presented that he believed as such. Then, most tellingly, after disavowing any theory that Kelly owned BWC Capital, the Government used its rebuttal case to pivot again and assert that the K Family Trust agreements *did* make Kelly the owner of BWC Capital through the doctrine of equitable ownership. That was not all the Government did for the first time in its rebuttal—it also asserted brand new theories about why the lien was extinguished, including theories based on principal/agency law and option contracts. Once again, none of those had any evidentiary support and were based solely on legal opinions offered by a bankruptcy professor. In fact, many of the opinions were wrong, as established below. The Government abandoned all efforts to prove that Mr. Filer shared Professor Markell's belief that any of the flawed legal theories he espoused in his "rebuttal" testimony rendered the lien unenforceable. Thus, there was no proof—none—that Mr. Filer knew the lien was invalid.

Now, with the benefit of closing arguments and additional time to review the evidence, defense counsel respectfully asks this Court to find that Mr. Filer is entitled to judgment of acquittal because, based on the evidence presented at trial, no rational juror could find beyond a reasonable doubt that the lien was invalid, let alone that Mr. Filer believed it was invalid. Moreover, even if the Court finds that the conduct at issue could constitute wire fraud, application of the wire fraud statute under these circumstances violates Mr. Filer's due process rights because he did not have fair notice that his actions could constitute a federal crime.

In the alternative, Mr. Filer is entitled to a new trial. After working on this case for over five years, the Government instituted a strategy of using vague and ever shifting legal theories as both a shield and a sword throughout the trial. This led to the presentation of confusing, misleading, and prejudicial evidence to the jury. Most significantly, Professor Markell provided the jury with improper and inaccurate legal conclusions, resulting in substantial prejudice to Mr. Filer. When the admissible evidence offered at trial is properly weighed, it leaves substantial doubt as to the correctness of the jury's verdict. The Government offered nothing more than incredible witnesses and conjecture. The weight of the evidence demonstrates that Mr. Filer lacked fraudulent intent and was simply doing his best to zealously—and legally—represent his client. In the interests of justice, the verdict cannot stand.

## **FACTUAL BACKGROUND**

### I.   **Woodwork's Background and Filer's Retention.**

Long before Paul Kelly ("Kelly") ever retained Mr. Filer to represent Woodwork, Kelly had run up Woodwork's debts to the Chicago Regional Council of Carpenters Union and its Pension and Benefits Funds (the "Union"), the taxing authorities, Woodwork's vendors, and most importantly, to Harris Bank ("Harris"). Exhibit 1, at 29:19-30:18, 31:5-9.  Harris engaged in aggressive collection efforts and eventually filed lawsuits against Kelly and Woodwork, causing

Kelly to officially retain Freeborn & Peters ("Freeborn") in February 2013. *Id.* at 66:25-67:5. Mr. Filer understood that Kelly could not afford to pay for the work that Freeborn would do for Kelly, but he agreed to help him because their wives were friends and Kelly told a compelling story about his struggling business. Exhibit 2, at 16:19-21; Exhibit 3, at 51:13-52:8; Exhibit 4, at 3:14-4:8. Unless Woodwork could strike some deal with Harris, nothing else mattered; Woodwork would cease to exist. It could not pay Harris, it had no defenses to the Harris lawsuits, Harris had locked up all of its cash and prevented it from operating, and the $1.1 million owed to Harris was over five times the total value of Woodwork's assets. Exhibit 1, at 68:1-71:5, 78:16-80:17.

**II.    The Harris Deal.**

   **A.    Kelly Retains Gereg and Reaches a Deal With Harris.**

Kelly and Mr. Filer believed that Harris would not do a deal directly with Kelly and that it would not allow Kelly to buy the loans at a discount, but that Harris might be willing to provide a discounted loan purchase to a third party. *Id.* at 71:13-16, 73:8-17; Exhibit 4, at 7:10-17. Kelly, with some help from Mr. Filer, conducted an exhaustive search for third parties to negotiate with Harris, all of whom either had their offers rejected by Harris or decided they did not want to become Woodwork's new lender. Kelly was out of options and Harris was in the process of liquidating Woodwork. Exhibit 1, at 75:1-78:22; Exhibit 4, at 5:19-6:8.

While Harris was pressing its suit to seize all of Woodwork's assets, Michael O'Rourke, the President of Signature Bank, introduced Kelly to Bob Gereg. Exhibit 1, at 81:2-13. Mr. Filer knew of Mr. O'Rourke as a well-respected banker in Chicago, so his recommendation provided Gereg with credibility. Exhibit 4, at 29:2-10. Gereg negotiated directly with Harris' outside counsel and convinced Harris to sell the loans to a new company with which Gereg was affiliated in exchange for $575,000. Exhibit 1, at 82:1-83:7. Gereg succeeded where everyone else had failed—he saved the company from liquidation by Harris. *Id.* The deal called for the purchase

price to be paid in whole or in part from Woodwork's accounts receivables, with BWC Capital to make up any difference if the amount of receivables collected was less than $575,000. *Id.* at 83:12-15.

**B. The Original Plan: BWC Holdings as Newco.**

Initially, Kelly, Gereg, and Mr. Filer contemplated that Harris would assign the loans to BWC Holdings, LLC. Exhibit 3, at 4:24-5:8; Exhibit 4, at 6:17-7:4. Under this original scenario, the plan was that Kelly would control BWC Holdings through the K Family Trust. Exhibit 4, at 37:6-10. Even though Kelly would control BWC Holdings and Mr. Filer understood the bank did not want to deal directly with Kelly, Mr. Filer thought that having a separate entity with Gereg as the signatory would provide Harris with the separation optics that Mr. Filer believed it was seeking. *Id.* at 36:4-37:4, 41:3-6. Using a company owned by Kelly was Mr. Filer's preferred option—he did not want Mr. Gereg to own Newco because he understood that Kelly would remain indebted to Newco. Exhibit 3, at 4:4-23; Exhibit 4, at 35:21-36:3. Kelly's name was listed on BWC Holdings' publicly filed Secretary of State documents, and there was no attempt to conceal Kelly's interest in Holdings from Harris. *Id.* at 40:8-41:6; Exhibit 5, *Excerpt of Testimony of Paul Kelly*, June 17, 2021 PM at 13:7-14:23.

**C. The Actual Deal: BWC Capital as Newco.**

The original plan to utilize BWC Holdings changed when Harris requested confirmation that Gereg was a member of Newco and had sole signing authority for Newco. Exhibit 3, at 10:20-11:2; Exhibit 4, at 9:22-10:10. As a result, Mr. Filer and Kelly both believed that Kelly had no choice but to go through with the transaction pursuant to which Gereg would own Newco—it was not their preferred deal structure, but it was the only way Woodwork could survive. Exhibit 3, at 11:3-12:2; Exhibit 4, at 10:12-20, 47:1-24. That is why BWC Capital was formed: not to stand

between Woodwork and its creditors but to satisfy Harris' required deal structure. Exhibit 3, at 12:3-12.

Gereg owned BWC Capital. Exhibit 1, at 35:23-24, 49:18-19; Exhibit 3, at 12:13-16. Mr. Filer, Kelly, and Gereg all understood that as a result of the transaction, Woodwork now owed Capital the full balance of what it had previously owed to Harris, less the $575,000 purchase price, and BWC Capital now held a security interests in Woodwork's assets. See, e.g., Exhibit 1, at 43:14-24; Exhibit 3, at 67:6-68:24; Exhibit 6, at 119:3-12.

**D.      The BWC Capital/K Family Trust Agreements.**

At the time of the Harris deal, the intention was for BWC Capital to be a temporary holder of the loans, in order to provide Woodwork some time to obtain additional financing and get back on its feet, after which Kelly would have the opportunity to buy back the loans. Exhibit 1, at 50:7-20. Kelly understood, however, that Gereg stepped into the shoes of Harris and could foreclose on Woodwork just as Harris had done. As a result, Kelly was concerned that he had gone from the frying pan into the fire. Id. at 44:4-6; Exhibit 4, at 52:13-18. Although Gereg told Kelly he did not intend to foreclose on Woodwork, Mr. Filer and Kelly understood that Gereg had the legal right to do so. Exhibit 1, at 44:22-45:22; Exhibit 4, at 68:4-24. The BWC Capital/K Family Trust agreements were developed to remind Gereg of his stated intent to give Woodwork time to get back on its feet and allow Kelly to buy back the loans and retake control of the company at some undefined point in the future. Exhibit 1, at 44:7-13, 47:3-11, 49:23-50:20. Mr. Filer never attempted to conceal the agreements from anyone. Id. at 58:8-59:5, 66:1-3; Exhibit 7, at 100:4-6.

Kelly understood that the BWC Capital/K Family Trust agreements were not effective when they were signed. Exhibit 1, at 35:25-36:7. He knew that additional steps had to be taken before the agreements could go into effect. Id. at 36:8-13. For instance, he understood that before the agreement could be effective, he and Gereg had to agree on Gereg's fee and Kelly actually had

to pay the fee—something that did not occur for even the initial fee for Gereg's work on the Harris deal until July 2013. By this point, Gereg had completed over two months of additional work for Kelly so the original compensation agreement no longer applied. *Id.* at 37:1-38:16; 52:19-53:12, 55:6-24. A new agreement was never struck. Kelly also understood that ownership of BWC Capital could not transfer until Mr. Gereg agreed to transfer it. *Id.* at 39:3-22. In any event, the unexecuted agreements quickly became an afterthought, as Gereg never attempted to foreclose on Woodwork—he kept to his word and did his best to help get Woodwork back on its feet. *Id.* at 46:7-22, 55:25-57:2.

III. **The Next Set of Problems for Woodwork and the Formation of Millwork.**

The Harris deal enabled Woodwork to begin operating again. *Id.* at 83:6-7. Restarting operations enabled Woodwork to repay some of the funds it owed to the Union, the IRS, its vendors, and other creditors. *Id.* at 83:16-86:1; *see also* Exhibit 4, at 13:17-14:2. While Gereg proposed forming a second Newco to operate the Woodworking business, Mr. Filer and Kelly disagreed with Gereg and they planned for Kelly to move forward operating Woodwork. Exhibit 3, at 21:15-22:24. Kelly and Mr. Filer discussed Kelly's goal, which was always for Woodwork to get out from under Harris and to pay the Union, the IRS, its vendors, and other creditors. Exhibit 1, at 95:20-96:5. Kelly and Mr. Filer both understood and discussed with each other that Kelly could not stay in business in the Chicago market if he walked away from his financial obligations to Woodwork's vendors and the Union. Exhibit 3, at 15:20-18:20; Exhibit 4, at 14:3-17. The goal was not to cheat creditors; the goal was to continue operating and pay them. Exhibit 3, at 14:22-15:19.

After the Harris deal, Woodwork attempted to obtain a contract from Turner Construction ("Turner") for a large project that was a potential lifeline for the company. *Id.* at 24:25-25-19. But Woodwork ran into multiple problems that made that impossible. On May 10, 2013, Woodwork's

corporate status lapsed and the Illinois Secretary of State dissolved the company. *Id.* at 25:20-26:14. When Kelly tried to get Woodwork reinstated, the Illinois Department of Revenue required payment of Woodwork's past due taxes prior to reinstatement. *Id.* at 26:15-27:20. At the same time, the Union began efforts to enforce a judgment it obtained against Woodwork, sending out citation letters to Woodwork's customers and locking up Woodwork's accounts receivable just as Harris had done. *Id.* at 27:21-28:10. Despite many attempts, neither Gereg nor Kelly were successful in obtaining additional financing that would allow Woodwork to restart. Exhibit 1, at 50:21-23; Exhibit 3, at 28:23-29:16.

Turner was unwilling to enter into a contract with Woodwork due to its financial issues. A new company, Barsanti Millwork ("Millwork"), therefore, had to be formed to be the recipient of the Turner business. *Id.* at 30:4-21. Gereg was the owner of Millwork, and Kelly was an employee. *Id.* at 31:21-22, 33:8-13; Exhibit 6, at 7:8-14, 101:9-13, 107:6-8. There was no effort by anyone to conceal Kelly's involvement in the new company; in fact, Kelly's involvement was a selling point to Turner.[1] Exhibit 3, at 31:11-32:18. Kelly and Gereg signed another membership transfer agreement—this time between Millwork and the K Family Trust—which, just like the prior membership transfer agreement, Kelly understood never went into effect. Exhibit 1, at 40:17-41-23. Kelly understood that Gereg owned Millwork and that the Millwork/K Family Trust agreements did not affect Gereg's ownership. *Id.* at 60:8-61:1.

---

[1] Gereg often referred to "daylight" between the various entities, or making sure the various entities are "separate to the outside world." There was nothing fraudulent or deceptive about these statements—Gereg was explaining legal strategies to defend against potential civil successor liability lawsuits. Exhibit 1, at 91:14-93:18; Exhibit 4, at 73:14-74:1. Kelly spoke to Mr. Filer often about this topic and Mr. Filer agreed that "daylight" or "separation" was a good legal strategy from a civil litigation perspective. Exhibit 1, at 95:1-19; Exhibit 4, at 74:2-75:2.

After the formation of Millwork, Freeborn drafted documents for BWC Capital to sue Woodwork in state court. Gereg and Kelly agreed that it was in both companies' best interests to obtain a judgment and then have Woodwork transfer its equipment and other assets to BWC Capital, which would then transfer the assets to Millwork. Exhibit 3, at 39:21-41:14. The purpose of the transfer was for Millwork to use the equipment to preserve the ongoing concern value of the woodworking business, generate revenue, and eventually repay Woodwork's creditors. *Id.* at 41:15-42:1. Kelly again discussed with Mr. Filer that he wanted to work out a deal with the Union. *Id.* at 42:2-14; *see also* Exhibit 4, at 62:3-12. The parties understood that the judgment was not necessary for the transfer of Woodwork's assets, but BWC Capital had the right to foreclose on Woodwork and Gereg thought it made sense to have a public record of the transaction. Exhibit 3, at 42:15-43:2. Mr. Filer believed a judgment was unnecessary and provided no benefit, but he assisted with it nonetheless because Kelly wanted it. Exhibit 4, at 76:12-77:23. At the time of the confession of judgment, Woodwork's assets were worth less than the amount Woodwork owed to BWC Capital. Exhibit 3, at 43:16-20.

After filing the Confession of Judgment, BWC Capital obtained a judgment against Woodwork on July 3, 2013. *Id.* at 44:14-16. The court ordered Woodwork's assets to be transferred to BWC Capital on July 18, 2013. *Id.* at 44:17-19. On August 21, 2013, Freeborn's Ashley Brandt provided Kelly with an Assignment and Conveyance of Title, which documented the conveyance of Woodwork's assets to BWC Capital. *Id.* at 44:20-45:12. The document was dated July 3, 2013 to correspond to the date of BWC Capital's judgment against Woodwork. *Id.*

## IV.  Woodwork's Bankruptcy.

Ultimately, Thomas Fawkes, Mr. Filer's partner and a member of Freeborn & Peters' bankruptcy group, recommended that Woodwork file a Chapter 7 bankruptcy. *Id.* at 33:24-34:1. In the weeks leading up to the bankruptcy filing, Fawkes told Kelly and Mr. Filer that a bankruptcy

trustee would be appointed and that all of the documents related to the various transactions would have to be turned over. *Id.* at 34:5-34:13. In other words, a bankruptcy would "allow the trustee behind the curtain." *Id.* at 39:6-8. He further warned that the fact that Woodwork's accounts receivable were used to pay the full purchase price for the assignment of the Harris loans "would probably give the trustee heartburn." *Id.* at 36:6-37:21. That was not because of any fraud, but rather because the trustee might find that fair value was not given for the loans and the transfer might be voidable under the bankruptcy code. Exhibit 8, at 95:19-96:3. Fawkes was also concerned about successor liability issues between Woodwork and Millwork. Exhibit 3, at 38:8-39:5. Fawkes also informed Mr. Filer that that the trustee had the power to waive Woodwork's attorney-client privilege, meaning the trustee would be able to obtain all of Filer's emails with Kelly related to the various transactions. Exhibit 8, at 109:2-16. Despite being fully aware of the detailed and thorough investigation that would result, Mr. Filer agreed with Fawkes that Woodwork should proceed with the bankruptcy filing and Mr. Filer never instructed Fawkes to withhold or conceal any information from the trustee. *Id.* at 109:17-110:5. After the filing, the trustee immediately commenced a thorough investigation, just as Fawkes predicted. *Id.* at 110:9-111:9. The act of filing for bankruptcy was the ultimate anti-concealment. If Mr. Filer actually believed he had participated in a fraud scheme, bankruptcy would have been unthinkable.

## LEGAL STANDARD

### I.     Motion for Judgment of Acquittal.

Federal Rule of Criminal Procedure 29(c) provides that on a defendant's motion within 14 days after a guilty verdict, "the court may set aside the verdict and enter an acquittal." A Rule 29 motion should be granted where "viewing the evidence in the light most favorable to the prosecution, the record contains no evidence on which a rational jury could have returned a guilty verdict." *United States v. Murphy*, 406 F.3d 857, 861 (7th Cir. 2005) (affirming judgment of

acquittal under Rule 29(c) where "a vital link between the evidence and the charge in the indictment [was] missing"). In other words, "[a] Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (affirming judgment of acquittal where "[t]he jury's verdict . . . relied on several such speculative inferences").

"Where the evidence as to an element of a crime is equally consistent with a theory of innocence as with a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Delay*, 440 F.2d 566, 568 (7th Cir. 1971); *see also United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010) ("In this situation, the evidence is essentially in equipoise; the plausibility of each inference is about the same, so the jury necessarily would have to entertain a reasonable doubt."); *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (a court must grant a Rule 29 motion if the Government's evidence gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," because in that situation, "a reasonable jury must necessarily entertain reasonable doubt").

## II.    **Motion for a New Trial.**

Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Court should grant a new trial "if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 438 (7th Cir. 2006). The Court has extremely broad discretion in making this determination because it "heard all the evidence, watched both the witnesses and the jury," and is in the best position to determine whether any improper evidence "tipped the scale against" the defendant. *Id.*

But errors during trial are not necessary to set aside the jury's verdict. To the contrary, "if the judge believes there is a serious danger that a miscarriage of justice has occurred—that is, that

an innocent person has been convicted—he has the power to set the verdict aside, even if he does not think that he made any erroneous rulings at the trial." *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990) (citation omitted).

Unlike a motion for judgment of acquittal, a motion for a new trial does not require the Court to view the evidence in the light most favorable to the prosecution. *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). Rather, the Court "may reweigh the evidence, taking into account the credibility of the witnesses." *Id.* at 658. After reweighing the evidence, the Court should "grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *Id.* at 657; *see also United States v. Reed,* 875 F.2d 107, 113 (7th Cir. 1989) (the Court must grant a new trial if that evidence "preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand"). A new trial is required "[i]f the complete record, testimonial and physical, leaves a strong doubt as to defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal." *Morales*, 902 F.2d 604, *as modified by United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990).

## ARGUMENT

### I.    Mr. Filer is Entitled to Judgment of Acquittal.

This Court has already held that "Counts 1 and 2 turn on two issues: One, the validity of the lien held by BWC Capital; and two, Filer's intent when engaging in the charged conduct."[2] Exhibit 9, at 14:22-24. Mr. Filer is entitled to judgment of acquittal because the Government has not met its burden to prove beyond a reasonable doubt that BWC Capital's lien was invalid or that

---

[2] In reliance on the Court's prior ruling, this motion does not attempt to re-litigate *why* the validity of BWC Capital's lien is dispositive, namely, that a valid lien means BWC Capital was entitled to all of the money and property it obtained, defrauding creditors was impossible, and any representations in the enforcement of the lien were immaterial. Mr. Filer expressly reserves the right to address such issues in his reply should the Government challenge these conclusions in its response brief.

Mr. Filer knew it to be invalid. The evidence in the record is insufficient to allow the Court (which should make the determination as a matter of law) or a reasonable jury to find that BWC Capital's lien was extinguished, let alone that Mr. Filer *knew* the lien was extinguished and intended to defraud Woodwork's creditors by helping BWC Capital enforce an invalid lien. Moreover, application of the wire fraud statute to Mr. Filer's conduct in this case would be a novel interpretation of the statute that would violate Mr. Filer's due process rights. Separate and apart from the lien's validity, Mr. Filer is entitled to judgment of acquittal because the Government failed to prove any material misrepresentations or that the alleged wire transmissions were made for the purpose of executing the alleged scheme.

### A. The Government Presented Insufficient Evidence to Prove Beyond a Reasonable Doubt That BWC Capital Did Not Hold a Valid Lien.

The Government's theory as to why BWC Capital's lien was invalid is unclear and has shifted throughout the trial. There is no dispute that the transaction between Harris and BWC Capital "permitted BWC Capital to step into the shoes of Harris Bank." Exhibit 10, at 40:11-12. But the Court has held that the open question "is whether the lien was extinguished when Harris Bank transferred the debt to BWC Capital." *Id.* at 40:13-14. As the Court has framed the issue, the question is "whether Kelly controlled BWC Capital such that when [BWC Capital] stepped into Harris Bank's shoes, Kelly acquired his own lien. If Kelly, in fact, acquired his own lien, the lien would have been extinguished." *Id.* at 41:4-7.

The only theory vaguely referenced in the Government's case in chief as to how the lien could possibly have been extinguished is a theory of "merger." Markell testified, in passing, that "the doctrine of merger … says that if you buy debt that you owe, it cancels out." Exhibit 11, at 20:5-7. The Northern District of Illinois has described the merger doctrine by stating that "when the same person who is bound to pay is also entitled to receive, there is an extinguishment of

rights." *In re Kreisler*, 331 B.R. 364, 378 (Bankr. N.D. Ill. 2005) (quotation omitted). Whether Woodwork's debt to BWC Capital was extinguished under the merger doctrine is a question of law for the Court. But even if left to the jury, the Government has presented insufficient evidence that the lien was extinguished.[3]

### 1. BWC Capital Held a Valid Lien as a Matter of Law.

The Government's case depended on proving that Woodwork acquired its own debt. The Government contends that if Woodwork acquired its own debt, the debt was extinguished. If it did not acquire its own debt, then BWC Capital had a valid lien and the right to assert its priority against other creditors. It is undisputed that Harris assigned the loans and lien to BWC Capital, which was a separate legal entity than the debtor, Woodwork. Therefore, the Government bears the burden of proving beyond a reasonable doubt that BWC Capital was not a legal entity separate from Woodwork (and that Mr. Filer *knew* that). This must be something more than a vague concept of "control." A parent controls a subsidiary, yet it is axiomatic that a subsidiary can owe money to a parent company. A controlling shareholder can loan money to a corporation despite its controlling interest. *See, e.g., In re Charles Crook Wholesale Produce*, 7 F.3d 222 (4th Cir.1993) ("There is no prohibition against a dominant shareholder's lending money to a corporation.").[4] How then can the Government prove beyond a reasonable doubt that Woodwork and BWC Capital

---

[3] In his surprise rebuttal testimony, Markell offered additional "opinions" as to why Woodwork did not owe a debt to BWC Capital. He opined that BWC Capital was not an arm's length third party, but rather Woodwork's agent, and that an agent cannot hold the debt of its principal. Exhibit 12, at 11:14-12:14. He also characterized the ineffective K Family Trust membership assignment agreements as "option contracts" that gave Kelly ownership in BWC Capital. *Id.* at 12:23-13:8. As explained in Section II.A, *infra*, these improper and inaccurate legal conclusions were contrary to the Court's rulings, contrary to the evidence and the law, and were inadmissible. Accordingly, that testimony should not be considered by the Court in determining Mr. Filer's motion for judgment of acquittal.

[4] Indeed, courts are loathed to take a position that "discourage[s] loans from insiders to companies facing financial difficulty" because "it is the shareholders who are most likely to have the motivation to salvage a floundering company." *In re Kids Creek Partners, L.P.*, 200 B.R. 996, 1020 (Bankr. N.D. Ill. 1996).

are the same entity? The Government never put forth a legal theory supporting this position, let alone that Mr. Filer knew about this legal theory, and Mr. Filer's conviction must be vacated for that reason alone.

The only way for the debt to be extinguished under the merger doctrine is if the Court makes an equitable determination to pierce the corporate veil, meaning to disregard the corporate structures and find that in the interests of justice, Woodwork and BWC Capital should be regarded as the same entity. *In re Kreisler*, 331 B.R. at 378-79 (where Garlin Mortgage Corp. was the holder of the mortgage and K&E LLC was the mortgagor, but the trustee alleged that a merger occurred because the same people controlled both entities, the court was required "to find that Garlin is not a legal entity separate and distinct form K&E LLC, and to conclude that they are one in the same"). "Piercing the corporate veil is not favored and in general, courts are reluctant to do so." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008); *see also Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co., Inc.*, 826 F.2d 725, 728 (7th Cir. 1987) ("[S]eparate corporate existence is the rule to which piercing the corporate veil is a stringently applied exception."). Although the required veil-piercing analysis involves factual findings, the ultimate determination of whether to disregard the separate corporate entities is a question of law for the Court. *See, e.g.*, *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 737 (7th Cir. 2004) ("[U]nder Illinois law, piercing the corporate veil is an equitable remedy to be determined by the court."); *Jones v. Hoosman*, No. 05 C 2909, 2006 WL 1302524, at *4 (N.D. Ill. May 9, 2006) (striking plaintiff's jury demand "insofar as it relates to determination or whether or not we should pierce the corporate veil on the basis of an alter ego theory," because "[w]hether to pierce the corporate veil is a matter of the trial court's discretion").

In opposing Mr. Filer's Rule 29 motion at the close of all the evidence, the Government asserted that these civil court principles did not apply to criminal cases. Exhibit 9, at 2:19-25. But this argument turns the burden of proof on its head. Mr. Filer does not bear the burden of proving that the doctrine of merger through piercing of the corporate veil does not apply; the Government bears the burden of proving beyond a reasonable doubt that this doctrine or some other doctrine applies to eliminate the corporate separation between BWC Capital and Woodwork (and that Mr. Filer knew that). Upon reflection, that neither the parties nor the Court could find any criminal cases applying the merger doctrine should weigh in favor of Mr. Filer—not against him. The Government must prove beyond a reasonable doubt that the lien was extinguished *and* that Mr. Filer knew it was extinguished. If the veil-piercing analysis does not apply in the criminal context, then how could the Court (or any rational jury) find that Woodwork acquired its own debt? What is the legal basis for treating Woodwork and BWC Capital as the same entity? If the concept of veil-piercing should not apply in this criminal case, then the Court must find as a matter of law that the debt was not extinguished and that BWC Capital's lien was valid, and the Court must enter a judgment of acquittal.

2.     Even if Left to the Jury, the Government Presented Insufficient Evidence for a Jury to Find that BWC Capital's Lien Was Extinguished *and* That Mr. Filer Knew the Lien Was Extinguished.

Regardless of whether the Court or the jury makes the determination, the Government presented insufficient evidence to demonstrate that Woodwork acquired its own debt, that the lien was extinguished, and that Mr. Filer knew the lien was extinguished. Neither the Court nor any reasonable jury could find that Kelly owned BWC Capital.

First, although the Government has proceeded on a theory that Kelly "controlled" BWC Capital, mere control is insufficient to extinguish BWC Capital's lien. Rather, the Government must prove beyond a reasonable doubt that there was "a unity of interest *and ownership*" of the

creditor and debtor such that there was an extinguishment of rights. *In re Kreisler*, 331 B.R. at 379 (emphasis added); *see also Access Realty Grp., Inc. v. Kane*, 2019 IL App 1st 180173 (2019), ¶ 26 (finding merger because the debt was held by an entity that the debtor "*wholly owns and controls*") (emphasis in original). The Government did not—and could not—present any evidence to the jury that Kelly *owned* BWC Capital. Kelly testified repeatedly and unequivocally that Gereg owned BWC Capital. Exhibit 1, at 35:23-24, 49:18-19; Exhibit 3, at 12:13-16. Gereg also testified in his deposition, which was admitted into evidence, that he was the owner of BWC Capital. Exhibit 6, at 7:8-14. The undisputed fact that Gereg owned BWC Capital prevents the Government from establishing the invalidity of the lien. BWC Capital was entitled to assert its lien to stand between Woodwork and the unsecured creditors.

Second, even if a theory that Kelly "controlled" BWC Capital was sufficient to establish that Woodwork acquired its own debt, the Government presented insufficient evidence to prove that theory beyond a reasonable doubt. The Government relied upon the membership assignment agreement between BWC Capital and the K Family Trust as its attempt to prove control. But as the Court has already recognized, "the government, Filer and all of the witnesses agree that the documents transferring control of BWC Capital to the K Family Trust were not effective and no such transfer took place." Exhibit 10, at 40:23-41:1. There was no evidence that Gereg, a witness in the Government's control who it decided not to call, believed the assignment agreements were effective or that Kelly had any control over BWC Capital as a result. If control of BWC Capital never transferred to the K Family Trust, no rational juror could find that the membership assignment agreement gave Kelly any control over BWC Capital.

Nor can the Government's assertion that the agreement gave Kelly "leverage" over Gereg salvage its theory—it is not as if Kelly could just fill in the blanks on the agreements and take over

17

the company. Kelly understood that before the agreement could be effective, he and Gereg had to agree on Gereg's fee and Kelly actually had to pay the fee—which was an issue that was never fully resolved. Exhibit 1, at 37:1-38:16; 52:19-53:12, 55:6-24. He also understood that ownership of BWC Capital could not transfer until Mr. Gereg agreed to transfer it. *Id.* at 39:3-22. And importantly, Kelly knew that he could not sue to enforce the agreement if Gereg refused to transfer ownership, which the Government recognized was true. *Id.* at 2:23-3:7; Exhibit 10, at 6:20-21. There is simply no evidence in the record that could lead a reasonable juror to conclude the membership assignment agreement gave Kelly control of BWC Capital.

The record also is devoid of any *other* evidence from which a rational jury could find that Kelly controlled BWC Capital. To the contrary, on direct examination, Kelly testified that although he did not want Gereg to control, Gereg indeed "had control of the activities of BWC Capital." Exhibit 13, at 79:4-6; 83:1-7. Kelly also testified that he did not have access to BWC Capital's bank account and had no control over the company's money. Exhibit 1, at 61:23-62:20. Furthermore, Kelly repeatedly testified that it was his plan to "***ultimately***" control BWC Capital "***at some point.***" Exhibit 13, at 23:15, 88:21-22, 91:2; Exhibit 14, at 18:23-24, 64:24. This testimony contradicts any notion that Kelly exercised control over BWC Capital during the relevant time period. Tellingly, the Government chose not to call Gereg, knowing that his testimony also would not support the Government's "control" theory. Gereg testified in his deposition that BWC Capital was *his* company. Exhibit 6, at 7:8-14.

There is simply no evidence in the record by which the Court or jury could conclude that BWC Capital's lien was extinguished. Woodwork did not acquire its own debt. Accordingly, BWC Capital held a valid lien on Woodwork's assets and was entitled to enforce that lien in any manner

18

it saw fit. The exercise of legal rights to obtain money or property to which one is entitled is not fraud. Accordingly, the Court should enter a judgment of acquittal.

**B.  Even if BWC Capital's Lien Was Extinguished Based on Some Unknown Legal Principle, No Reasonable Jury Could Find That Mr. Filer Acted With Intent to Defraud.**

As deficient as the Government's evidence is about Kelly's control or ownership of BWC Capital, there is absolutely no evidence, circumstantial or direct, that Mr. Filer knew or believed the lien was extinguished.  There is no evidence that Mr. Filer embraced any of the Government's legal theories of extinguishment (flawed as they are) or that he believed BWC Capital was enforcing an invalid lien. Assuming, *arguendo*, that BWC Capital did not have a valid lien and did not have a legal right to stand between Woodwork and its other creditors, Mr. Filer is still entitled to a judgment of acquittal because there is no evidence in the record to suggest that he believed the lien was invalid in 2013. Accordingly, no rational jury could have found that Mr. Filer intended to defraud Woodwork's creditors.

As an initial matter, there is no evidence that Mr. Filer engaged in any merger analysis in 2013 or that as a construction lawyer, he even knew what the doctrine of merger was. Nor is there any evidence thar Mr. Filer considered any of the esoteric legal concepts offered in Markell's improper rebuttal testimony as a basis for extinguishing Woodwork's debt. Rather, all of the evidence in the record indicates that Mr. Filer believed BWC Capital held a valid lien and was entitled to enforce that lien ahead of Woodwork's other creditors.

All of the testimony indicates that Mr. Filer believed BWC Capital had a legal right to exercise its lien and obtain Woodwork's assets. Mr. Filer himself took the stand and testified that he believed Woodwork owed BWC Capital the face amount of the loan, less the $575,000 credit for the use of Woodwork's accounts receivables. Exhibit 4, at 67:6-68:24.

Kelly's testimony also supports Mr. Filer's good faith intent. Kelly likewise testified that he believed there was a debt—Woodwork owed BWC Capital the value of the loans less the $575,000 purchase price—and that BWC Capital held a valid security interest in Woodwork's assets. Exhibit 1, at 43:14-24; Exhibit 3, at 50:3-4. Importantly, Kelly also testified that Mr. Filer *told* Kelly that BWC Capital held a security interest in Woodwork's assets, thus evidencing Mr. Filer's belief at the time that BWC Capital in fact held the lien. Exhibit 1, at 43:25-44:3. Kelly further testified that he understood that BWC Capital had the legal right to foreclose on Woodwork just as Harris did. *Id.* at 44:18-23.[5] Indeed, Kelly communicated his understanding to Mr. Filer at the time that "BWC Capital was a secured lender and had the UCC filings, so the union would come behind them on any assets that [Woodwork] may have." Exhibit 14, at 7:21-22. Kelly did not say BWC Capital was "pretending" to be a secured lender or "pretending" that it had the UCC filings—BWC Capital was a secured lender with a UCC filing in place. This was the reality of everyone's understanding at the time.

Gereg likewise testified in his deposition that he had stepped into the shoes of Harris and that Woodwork owed BWC Capital the remaining debt, less the $575,000 credit Woodwork received for the purchase price. *See* Exhibit 6, at 119:3-12. Accordingly, Gereg believed that BWC Capital had "a senior lien on all the assets" of Woodwork. *Id.* at 128:11-12.

The documentary evidence also demonstrated Mr. Filer's belief that BWC Capital was owed a debt by Woodwork. Most notably, in a March 14, 2013 email, weeks before BWC Capital was ever formed and entered into the transaction with Harris, Mr. Filer demonstrated his understanding of what the consequences would be of Gereg owning Newco. Mr. Filer warned that

---

[5] Gereg expressed to Kelly that he did not intend to foreclose on Woodwork, but Kelly understood that Gereg had the legal right to do so. Exhibit 1, at 44:24-45:23. Mr. Gereg's subjective intent not to foreclose on Woodwork does not change the fact that he had a legal right to do so.

in that scenario, Woodwork would "still have the debt hanging on [its] neck." *See* <u>Exhibit 15</u>. For this reason, Mr. Filer recommended against Gereg owning the new company, telling Kelly it was "[n]ot a good idea." *Id.* Mr. Filer and Kelly both confirmed in their testimony that Mr. Filer only changed his mind and ultimately agreed to Gereg owning BWC Capital because Harris had left Woodwork with "no choice." <u>Exhibit 3</u>, at 11:12-12:12; <u>Exhibit 4</u>, at 10:11-20.

The record is clear that all parties believed BWC Capital's lien was valid and that the company could exercise its legal rights accordingly. There is simply no documentary or testimonial evidence that Mr. Filer believed the lien was extinguished. On this record, no reasonable jury could find that Mr. Filer acted with intent to defraud. Thus, Mr. Filer is entitled to a judgment of acquittal.

### C.  Application of the Wire Fraud Statute as Applied to the Circumstances of This Case Violates Mr. Filer's Due Process Rights.

Mr. Filer did not have fair notice that his conduct could be considered a federal crime. Due process requires that a criminal statute "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402-03 (2010). "[A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute," it has long been understood that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Moreover, the rule of lenity requires a court to "resolv[e] ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id.*

The wire fraud statute prohibits making material misrepresentations as part of a scheme to obtain money or property to which one is not entitled. But a senior lienholder is undisputedly *entitled to obtain* the secured assets of a defaulted debtor. Thus, even deception by a secured

lienholder in the process of obtaining a debtor's assets does not constitute wire fraud because the lienholder is entitled to the property at issue. The Government's reading of 18 U.S.C. § 1343, however, is that the lienholder's conduct constitutes wire fraud if there is a potential basis under civil law doctrines to invalidate the lien. No reasonable person could ever understand the wire fraud statute to criminalize a lienholder's efforts to enforce its lien in the event of on an after-the-fact determination, based on civil law theories, that the lien was invalid.

To be sure, there very well could be legal theories under which a creditor or a bankruptcy trustee could attempt to challenge the validity of BWC Capital's lien through civil litigation. But imposing *criminal* liability based on potential *civil* causes of action would be novel. The undersigned counsel's extensive research has revealed several cases in which parties sought to impose civil liability based on merger, veil piercing, and fraudulent conveyance theories, but counsel was unable to locate a single case in which a court has imposed criminal liability under similar circumstances. Neither 18 U.S.C. § 1343 nor any court decision interpreting it provide fair notice that a lienholder's enforcement of its lien could constitute fraud in the event that the lien was later determined to be invalid. Unless and until a court found that BWC Capital's lien was invalid or that Woodwork's debt was somehow extinguished, Mr. Filer could not possibly have notice that attempts by BWC Capital to assert its facially valid lien—obtained through an assignment agreement with Harris that all parties agree was valid—could constitute a federal crime. Therefore, even if the Court finds that BWC Capital did not hold a valid lien and the debt was extinguished, application of the wire fraud statute in this case would violate due process.

The implications of a holding to the contrary are staggering. Attorneys would be unwilling to help friendly creditors attempt to collect on problem loans. They would be reluctant to assist shareholders seeking repayment of loans they made to their own companies. All it would take is

one allegation from an angry creditor or a zealous prosecutor claiming that the debt at issue was "extinguished," and the attorneys' efforts to help their clients could be converted into federal crimes. Every email discussing legal strategies to collect the debt could suddenly become wire transmissions in furtherance of a fraud. That is not the law. Civil causes of action to invalidate a debt or unwind asset transfers must stay in the civil realm—attorneys should not be put in the position of guessing whether efforts to assist a lienholder in enforcement actions could subject them to criminal liability if the lien is ultimately deemed invalid. The Constitution demands more. Mr. Filer is entitled to a judgment of acquittal.

### D.     No Reasonable Juror Could Find That the Alleged Misstatements in Connection with BWC Capital's Enforcement of its Lien Were Material.

"To prove a scheme to defraud, the government must show that [the defendant] made a material false statement, misrepresentation, or promise, or concealed a material fact." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). The Court has already found that the materiality of the alleged misstatements made in connection with BWC Capital's enforcement of the lien "depends entirely on whether BWC Capital held a lien on Barsanti Woodwork's assets." Exhibit 10, at 42:11-13. If BWC Capital held a valid lien, the alleged misstatements were immaterial because they "only allowed BWC Capital to take actions it would already have been permitted to take." *Id.* at 42:15-18. Because the Government has provided insufficient evidence that the lien was invalid, it has also provided insufficient evidence of any material misstatements.

Even assuming that BWC Capital did not hold a valid lien, the alleged misstatements were still immaterial. The Government alleges two misstatements: backdating the Change in Terms Agreements and overstating the loan balance in the Confession of Judgment Complaint. Neither can constitute material misrepresentations as a matter of law.

23

First, the Government's theory that backdating the Change in Terms Agreements concealed a lack of consideration for the agreements is flawed. The consideration for the confession of judgment provision is an extension of the maturity dates on the loans to May 20. Even though the Change in Terms Agreements were executed after that date, there is no dispute that Woodwork was in default on the loans at the time they were assigned to BWC Capital, and that Gereg agreed not to foreclose immediately on the loans. Regardless of whether Gereg and Kelly agreed specifically to a date certain, the extension of time *was* valuable consideration provided in exchange for the confession of judgment provision. This is true even though the agreements were documented after the consideration was provided. *See, e.g.*, *Warner Agency, Inc. v. Doyle*, 133 Ill. App. 3d 850, 857 (4th Dist. 1985) (listing situations where past consideration is sufficient to support an agreement, including where "the consideration was rendered at the request of the promisor"); *see also Town & Country Bank of Quincy v. E. & D. Bancshares, Inc.*, 172 Ill. App. 3d 1066, 1075 (4th Dist. 1988) ("[A]n agreement to forebear need not be in express terms or for an exact period of time."). Moreover, even assuming the Change in Terms Agreements lacked consideration, the backdating cannot be material because the confession of judgment—and thus the Change in Terms Agreements—were not needed to carry out the defendants' plan. The Government's own expert opined that the alleged benefit of a confession of judgment—that the proceedings will move quicker—also exist where a creditor simply files a regular lawsuit that the debtor does not contest. Exhibit 11, at 58:8-16.

Second, the overstated loan balance was immaterial. It is undisputed that whatever the true amount of the debt owed under the loans, it exceeded Woodwork's assets. Exhibit 3, at 43:16-20. Therefore, even if the correct loan balance was used, the result of the confession of judgment proceedings would have been identical: BWC Capital would have obtained a judgment against

Woodwork that exceeded the value of Woodwork's assets, and Woodwork would have transferred *all* of its assets to BWC Capital in *partial* satisfaction of that judgment. The loan balance listed in the complaint was not capable of influencing anyone.[6]

### E. No Reasonable Juror Could Find That the Wire Transmissions Were Made for the Purpose of Executing the Alleged Scheme.

The Government must prove that the wire transmissions alleged in Counts 1 and 2 were made "in furtherance of" the alleged scheme. The wire fraud statute "does not reach every single use of the [wires] that is in any way remotely related to a scheme to defraud." *United States v. Seward*, 272 F.3d 831, 835-36 (7th Cir. 2001). It is not sufficient to prove merely that the wire transmission was "a result of the fraudulent scheme." *United States v. Maze*, 414 U.S. 395, 405 (1974). Rather, the wire transmission must be "for the purpose of executing such a scheme" and must be "causally linked to the scheme's success." *United States v. Kwiat*, 817 F.2d 440, 443 (7th Cir. 1987). "In other words, the success of the scheme must in some measure depend on the [wire transmission]." *Seward*, 272 F.3d at 836; *see also Kwiat*, 817 F.2d 443 (the wire transmissions must "make the fraud possible or facilitate it"). Where the wire transmission "had little effect" on the alleged scheme or was "too remote" from the alleged scheme, it will not support a conviction under 18 U.S.C. § 1343. *See United States v. Staszcuk*, 502 F.2d 875, 880-81 (7th Cir. 1974). The Government did not meet its burden of proof with respect to the wire transmissions alleged in Counts 1 and 2.

---

[6] Although the Indictment alleges that Mr. Filer deceived Harris, the Court has already held that the alleged "lack of candor" to Harris is "not part of Counts 1 and 2." Exhibit 9, at 16:15-23. Although the negotiations with Harris "could be argued as part of the scheme," the alleged misrepresentations "would not support a scheme itself." *Id.* at 16:15-17:16. Accordingly, Mr. Filer does not address the alleged misrepresentations to Harris in this section. Mr. Filer reserves all rights to address those issues in a reply brief should the Court's conclusions be challenged by the Government in its response to this motion.

1.     <u>The Email Charged in Count 1 Did Not Execute the Alleged Fraud.</u>

Count 1 charges an August 21, 2013 email from Kelly to Gereg, Brandt, Lichtenfeld, and Mr. Filer, which attached an Assignment and Conveyance of Title between Woodwork and BWC Capital. *See* Dkt. 64 at 26 and ¶ 57; *see also* <u>Exhibit 16</u>. The Government introduced no evidence that this email attaching the Assignment and Conveyance of Title furthered the alleged fraud in any way. Rather, the Government's case focused entirely on the state court action that proceeded the execution of the Assignment and Conveyance of Title. According to the Government, the act of obtaining the judgment in state court is the act that allegedly "deterred" creditors from attempting to assert their rights against Woodwork. There is no evidence in the record that the Assignment and Conveyance of Title was sent to any creditor or used in any way to further the scheme. Without this evidence, there is no way that a rational jury could find that the email that is the subject of Count 1 was sent for the purpose of executing the alleged scheme.

The Seventh Circuit's decision in *United States v. McClain*, 934 F.2d 822 (7th Cir. 1991), is instructive. In that case, the scheme involved submitting a fraudulent parking study to the City of Chicago. *Id.* at 835. The co-schemers decided that it would enhance the study's credibility if they possessed additional credentials, so they submitted an application to become members of the Institutional and Municipal Parking Congress ("IMPC"). *Id.* The mailing of the membership application was charged as an execution of the scheme. *Id.* The Seventh Circuit found "a fundamental defect in the mail fraud conviction" because although the defendants "apparently believed at one point that IMPC membership would enhance their credibility, they must have changed their mind: no indication of these credentials appears on the study" that was provided to the City of Chicago. *Id.* The court vacated the mail fraud conviction, holding:

> While at the time of the mailing, the defendant believed the credentials would be used to facilitate the fraud, we do not believe that an earlier and apparently abandoned intent is sufficient. Whatever may have been the original purpose of the

mailings, if their subject was never used in furtherance of the scheme, they cannot properly serve as predicates to a mail fraud conviction.

*Id.*

The Seventh Circuit's reasoning applies equally to this case and requires judgment of acquittal on Count 1. Even if the Government proved that the Assignment and Conveyance of Title was *created* to facilitate the fraud in some way, that original purpose cannot serve as the predicate to a wire fraud conviction without proof beyond a reasonable doubt that the Assignment and Conveyance of Title (and thus the wire transmission), was actually *used* to further the fraud in some way. Without evidence that the Assignment and Conveyance of Title was used to deter creditors or otherwise prevent them from obtaining money or property to which they were entitled, no rational jury could find that the email charged in Count 1 was "causally linked to the scheme's success" or that the "success of the scheme ... depend[ed] on" the email. *Kwiat*, 817 F.2d at 443; *Seward*, 272 F.3d at 836. As such, Mr. Filer is entitled to judgment of acquittal on Count 1.

2.   <u>The Email Charged in Count 2 Did Not Execute the Alleged Fraud.</u>

Count 2 suffers from the same infirmities. It charges an August 22, 2013 email in which Gereg suggests that Kelly endorse accounts receivable checks to BWC Capital and possibly send a notice to Woodwork's customers requesting that they remit their payments to BWC Capital directly. *See* Dkt. 64 at 27 and ¶ 58; *see also* <u>Exhibit 17</u>. Mr. Filer forwarded the email and inquired of Fawkes "should we tell Bob to stop communicating with us like this? I.E. all verbal?" to which Fawkes replied "Yes." *Id.* Much like the email in Count 1, the Government never provided any evidence that Mr. Gereg actually sent the suggested communications to Woodwork's customers or that Kelly took any actions in response to the email. Moreover, the alleged fraud scheme was completed prior to August 22, 2013. The Government alleges that the scheme was to conceal assets from Woodwork's creditors by falsely representing that those assets "had been taken by a secured

27

creditor in arms-length transactions and that collection activities by legitimate creditors … would be futile." Dkt. 64 ¶ 4. As discussed above, the alleged purpose of the scheme was completed when BWC Capital obtained the state court judgment and order directing the conveyance of Woodwork's assets to BWC Capital that allegedly deceived Woodwork's creditors—both of which occurred over one month prior to August 22. The email simply could not have been for the purpose of executing the scheme because the alleged scheme had already "reached fruition" and "there is no indication that the success of [the] scheme depended in any way on" the email. *See Maze*, 414 U.S. at 404.

Nor is there any evidence in the record to suggest that Filer's response email was for the purpose of concealing the antecedent alleged scheme. To the contrary, Fawkes testified that the email had nothing to do with an alleged scheme. At that time, Freeborn was anticipating litigation with the bankruptcy trustee, and Fawkes stated that the discussion in this email concerned normal considerations in advance of anticipated litigation. Exhibit 8, at 80:16-81:14. He explained that he believed it was in the best interests of Freeborn and Woodwork "to limit, as much as possible, e-mail communications, which oftentimes can be hastily written, imprecise, and could cause confusion on the part of the trustee." *Id.* at 81:11-14. Robert Chapman likewise testified that limiting non-privileged email communications in advance of litigation is part of ordinary litigation conduct for any lawyer and is typically required to comply with a lawyer's standard of care.

This email had no effect on the alleged scheme; it is simply "too remote" to support a wire fraud conviction. *Staszcuk*, 502 F.2d at 880-81. Neither the sender or recipient of the email nor any other witness testified that it facilitated the antecedent scheme in any way. Put simply, there is absolutely no evidence in the record that would allow a reasonable juror to find that the "success

of the scheme … depend[ed] on" the email. *Seward*, 272 F.3d at 836. Accordingly, Mr. Filer is entitled to judgment of acquittal on Count 2.

## II. **Alternatively, Mr. Filer is Entitled to a New Trial.**

No rational juror could have convicted Mr. Filer on the evidence in the record, but even if the Court disagrees, Mr. Filer is entitled to a new trial. First, improper testimony from Bruce Markell prejudiced the jury's verdict. Second, the weight of the evidence contradicts the jury's verdict. Finally, the Government's case was misleading and confusing, creating a high risk of juror confusion and prejudice.

### A. **Bruce Markell's Improper and Unfairly Prejudicial Testimony Warrants a New Trial.**

The Government used its rebuttal case to spring undisclosed expert testimony on the defense. On the last day of trial, under the guise of rebutting the testimony of Neil Bivona—a banker who testified about banking practices, not legal doctrines—Bruce Markell took the stand and usurped the role of the Court by telling the jury what the law is. Not only were his opinions improper legal conclusions, but in many instances, they were incorrect legal conclusions and were contrary to the evidence and the Court's prior rulings. This testimony created a substantial danger that the jury convicted Mr. Filer based on Markell's incorrect instruction on the law. Its admission warrants a new trial.

#### 1. The Late Disclosure of Markell's Testimony Was Fundamentally Unfair.

Given the complexity of this case, the Court ordered the Government to disclose rebuttal expert testimony 60 days before trial. Dkt. 60. On April 8, 2021, the Government disclosed Markell as its rebuttal witness but did not disclose any opinions or bases for opinions that he would offer in his rebuttal testimony. *See* Dkt. 94. The defense requested that the Government provide notice of any opinions and bases that Markell would offer in rebuttal so that it could adequately prepare

for cross-examination. Government counsel agreed to do so before the close of its case in chief, and on June 24, 2021, it provided notice of Markell's rebuttal opinions. Exhibit 18. The notice provided that Markell would rebut a single opinion of defendant's expert Neil Bivona: that "use of a 'friendly creditor' is not an uncommon practice in workout scenarios." *Id.* at 2. The defense proceeded to put on its case in reliance on the Government's representations concerning the scope of Markell's original rebuttal disclosure.

The evening before the last day of testimony, during the jury instruction conference, the Government orally disclosed that it intended to elicit testimony from Markell regarding the doctrine of "merger," including whether the debt between Woodwork and BWC Capital was extinguished under the merger doctrine in this case. Accordingly, Mr. Filer filed a motion to limit Markell's testimony by precluding him from offering this opinion on the basis that it was not a rebuttal opinion and should have been provided in the Government's case in chief, that it was an improper legal opinion, and that it was prejudicial. *See* Dkt. 167.

At 9:26 AM the following morning, just hours before Markell was set to testify, the Government provided a laundry list of no less than six different "rebuttal" opinions it intended to elicit from Markell. Exhibit 19. These opinions were not rebuttal, they were improper legal opinions, and they were unfairly prejudicial. After two separate arguments, the Court admitted each of the opinions over defense counsel's vigorous objection. Exhibit 20; Exhibit 21.

Markell's opinions were not proper rebuttal testimony, but even if they were, the Court should take the Government's late disclosure into account when determining whether a new trial is warranted in the "interest of justice." Fed. R. Crim. P. 33. Although Federal Rule of Criminal Procedure 16 does not require pre-trial disclosure of rebuttal testimony, courts recognize that the Government does not have "carte blanche in every case to spring a surprise expert witness on an

unsuspecting defendant who has long since disclosed his own expert's prospective testimony." *United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007) (stating that springing surprise expert testimony on the defendant "one day before the end of the defense case … was a sharp practice, unworthy of a representative of the United States."). The Second Circuit has noted that late disclosure of expert rebuttal testimony "might well violate due process" in certain cases. *Id.* Indeed, the Supreme Court has held that "discovery must be a two-way street," and that "[i]t is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." *Wardius v. Oregon*, 412 U.S. 470, 475-76 (1973).

In this case, where the Court ordered disclosure of rebuttal experts 60 days before trial, where the Government disclosed only a single opinion in rebuttal to Mr. Bivona's testimony during the trial, and where the Government inexplicably waited until the morning of Markell's testimony (after Mr. Filer had essentially concluded his defense case), to spring a half-dozen additional opinions on the defense, the Government's conduct violated fundamental notions of fairness.

### 2. Timing Aside, Markell's Testimony Was Improper and Prejudicial.

Markell's rebuttal testimony was improper for numerous reasons. Most notably, his testimony largely consisted of bare legal conclusions. This testimony severely prejudiced Mr. Filer and created a substantial risk—if not a high likelihood—that the jury convicted Mr. Filer on Markell's legal opinions and conclusions that involved issues not addressed by the Court's instructions.

"[I]n a trial, there is only one legal expert—the judge." *Pivot Point Int'l, Inc. v. Charlene Prod., Inc.*, 932 F. Supp. 220, 225 (N.D. Ill. 1996) (Easterbrook, J., sitting by designation). "[T]he law … that a jury applies is the law given to it by the judge in his instructions, not the legal opinion offered by a witness, including an expert witness." *United States v. Farinella*, 558 F.3d 695, 700

(7th Cir. 2009); *see also Panter v. Marshall Field & Co.*, 646 F.2d 271, 294 n. 6 (7th Cir.1981) ("It is not for witnesses to instruct the jury as to applicable principles of law, but the judge."). "Expert testimony that usurp[s] ... the role of the trial judge in instructing the jury as to the applicable law ... by definition does not aid the jury in making a decision; rather it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Davis v. Duran*, 277 F.R.D. 362, 371 (N.D. Ill. 2011). Accordingly, a district court should exclude a law professor's testimony where the testimony is "largely on purely legal matters and made up solely of legal conclusions." *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

The danger of allowing this type of legal testimony was aptly explained by the Tenth Circuit in *Specht v. Jensen*, 853 F.2d 805, 808-810 (10th Cir. 1988). As the court explained, "the jury may believe the attorney-witness, who is presented to them imbued with all the mystique inherent in the title 'expert,' is more knowledgeable than the judge in a given area of the law." *Id.* at 809. That danger was especially acute here because Markell is not only a professor of law but a retired bankruptcy court judge. *See id.* ("Indeed, in this case, the expert's knowledge and experience was made known to the jury by both the court and counsel in a manner which gave his testimony an aura of trustworthiness and reliability."). In this situation, "there is a substantial danger the jury simply adopted the expert's conclusions rather than making its own decision." *Id.*

Markell's legal conclusions were especially prejudicial because most of them were "bare conclusion[s] that provided nothing but the bottom line." *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.* It is well-established in the Seventh Circuit that this type of "because I said so" testimony is "worthless." *Id.*

Finally, there is another critical reason that the admission of Markell's legal testimony was irrelevant and particularly prejudicial in this case: there is no evidence in the record that Mr. Filer ever considered or even knew about the various legal theories proffered by Markell. Markell's opinions, therefore, have absolutely no bearing on Mr. Filer's intent. Yet the jury, unfamiliar with the specialized nature of the practice of law, could very easily infer that because Professor Markell believes a certain legal principle to be true, then Mr. Filer, also an accomplished lawyer, certainly knew about the same legal principles.

As detailed below, admission of Markell's opinions was error. There can be little question that "there is a reasonable possibility" that Markell's testimony "had a prejudicial effect upon the jury's verdict." *Van Eyl*, 468 F.3d at 438.

a)  *Improper Opinion that Woodwork's Debt Was Extinguished Because Kelly Owned BWC Capital.*

Perhaps the most prejudicial of Markell's opinions is that the debt between BWC Capital and Woodwork was extinguished due to the mere "existence" of the membership assignment agreements between the K Family Trust and BWC Capital, because those agreements essentially made Kelly the owner of BWC Capital. Exhibit 12, at 12:15-22. Markell told the jury that these agreements gave Kelly "an option to become the owner," and "the existence of an option to become the owner, that puts you in the same place as, basically, as an owner." *Id.* at 12:23-13:8.

This opinion addressed the core issue of the case: Whether the debt owed by Woodwork to Harris was extinguished when it transferred to BWC Capital. There was no issue more central to the jury's decision. This option contract pronouncement was offered for the first time in "rebuttal" testimony and provided an independent basis for the jury to conclude there was a fraud scheme because the debt did not exist. This opinion was improper for numerous reasons.

33

First, the legal effect of a contract such as the membership assignment agreements is purely a question of law. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) ("The interpretation or legal effect of a contract is a question of law to be determined by the court."); *Lineas Aereas Comerciales S.A. de C.V. v. Jet Support Servs., Inc.*, No. 17 C 8666, 2020 WL 1974377, at *7 (N.D. Ill. Apr. 24, 2020) (resolving the parties' dispute as to when a contract went into effect); *Higgins v. Conopco, Inc.*, No. 06 C 7077, 2008 WL 216380, at *4 (N.D. Ill. Jan. 23, 2008) (analyzing motion to dismiss arguing that an agreement "never went into effect because, under the terms of the agreement, it was to be 'effective upon execution by the parties....'"). Accordingly, it was for the Court, not Markell, to instruct the jury on the legal effect of the K Family Trust agreements, including whether they rendered Kelly the owner of the company.

Second, the Court *did* make a decision as to the legal effect of the K Family Trust agreements, and Markell's opinion flatly contradicted the Court's prior rulings. By this point in the trial, the Court had already held that "the government, Filer and all of the witnesses agree that the documents transferring control of BWC Capital to the K Family Trust were not effective and no such transfer took place." Exhibit 10, at 40:23-41:1. Indeed, the Court had *precluded the Government* from "rely[ing] on the membership transfer agreement to argue that control actually transferred to Kelly." Exhibit 22, at 3. Mr. Filer conducted the trial and presented his defense based on the understanding that the Government would comply with the Court's rulings, only to have the Government offer Markell's opinion, in the last moments of the trial, that the agreements made Kelly the owner of the company.

Third, Markell provided no basis for his interpretation that the agreements gave Kelly "an option to become the owner." Exhibit 12, 12:23-13:8. Indeed, the agreements themselves make clear that to the extent any aspect of the agreement could be characterized as an "option," that

option belonged solely to Gereg, not Kelly. Exhibit 1, at 39:3-22 (explaining that *Gereg* had to agree to transfer ownership of BWC Capital before any such transfer could take place). Likewise, Markell provided no basis other than his mere say-so that the existence of an un-exercised "option" to buy the company extinguishes the debt. Thus, his testimony "was a bare conclusion that provided nothing but the bottom line." *Noel*, 581 F.3d at 497. This type of "because I said so" testimony is "worthless" and does not assist the jury. *Id.*

Fourth, Markell's opinion was not rebuttal testimony and should have been excluded based on its late disclosure alone. The Government first attempted to argue that Markell's opinion rebutted testimony about equitable ownership that the Government elicited from Bivona *on cross-examination*. Exhibit 19, at 1-2. The Court agreed that the opinion could not properly be offered to rebut testimony that the Government elicited on cross and excluded the opinion. Exhibit 20, at 4:7-7:10. The Government then took the lunch break to come up with a new argument. Rather than the initial grounds asserted, the Government argued in the afternoon that Markell's opinion was being offered to rebut Bivona's opinion that BWC Capital became the rightful owner of the loan notes as a result of the transaction with Harris.[7] Exhibit 21, at 2:20-4:9. The Court, faced with this ever-changing Government approach, allowed Markell to offer the opinion that Kelly owned BWC Capital. *Id.* at 4:10-7:1.

But Bivona's testimony had nothing to do with ownership of *BWC Capital*—he testified that as a result of the Harris transaction, BWC Capital became the owner of the *loan notes*. Exhibit 23, at 103:17-22. Thus, contrary to the Government's representation to the Court, Markell's

---

[7] If that were truly the reason the opinion was being offered, there is no reason it should have been disclosed on the day of Markell's testimony. Bivona's opinion that Markell was supposedly rebutting had been disclosed by Mr. Filer more than 90 days before trial. *See* Dkt. 81, at 4-5. The reality is that the Government was searching for whatever pretextual rationale it could muster for admission of Markell's improper opinion after the Court rightfully excluded it the first time.

opinion was not responsive to Bivona's testimony. Moreover, Bivona's opinion was based on his "experience in dealing with loan assignment transactions throughout [his] career" as a banker. *Id.* Relying on his banking experience, he testified that the basis of his opinion was that "[t]he assignment agreement contemplated that upon payment of the purchase price, the loan documents would be formally assigned and turned over to BWC Capital. Following payment of the [$]575,000 and the handing over [of] the customer checks to Jim Sullivan, the loan documents were … delivered to BWC Capital." *Id.* at 103:23-104:4. Markell's legal conclusions regarding the effect of purported "option contracts" on Kelly's ownership of BWC Capital in no way addressed Bivona's opinion about banking practices.

In addition to being improper, Markell's testimony could hardly have been more prejudicial. As the Court recognized, all of the parties involved in the membership assignment agreements testified that those agreements had no legal effect. Exhibit 10, at 40:23-41:1. Kelly and Mr. Filer both testified that the agreements had not gone into effect and could not go into effect until Mr. Gereg was satisfied and agreed to effectuate the transfer. Exhibit 1, at 37:1-38:16; 39:3-22, 52:19-53:12, 55:6-24; Exhibit 4, at 53:17-54:18, 56:20-22. Thus, there was no option for Kelly to exercise. Lichtenfeld, who drafted the agreements, likewise testified that Gereg was still the owner of BWC Capital on April 5, 2013 as long as the consulting fee had not been paid; it was never paid. *See* Exhibit 7, at 104:13-16. By offering his opinion about BWC Capital's ownership, Markell essentially substituted his uninformed legal conclusion for the intent of the parties and the drafter of those agreements. He invited the jury to disregard all of the testimony about what Mr. Filer and others actually knew and understood at the time in question, and instead simply agree with Markell's conclusion of the legal effect of the membership transfer agreements: installing

Kelly as the owner of BWC Capital. Clothed in Markell's expertise in the law and bankruptcy, that testimony was devastating to the defendant.

> b)   *Improper Opinion that Woodwork's Debt Was Extinguished Because an Agent Cannot Hold the Debt of a Principal.*

Markell also opined that BWC Capital's lien was invalid, and the debt between Woodwork and BWC Capital was extinguished, because BWC Capital was Woodwork's agent, and an agent cannot hold the debt of a principal. Exhibit 12, at 11:14-12:14. Once again, whether or not the debt was extinguished—and the legal theory that provides that basis for said extinguishment—is a question of law. And once again, Markell did not provide any basis for his "bare conclusion" that an agent cannot hold the debt of a principal. *Noel*, 581 F.3d at 497. He essentially told the jury "I am familiar with" the law, and this is what the law is, "because I said so." *Id.* Regardless of how well-qualified Markell is or how deep his expertise in this area of the law, he cannot "merely tell the jury what result to reach." *Id.* And that is exactly what he did.

Moreover, any attempt to verify Markell's bare legal conclusion quickly reveals that his conclusion is *wrong*. For example, insiders of a company are clearly agents of the company, and the Seventh Circuit has squarely held that insiders making "a secured loan to the company is not wrongful per se." *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 345, 347 (7th Cir. 1997) (holding that unless there was deceit or another equitable reason to subordinate an insider loan to that of other creditors, "we see no reason to treat an insider's loan to a company more poorly than that of a third party's"). The jury was invited to apply Markell's incorrect legal conclusion to the facts of the case to reach his conclusion about the essential issue in the case: the existence of Woodwork's debt to BWC Capital.

And like his other opinions, this opinion creates a substantial danger that the jury substituted Markell's knowledge for Mr. Filer's. There is no evidence in the record that Mr. Filer

considered whether any principal/agent theory could invalidate BWC Capital's lien or extinguish the debt.

    c)    *Improper Opinion that BWC Capital Was Not an Arm's Length Third Party.*

Markell also offered the improper, inaccurate, and prejudicial opinion that the Harris transaction was not an arms-length third party transaction because BWC Capital was acting as Woodwork's agent, and thus cannot be considered an arms-length third party. Exhibit 12, at 3:8-4:5. Whatever the propriety of Markell's opinion in a civil case—and defense counsel has located no case law stating that an agent cannot be considered an arm's length third party even in a civil setting—it clearly had no place in this criminal proceeding. In *Weimert*, the Seventh Circuit analyzed whether the transaction at issue should be considered "an arms-length transaction among three separate parties." 819 F.3d at 366. In that case, not only was one of the parties an agent of another party involved in the transaction, but he was actually an officer of the company. *Id.* Despite the agency relationship between two of the parties, the Seventh Circuit held "we think the better approach is to treat this as closer to an arms-length transaction, at least for purposes of criminal law." *Id.* Accordingly, not only did Markell instruct the jury on what the law is, but his instruction was contrary to the law of the Seventh Circuit in criminal cases.[8]

This opinion was highly prejudicial to Mr. Filer because it wrongly suggested to the jury that Mr. Filer made a material misrepresentation to Harris concerning the third-party nature of the transaction. The prejudicial nature of this testimony was exacerbated when Government counsel improperly made this exact argument in closing. *See* Exhibit 9, at 51:10-52:8. As discussed in more detail below, this aspect of the Government's closing was highly prejudicial and confused

---

[8] The Court denied Mr. Filer's request for a jury instruction aimed at curing the prejudice caused by Markell's testimony. Exhibit 9, at 16:15-23; *see also* Exhibit 24 (proposed instruction).

the jury in light of the Court's prior ruling that the alleged "lack of candor" to Harris is "not part of Counts 1 and 2" and "would not support a scheme itself." Exhibit 9 at 16:15-17:16.

d) <em>Improper Opinion that BWC Capital Was Not a Creditor.</em>

Markell opined that BWC Capital was not a creditor of Woodwork because the relationship between BWC Capital and Woodwork was "more of an agency relationship." Exhibit 12, at 7:16-17. Critically, the basis for Markell's opinion was that the money for the purchase of the Harris loans did not come from BWC Capital. *Id.* at 7:13-16 ("[W]hen someone comes in in less than a month, takes over a company without putting in any of their own money, it doesn't seem to me to be really a creditor.").

Markell's opinion is contrary to the law and the facts of the case. As discussed above, there is no dispute that the assignment agreement between Harris and BWC Capital was valid and allowed BWC Capital to step into Harris' shoes. Whether or not BWC Capital paid the consideration for that transaction or the money came from some other source has no impact on the validity of the assignment. *See 7841 Pines Boulevard, LLC v. 114 Church St. Funding, LLC,* No. 18-CV-07405, 2020 WL 5502328, at *3 (N.D. Ill. Sept. 11, 2020) ("[C]onsideration given by a third party is adequate to bind the parties to a contract.") (quoting *Fields v. Gen. Motors Corp.*, 932 F. Supp. 212, 216 (N.D. Ill. 1996), *aff'd*, 121 F.3d 271 (7th Cir. 1997)); *see also* 3 Williston on Contracts § 7:20 (4th ed.) ("[A]s long as the promisor has received the performance or return promise it bargained for, within the terms of its offer, there simply is no difference whether that consideration is furnished by the promisee or by some third person."); 1 Restatement of Contracts § 75 (1932) ("[C]onsideration may be given by someone other than the promisee, but must nonetheless be given in exchange for the promise."). Markell thus provided the jury with an inaccurate statement of the law.

39

      e)     *Improper Opinion that Insufficient Information Was Disclosed to Harris Bank.*

Markell opined that providing Harris with the ownership information of BWC Capital was not sufficient to satisfy the bank's requirement of a third-party transaction. Exhibit 12, at 8:13-17. This testimony was purportedly offered to rebut Bivona's "opinion" that the ownership documents satisfied Harris' requirements. Mr. Bivona's actual opinion was that "Harris Bank had all of the information that would be pertinent to their decision whether or not to sell their loan to BWC Capital." Exhibit 23, at 100:14-17. Markell's opinion regarding third-party transactions did not rebut or even address Bivona's testimony. In any event, Bivona's opinion was based on his years of experience in the banking industry. He did not opine on any legal principles or legal disclosure requirements. Markell, on the other hand, has never worked as a banker. He was disclosed as an expert in "bankruptcy and commercial law," not on banking practices. *See* Dkt. 79, at 1. Markell disclosed no expertise that would qualify him to testify as to what information a bank would deem pertinent when selling a loan—and certainly not what Harris in particular deemed pertinent. *Noel*, 581 F.3d at 497 (an expert's "opinions may not be divorced from the expert bases that qualified them as witnesses in the first place"). That the Government failed to disclose and call a Harris witness does not justify attempting to plug this hole in their case by having an expert with no banking experience testify about what Harris would have deemed important.

      f)     *Improper Opinion Regarding Bad-Faith Assertion of a Lien.*

Finally, Markell opined that it is not appropriate for a senior lienholder to assert a lien in bad faith or for an improper purpose. Exhibit 12, at 13:9-15:16. In that situation, he opined, the senior lienholder "actually may be liable to the second or junior lienholders." *Id.* at 15:10-12. Once again, this is a bare legal conclusion. Markell told the jury what the law is, without any substantiation. Moreover, like his other opinions, this testimony infected this criminal proceeding

with civil law issues that have absolutely no bearing on this case. Markell's unsupported testimony that there are situations in which a senior lienholder might be civilly liable to a junior lienholder if they acted in bad faith has no bearing on whether Mr. Filer engaged in a scheme to defraud or acted with intent to defraud. The only purpose this testimony served was to insinuate that BWC Capital's assertion of its lien was improper or wrong.

**B.** **The Jury's Verdict is Contrary to the Weight of the Evidence.**

Even if the Court finds no error in the admission of any evidence, "the question of admissibility must be separated from that of weight" when considering a motion for a new trial. *Morales*, 910 F.2d at 468. In this case, even absent any error, a new trial is still warranted. As set forth in Section I, *supra*, the Government presented insufficient evidence for any rational jury to find beyond a reasonable doubt that Mr. Filer knowingly engaged in a scheme to defraud, let alone that he acted with intent to defraud. But even if the Court finds some evidence that would allow a rational juror to convict, it must find that the record as a whole "leaves a strong doubt as to defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal." *Morales*, 910 F.2d at 468. In addition to the evidence discussed in Section I, additional aspects of the record cast serious doubt on the jury's verdict and compel the grant of a new trial.

1.     The Complete Lack of Motive Weighs Heavily Against Intent to Defraud.

One of the most striking aspects of the record is the complete lack of motive for Mr. Filer to commit this crime. The evidence demonstrated that Mr. Filer was a successful attorney with an enviable client list earning a substantial salary. *See* Exhibit 25; Exhibit 4, at 25:13-26:1; Exhibit 26, at 21:15-22:15. Mr. Filer did not receive any financial benefit for his representation of Woodwork. *See* Exhibit 3, at 54:17-55:13; Exhibit 25; Exhibit 27 (showing that Woodwork paid Freeborn $4,547, which was less than 0.2% of the approximately $2.5 million in attorneys' fees that Mr. Filer generated for Freeborn in 2013). To the contrary, he attempted to help Kelly as a

favor, knowing that Freeborn would not receive any meaningful compensation for the representation. Exhibit 1, at 51:13-52:8; Exhibit 4, at 3:14-4:8.

In an attempt to fill this gaping hole in its case, the Government grasped at straws, and resorted to presenting misleading evidence to the jury. Over Mr. Filer's objection, the Government introduced emails about a networking event hosted by Kelly, suggesting that Mr. Filer was motivated by "opportunities for Mr. Filer to meet clients." Exhibit 28, at 11:25-13:7. The Government proceeded to show Kelly four different emails (all pertaining to a single presentation a year after Mr. Filer's retention) and asked questions to imply that this was Mr. Filer's motivation for assisting Kelly. *Id.* at 75:20-80:2. On cross-examination, Kelly acknowledged that the entire line of questioning was highly misleading. He testified that any suggestion that Mr. Filer was helping him because of his networking contacts would be "untrue." Exhibit 3, at 53:12-54:7.

Mr. Filer had no financial or other motivation to risk his law license, and more importantly, his liberty, by engaging in a fraud scheme with Kelly and Gereg. The complete lack of motive evidence weighs *heavily* against a finding that Mr. Filer acted with intent to defraud and casts serious doubt on the jury's verdict.

2.      The Evidence Demonstrated that Mr. Filer Took Actions Inconsistent with Fraudulent Intent.

The record is replete with evidence that Mr. Filer took actions contrary to a finding of intent to defraud. Most strikingly, Mr. Filer agreed that Woodwork should file for Chapter 7 bankruptcy despite Fawkes explicitly telling him that a bankruptcy filing would "allow the trustee behind the curtain," and that all of the documents related to the various transactions would have to be turned over. *Id.* at 34:5-13, 39:6-8; Exhibit 8, at 108:6-109:1. Fawkes explained that the trustee would immediately and fully investigate the transactions and that the nature of the transactions "would probably give the trustee heartburn." Exhibit 3, at 37:18-21; Exhibit 8, at 108:6-109:1. Fawkes

testified that he recommended the Chapter 7 filing precisely so that the trustee could investigate the transactions at issue—Fawkes and Mr. Filer *wanted* the trustee to look into the transactions so that they could obtain an expedited resolution of issues with Woodwork's creditors. Exhibit 8, at 102:25-103:14, 107:22-108:5, 110:2-5. Importantly, Fawkes told Mr. Filer that the trustee had the power to waive Woodwork's privilege. *Id.* at 109:2-16. Thus, Mr. Filer knew that all of the Freeborn attorneys' emails regarding the representation—the *very emails* that the Government contends evidence the fraud scheme—would be turned over to the trustee. Mr. Filer's actions are inconsistent with the actions of someone who was knowingly engaged in a scheme to defraud. *See, e.g.*, *Maze*, 414 U.S. at 403 (mailings were not in furtherance of a scheme to defraud where they "increased the probability that [the defendant] would be detected and apprehended"); *United States v. Bonansinga*, 773 F.2d 166, 172 (7th Cir. 1985) (reversing mail fraud conviction where "the mailing made it more likely that defendant's scheme would be detected"); *see also Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (finding that mailings were not "in furtherance" of any scheme where the documents mailed "would have revealed (not concealed)" the alleged fraud).

Furthermore, the record demonstrates that Mr. Filer never attempted to conceal any information from the various Freeborn attorneys involved in the representation, and to the contrary, encouraged those attorneys to freely communicate with one another and with Kelly and Gereg. This is fatal to a finding of fraudulent intent. Each of the attorneys was intimately involved in the Woodwork representation. But the record is clear that the Freeborn attorneys were not co-schemers. Each of them testified that they did not knowingly participate in a scheme to defraud. Exhibit 7, at 24:21-24; Exhibit 8, at 39:24-40:2, 124:15-19; Exhibit 29 at 57:7-10. Accordingly, if Mr. Filer's conduct with respect to the Woodwork representation was fraudulent—or if Mr. Filer

*believed* it was fraudulent—then he would have taken steps to prevent these attorneys from learning the full scope of the representation in order to conceal the alleged scheme. But Mr. Filer's former colleagues testified repeatedly and consistently that Mr. Filer never directed them to conceal any information from one another or limited their communications with each other or with Gereg and Kelly in any way. *See, e.g.*, Exhibit 8, at 5:20-7:9, 35:9-36:4, 38:11-39:8, 115:5-25; Exhibit 29, at 53:22-55:24; Exhibit 30, at 16:6-17:18. To the contrary, the record reflects that the Freeborn attorneys communicated with one another and with Kelly and Gereg outside of Mr. Filer's presence on a regular basis. *See*, *e.g.*, Exhibit 31. This weighs heavily against a finding that Mr. Filer possessed intent to defraud.

The lack of concealment of the K Family Trust agreements is particularly probative. According to the Government, these were "secret side agreements" that were the key to the entire scheme. Yet the record is devoid of any evidence that Filer attempted to conceal these "fraudulent" documents from any of his colleagues. Lichtenfeld, the author of the agreements, testified that he was never directed to conceal them from anyone. Exhibit 7, at 100:2-6. Brandt admitted that he had access to the agreements and indeed accessed them multiple times in Freeborn's computer system. Exhibit 29, at 75:3-77:22. In fact, Mr. Filer *encouraged* Lichtenfeld, Fawkes, and Brandt to get together and discuss the deal, including the allegedly "secret" agreements. Exhibit 8, at 5:20-7:9; Exhibit 30, at 16:22-25; Exhibit 32. The record reflects that the attorneys followed Mr. Filer's instructions and discussed the deal with each other the following day. Exhibit 33, at 57. This evidence weighs heavily in favor of a finding that Mr. Filer lacked intent to defraud.

### 3. No Credible Witness Testified That Mr. Filer Did Anything Wrong.

In considering Mr. Filer's new trial motion, the Court "may reweigh the evidence, taking into account the credibility of the witnesses." *Washington*, 184 F.3d at 658. Throughout this lengthy trial, there were only two occurrence witnesses who testified that Mr. Filer did anything

44

wrong—Paul Kelly and Ashley Brandt. Both witnesses were completely incredible and their testimony should be given little weight.

Kelly's bias and lack of credibility was clear. The Government allowed him to plead to a single tax count in an information, agreed to dismiss every single charge against him in the Indictment, and agreed to recommend an *unspecified* downward departure at Kelly's sentencing, as long as Kelly continued to cooperate against Mr. Filer. Exhibit 1, at 19:20-20:12, 24:22-26:19, 27:21-28:2. Kelly also testified as an admitted perjurer. *Id.* at 3:10-7:15. He admitted that he committed perjury during his 341 hearing testimony and during his deposition in the bankruptcy proceedings. He even admitted that he lied during his direct examination *in this case*. *Id.* at 2:23-3:7. Furthermore, Kelly's testimony against Mr. Filer followed what was essentially "a 36-page script" that the Government wrote for him in his plea agreement. *Id.* at 23:8-10. When asked in a simple open-ended question to depart from his script and explain *how* he defrauded Woodwork's creditors, Kelly was unable to do so:

> Q. Now, you testified that under the plea agreement, you took responsibility for the scheme to defraud Woodwork's creditors for which you were indicted, did you?
>
> A. I did.
>
> Q. I'm sorry to belabor this point, sir, but I'm trying to figure out how these creditors were defrauded if they ended up with more money than they would have had Harris foreclosed. Could you explain that to us?
>
> A. Well, these creditors would [not] have gotten the money. I think what was stipulated to was later on in the process.
>
> Q. Those creditors wouldn't have gotten any money either, would they?
>
> A. No.
>
> Q. No. Not one cent, right?
>
> A. Correct.

Q. So how were they defrauded, sir? Tell us.

A. I'm not the one who charged me.

Q. Right. You have no idea, do you?

A. No, I don't.

*Id.* at 86:2-20.

Kelly admitted on cross examination that he and Mr. Filer had an *innocent* intent. Specifically, he admitted that they intended to use lawful processes to keep Kelly's company alive, work out deals with Woodwork's creditors, and to pay what was owed so that Kelly could continue to operate his woodworking business in the Chicago market. *Id.* at 95:20-96:5; Exhibit 3, at 14:22-18:20.

Brandt also was incredible. Testifying pursuant to an immunity agreement, Brandt is the only witness in the entire trial who attributed any misstatement to Mr. Filer. He testified that Mr. Filer directed him to use an inflated $1.6 million loan balance in BWC Capital's Confession of Judgment Complaint. Exhibit 30, at 66:9-14; Exhibit 29, at 10:4-10. Brandt's trial testimony, however, was contrary to over *a dozen stories* he told the Government while seeking and protecting his immunity deal. Brandt was impeached repeatedly on the subject of Mr. Filer's alleged misrepresentation of the $1.6 million number. The impeachments were perfected through the testimony of Postal Inspector Benjamin Weller.

Inspector Weller's testimony established that on January 20, 2017, Brandt told the Government that he did not know if Mr. Filer instructed him to use the $1.6 million figure. Exhibit 34, at 3:3-5, 4:12-14. Brandt further told the Government that he did not recall Mr. Filer instructing him to use that number. *Id.* 4:19-21. Brandt then told the Government that he was working on a number of matters at the time, and that he may have been "sloppy" by including the $1.6 million

figure in the complaint. *Id.* at 4:25-5:2. He also denied knowing that the $1.6 million figure was inaccurate. *Id.* at 4:25-5:2. He later told the Government that Mr. Filer must have told him to use the $1.6 million figure, but he could not recall Mr. Filer's specific instructions to do so. *Id.* at 6:1-4. Brandt then told the Government that he was not instructed by anyone to knowingly use the incorrect $1.6 million figure. *Id.* at 6:10-13. Then Brandt said he was positive that someone told him to use the $1.6 million figure, but he could not recall who. *Id.* at 6:17-20.

On January 30, 2017, Brandt told the Government that he spoke to Mr. Filer in person and that Brandt could not recall how he questioned Mr. Filer, but that it was enough for Mr. Filer to refer him to Gereg. *Id.* at 6:21-23, 7:9-12. On October 24, 2018, Brandt told the Government that Gereg assumed Brandt's numbers were right. *Id.* at 7:13-24. Brandt further told the Government that when he realized the numbers did not match, he sought guidance from Mr. Filer, who directed him to Gereg. *Id.* at 7:25-8:4. Brandt said that *Gereg* told him which numbers to use. *Id.* at 8:5-7. Brandt stated that he did not recall any conversations about inflating the number. *Id.* at 8:8-11. Brandt further stated that he did not specifically recall discussing the use of the $1.6 million figure with Mr. Filer, but Brandt assumed that his use of the $1.6 million number caused Mr. Filer to direct Brandt to Gereg. *Id.* at 8:12-16.

The impeachments—as stunning as they are—only underscore Brandt's overall lack of credibility. His demeanor, comportment, and memory changed drastically between direct and cross-examination. When questioned by the Government, Brandt answered "I don't recall" (or a similar response) only 18 times, but when questioned by Mr. Filer's counsel, he provided that answer 125 times. *Compare* Exhibit 30, at 38:18-142:10 and Exhibit 29, at 99:23-112:20, *with* Exhibit 30, at 142:14-156:24 and Exhibit 29, at 2:17-99:15. Brandt's convenient lack of memory during cross-examination was especially incredible given that Brandt admitted to reviewing nearly

every piece of paper filed in this case. Exhibit 29, at 64:15-64:22. When considering whether the weight of the evidence warrants a new trial, Brandt's testimony should be discounted significantly.

### C. Other Misleading, Confusing, and Prejudicial Evidence Presented to the Jury Casts Serious Doubt on the Verdict and Further Supports a New Trial.

Aside from Markell's prejudicial testimony, the Government's trial strategy resulted in a misleading and prejudicial presentation of evidence to the jury. Especially in light of the overall weakness of the Government's case, this misleading and confusing presentation of the evidence presents serious risk that the jury convicted Mr. Filer based on confusion or a general feeling that somebody did something wrong, rather than an application of the evidence to the elements of proof for wire fraud.

#### 1. The Government's Shifting Position on the Lien.

The most striking aspect of this case was the Government's constantly shifting theories regarding why BWC Capital was not entitled to enforce its lien. The defense was constantly trying to respond to a moving target. In the Indictment, the Government alleged that the lien was unenforceable because Woodwork's funds were used for the purchase price. Dkt 64 ¶ 22 ("Defendants … knew that any representation that BWC Capital had an enforceable lien on the assets of Barsanti Woodwork was fraudulent in that BWC Capital had acquired its interests in the Harris Bank Loan Documents and the Harris Bank Lien through the fraudulent transfer of Barsanti Woodwork's funds for BWC Capital's benefit."). The Government reiterated at the pretrial conference that "the core of our case here is that Barsanti Woodwork used its money to pay Harris Bank." Exhibit 35, at 19:5-6. Mr. Filer prepared for trial to defend against these allegations, but they were quickly abandoned when the Government realized they were untenable.

The Government also repeatedly shifted its positions on whether Kelly's "ownership of," "control of," or "relationship to" BWC Capital meant that BWC Capital was not entitled to enforce

the lien. The Indictment alleged that the K Family Trust agreements were effective and actually transferred Gereg's ownership in BWC Capital to Kelly, stating Gereg "agreed to assign *and assigned* all of his ownership interest in BWC Capital to the K Family Trust." *See* Dkt. 64 ¶¶ 14-15, 17 (emphasis added). The Government repeatedly asserted in pretrial filings that the K Family Trust agreements were effective and actually transferred Gereg's ownership interest. *See, e.g.*, Dkt. 112 ("Gereg transferred his interest in the new entity to the K Family Trust"); Dkt. 115 ("Kelly was the owner of BWC Capital.").

After it became clear that the agreements had no such effect, the Government backtracked, admitting that the agreements were not effective to transfer ownership of the company, but instead arguing that they had some "level of effect" that gave Kelly "control" over BWC Capital. *See, e.g.*, Exhibit 28, at 3:13-14 ("[T]he government is not going to seek to argue that the transfer was effective."); *id.* at 4:18-19 ("[T]he documents are designed to give Kelly control over the nominee."); *id.* at 4:22-5:1 ("I don't want to argue that they're effective, but … I think that the evidence is such that there was a level of effect.").

Then, inexplicably, after proceeding through the entire trial on its "control" theory, and expressly stating that the Government's case was "not about deciding who actually owned the company," Exhibit 9, at 2:21, the Government put Markell on the stand to say that the K Family Trust agreements were "option" contracts that essentially made Kelly the owner of BWC Capital.[9] Exhibit 12, at 12:15-13:8. The Government emphasized this new position—which it had disavowed and indeed which the Court had rejected—in closing argument, telling the jury that "Bob Gereg wasn't the owner" of BWC Capital. Exhibit 9, at 40:13.

---

[9] As discussed, *supra*, Markell also testified as to various other previously undisclosed legal theories which, in his view of the law, rendered BWC Capital's lien invalid.

Defense counsel struggled to keep up with the Government's shifting positions. Indeed, the Government's precise position still is unclear as of this writing. The jury certainly could not follow it.

2.     <u>The Government Confused the Jury About Alleged Misrepresentations to Harris Bank.</u>

The Government's presentation of the evidence and its closing arguments also created a substantial risk of juror confusion regarding alleged misrepresentations to Harris. The Indictment alleged that Mr. Filer deceived Harris during the course of the loan transaction with BWC Capital, and indeed, the Government spent much of its case futilely attempting to prove that Mr. Filer made material misrepresentations to Harris.

The Court, however, rejected any notion that the alleged misrepresentations to Harris could constitute wire fraud. The Court acknowledged that "lack of candor" in a negotiation "cannot constitute wire fraud," and held that "that was basically what was being accomplished regarding the negotiation with Harris." <u>Exhibit 9</u>, at 16:15-23. The Court held that these alleged misrepresentations to Harris were "not part of Counts 1 and 2." *Id.* These alleged misrepresentations "would not support a scheme itself." *Id.* at 17:15-16. The Court denied Mr. Filer's proposed jury instruction related to representations to Harris because it did not apply given the Court's ruling. *Id.* at 16:15-17:1.

However, in direct contravention to the Court's ruling, Government counsel argued that an alleged misrepresentation to Harris concerning the arms-length nature of the transaction was one of the material misrepresentations supporting the third element of wire fraud. *Id.* at 51:10-52:10. This improper argument created a grave danger that the jury convicted Mr. Filer based on a representation that the Court held, as a matter of law, could not support the scheme. This danger was exacerbated when Government counsel argued *7 **additional times*** in closing that Mr. Filer

tricked, deceived, lied to, made misrepresentations, or failed to disclose to Harris. *Id.* at 22:3-5, 25:21-24, 28:9-20; Exhibit 36, at 27:20-28:3, 31:21-22, 32:14-19, 40:12-14. The Government's improper and prejudicial arguments warrant a new trial.

### 3. Other Misleading and Prejudicial Evidence and Arguments.

The Government presented other misleading and prejudicial evidence to the jury. For example, the Government intentionally elicited testimony from Kelly that Mr. Filer was present at his preparation session for the 341 creditors meeting. Exhibit 28, at 70:4-13. This was an extremely important point because Kelly testified that he was instructed to commit perjury during that preparation session. *Id.* at 70:14-25, 72:15-24. The Government elicited testimony that Mr. Filer was present despite knowing, ***and agreeing to a stipulation***, that Mr. Filer ***was not*** at that preparation session. Exhibit 3, at 64:9-65:5. The Government eliciting this testimony from Kelly was inexcusable and prejudicial.

Similarly, the Government repeatedly cited an email from Mr. Filer in which he said "Let's attack the Union next" to argue that Mr. Filer intended to defraud the Union. Exhibit 37. The Government emphasized this email in its opening statement, closing argument, and with multiple witnesses. The prosecutors did this despite knowing that Kelly would testify and did testify that there was nothing improper communicated in this email—Mr. Filer was simply referring to working out a payment plan to pay the Union the money it was owed. Exhibit 3, at 19:1-10; *see also* Exhibit 26, at 18:5-6.

Finally, Government counsel made repeated statements designed to make the jury dislike Mr. Filer based on his successful career and high income. *See* Exhibit 36, at 21:12-15 ("I'm sure Mr. Filer would wish we spent our resources prosecuting street crime and not actually looking into the activities of corrupt lawyers…"); *id.* at 21:22-24 ("You're also not going to get an instruction that the burden of proof is higher to convict a successful person versus a regular guy."); *id.* at 27:16

(referring to Mr. Filer as "a big firm lawyer who bills millions of dollars"); *id.* at 28:21-29:1 ("Mr. Filer paid [his expert witness] Mr. Bivona $80,000"[10]). In light of the other evidence discussed herein, these inappropriate comments exacerbated the risk that the jury convicted based on a dislike of Mr. Filer and the transactions rather than the elements of proof.

## **CONCLUSION**

WHEREFORE, Mr. Filer respectfully requests that the Court enter an Order granting judgment in his favor and dismissing Counts 1 and 2 of the Indictment, or in the alternative, vacating his conviction and granting a new trial.

Dated: July 16, 2021

Respectfully submitted,

*/s/ Ronald S. Safer*
Ronald S. Safer
Eli J. Litoff
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700
rsafer@rshc-law.com
elitoff@rshc-law.com

*Attorneys for Edward Lee Filer*

---

[10] There was no evidence introduced at trial that Mr. Filer personally paid Mr. Bivona's expert fees, and thus, the prosecutor's statement during rebuttal was improper. It also was inaccurate. These expert fees were covered by Freeborn & Peters' insurance carrier, not Mr. Filer.

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2021 I caused the foregoing document to be electronically filed using the CM/ECF system, which will send notice of this filing to all counsel of record.

/s/ Eli J. Litoff