UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 19 CR 565-1 |
| v. | |
| EDWARD LEE FILER | Judge Harry D. Leinenweber |

**GOVERNMENT'S RESPONSE TO DEFENDANT EDWARD FILER'S
MOTION FOR JUDGMENT OF ACQUITAL OR,
IN THE ALTERNATIVE, A NEW TRIAL**

The UNITED STATES OF AMERICA, by its attorney, TIMOTHY M. O'SHEA, Acting United States Attorney for the Western District of Wisconsin, respectfully submits the following responses to defendant EDWARD FILER's motions for a judgment of acquittal or, in the alternative, a new trial (hereinafter collectively referred to as the "Motion").

**I. Background**

On September 18, 2020, the grand jury returned a second superseding indictment against FILER, Robert Gereg, and Paul Kelly. In Counts 1 and 2, FILER was charged with participating in a fraud scheme involving executions over interstate wires in violation of 18 U.S.C. § 1343. FILER pled not guilty to these counts (and others, dismissed by the Court on FILER's two prior Rule 29 motions[1]), and proceeded to a 3-week jury trial held in June 2021.

---

[1] As it has previously argued, but will not re-argue in detail here, it is the government's position that the Court erred in granting the prior Rule 29(a) motions in that it did so by

1

During trial, the government introduced hundreds of exhibits, principally in the form of email communications between and among FILER and his co-schemers exchanged during the course of their scheme. These candid, contemporaneous communications provided the jury with a clear view of the reality behind the façade that FILER and his co-schemers sought to convey to the "outside world," as it was called in their communications.

On July 1, 2021, the jury returned a verdict of guilty against FILER on Counts 1 and 2. Filer now moves (for the third time since the close of the government's case) for a judgment of acquittal on Counts 1 and 2 pursuant to Federal Rule of Criminal Procedure 29(a). Filer also moves, in the alternative, for a new trial. These two motions are addressed in turn below.

## II. Legal Standards for Judgment of Acquittal Under Rule 29

Fed. R. Crim. P. 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The legal standards by which the motion must be decided are clear. "In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir.

---

improperly weighing evidence, by erroneously excluding from its consideration evidence favorable to the government's case on the mistaken belief that it could not be considered against the defendant under FRE 801(d)(2)(c) because the defendant was not charged with a conspiracy, and by incorporating the Rule of Lenity into its decision.

2010); *see also United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg*, 640 F.3d 239, 246 (7th Cir. 2011); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009). Moreover, a "defendant faces an uphill battle in challenging the sufficiency of the evidence." *United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016). The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Warren*, 593 F.3d at 546 (*quoting United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also United States v. Rahman*, 805 F.3d 822, 836 (7th Cir. 2015). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (*quoting United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see also Warren*, 593 F.3d at 546.

Under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). This strict standard recognizes that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547. The Seventh Circuit instructs that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable

3

doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (*quoting Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781 (1979)). Applying these standards to this case, FILER's convictions must be upheld.

## III. Analysis

The contemporaneous, documentary evidence in this case was vast, and overwhelming. Until FILER and his colleagues made the conscious decision to limit written communications, they dutifully documented their scheme through coordinating significant portions of it by email. In his 52-page Motion, FILER failed to address this substantial body of evidence. Instead, FILER filled his oversized brief with his views of the government's case and his feigned inability to understand what the fraud scheme was. In short, FILER repeated the same general argument he has made to this Court twice before. (*See* Dkts. 159 and 169.) And he repeats the same refrain that he unsuccessfully pitched to the jury: "What was the fraud?"

The scheme in this case – at its core – was not complex. It was about FILER arranging transactions for Paul Kelly to: (1) get control of the Harris Bank senior loan and accompanying lien, (2) use that lien as a shield against his business's other

creditors, and (3) try to evade detection.[2] To accomplish these goals, FILER facilitated the deception of Harris Bank so that they would sell the loan to BWC Capital, a front company for Kelly that FILER caused to be created. After the Harris Bank loan and lien were transferred to BWC Capital, and after a creditor engaged in collection efforts against Barsanti Woodwork Corporation, FILER caused fabricated loan documents to be created so that he could trick the Cook County Circuit Court into entering judgment against Barsanti Woodwork Corporation in favor of the newly created BWC Capital. With that judgment in hand, FILER then caused attorneys working at his direction to take steps to strip all assets from Barsanti Woodwork Corporation (at least on paper, to the "outside world") so that the assets would not be subject to the claims of the entity's other creditors and were instead available for Kelly to use for his business as it changed to operating under a new legal entity FILER caused to be created, Barsanti Millwork, which, on paper, Kelly did not "own."

As the Court observed in denying FILER's second Rule 29 motion with respect to Counts 1 and 2 immediately before the start of closing arguments:

> whether the lien [once assigned to BWC Capital] was enforceable is a question of fact for the jury. Taking the evidence in the light most favorable to the government, a rational jury could conclude that the lien was not enforceable and Filer acted with intent to deceive. For these reasons, Filer's motion for judgment of acquittal is denied as to Counts 1 and 2.

---

[2] A more detailed, general overview of the scheme is provided in Paragraphs 3-5 of the Second Superseding Indictment.

5

(6/30/21 A.M. Transcript at 15:7-13.) The jury thereafter followed the clear evidence in finding that the lien was not enforceable – it was a lien that Kelly held against himself, concealed behind Gereg (the "front guy," as FILER called him), and used to hold off the claims of legitimate creditors.

The evidence has not changed since the Court denied FILER's second Rule 29 motion with respect to Counts 1 and 2. When the evidentiary record is viewed in the light most favorable to the government, a rational trier of fact could (and did) find the essential elements of wire fraud beyond a reasonable doubt.

### a. A *Sampling* of the Evidence Presented to the Jury

In early March of 2013, Harris Bank was days away from obtaining entry of a court order appointing a receiver over Barsanti Woodwork Corporation that would have spelled the end of the business. The testimony of FILER, Kelly, Jim Sullivan, and Ashley Brandt were all consistent on this point. As FILER himself testified, his client (Barsanti Woodwork Corporation) had no defense to Harris Bank's motion to appoint a receiver. So Filer played for delay. And with that delay, he presented a faux investor to Harris Bank who pretended to be interested in purchasing the defaulted debt for his own account.

On March 7, 2013, Kelly retained Robert Gereg as a consultant to find financing for his company. (GEREG_3) On that same day, Gereg was presented by FILER to Harris Bank as someone interested in purchasing the defaulted loans owed by Kelly's company. (FREEBORN_17.) FILER made the introduction by forwarding

6

Harris Bank's attorney a letter from Gereg announcing his desire to purchase the loans. As the documentary evidence showed, this letter was provided to FILER first in a draft iteration (*see* FREEBORN 14), and then in a final version (*see* FREEBORN 17). While FILER knew that Gereg was a consultant working for Kelly, he presented him to Harris Bank as something else altogether. He then reinforced this misrepresentation to Harris Bank in subsequent emails, where he described Gereg as the "money source" who he claimed was on the "ledge" and ready to walk if a deal wasn't soon reached. (KELLY_4.)

The evidence shows that the plan (from at least mid-March 2013) was that Gereg would negotiate a deal with Harris Bank for the purchase of the defaulted loans and he would cause Harris to transfer those loans to an assignee specified by Kelly. FILER knew that Gereg was not going to be the actual purchaser of the loans and was wary of him being the paper owner due to lack of trust. On March 14, 2013, FILER commented to Kelly:

> Spoke to him several times at length. Unfortunately, I do not believe he has a deal in place. Good news is he bought us 7 days. Bad news is that I think we need to start making other plans. He is wanting to put himself in as the Owner of Newco. Huh? I have seen that game before ... he gets new company and contracts, you still have debt hanging on your neck and then he decides to never give you ownership in Newco. Believe me, it has happened with a friend I know. No thank you. Not a good idea. Anyway, if the chips fall, BK of entity would be the start followed by a discussion of your personal options. We can give Bob one or two more days but after that my opinion is we are wasting our time and we need to move on. I am around if you want to talk.

(KELLY_1.) When Gereg did thereafter reach a deal with Harris Bank to sell the defaulted loans, the assignee was to be an entity FILER caused to be created called

BWC Holdings. The idea was that the lien could then be used as leverage on Barsanti Woodwork Corporation's creditors (*see* FREEBORN_40), who would think that a senior secured lender was ahead of their claims.

Kelly was the owner of BWC Holdings in his purported capacity as "Trustee" of the "K Family Trust," an entity that FILER specified, knowing at all times that such a trust did not actually exist. Against all evidence, FILER points to Kelly's ownership of BWC Holdings – a fact disclosed on documents filed with the Indiana Secretary of State – as *transparency* mitigating against the existence of fraudulent intent. A rational juror could see right through this sophistry, however, as the evidence shows FILER's multiple attempts to conceal Kelly's ownership. First, FILER asked Kelly for one of his (Kelly's) in-law's names and Social Security Numbers. (FREEBORN_32.) When Kelly rebuffed this request, FILER tried to have the entity formed with just the (non-existent) "K Family Trust" as the member. (FREEBORN_34.) Only after the Indiana Secretary of State rejected the articles of organization noting that "an individual must be identified on behalf of the trust along with the trust name" (FREEBORN_36) did FILER provide Paul Kelly's name to Cathleen Franczyk, the paralegal he tasked with forming BWC Holdings. (FREEBORN_37.)

When a deal was reached between Harris Bank and Gereg (secretly negotiating on behalf of Kelly), the loan transfer paperwork was drawn up for the sale of the loans to BWC Holdings. On April 3, 2013, Harris Bank's counsel informed Gereg that "[t]he

Bank requires a corporate resolution for BWC Holdings, LLC before it can release the Assignment Agreement for signature (i.e., something that says you are a member thereof and have sole signing authority)" (FREEBORN_46) – the plan quickly changed. The problem was not the requested resolution was impossible; indeed, a resolution was created. (FREEBORN_49, pp. 3-4.) The problem was that providing the paperwork to Harris Bank would reveal that Kelly was behind the entity, and FILER and his co-schemers accurately believed that Harris Bank would not do the deal with an insider entity.[3]  So a new entity was created, and FILER came up with its name: BWC Capital LLC. (FREEBORN_52.)

BWC Capital was formed at FILER's direction. (6/17/21 P.M. Transcript at 75:14-15.) At the time it was created, FILER also caused to be created a membership interest assignment agreement and an assignment of membership units purporting to transfer ownership of the entity from Gereg to the (nonexistent) K Family Trust. (*See* FREEBORN_54, FREEBORN_54-1, FREEBORN_54-2, FREEBORN_54-3,

---

[3] This reality was established at trial through HARRIS_3, an internal Harris Bank document approving the sale and stating:

> Final approved subject to:
> 1. confim1ation that this is a third party, arms length sale
> 2. Execution by guarantor Mr Kelly of a global statutory declaration confirming assets/liabilities as disclosed.

Harris Bank's outside counsel for the transaction, James Sullivan, also confirmed in his trial testimony that Harris Bank required that the purchaser of the defaulted loans to be a third-party. (6/14/21 P.M. Transcript at 65:23-25.)

FREEBORN_55.) FILER caused Gereg to sign these documents *before* he signed the loan assignment agreement with Harris Bank. (*See* FREEBORN_55.) Notably, FILER's direction to Gereg regarding signing sequence was precisely the opposite of what transactional attorney Samuel Lichtenfeld advised FILER, when he stated:

> I think Gereg should sign this [LLC Membership Interest Assignment Agreement] immediately after he enters (via the new LLC) into the Loan Assignment Agreement with Harris. Part of the consideration is the fee he earns for the deal pursuant to whatever agreement he has with Paul. The other part of the consideration is that he becomes Autl1orized Signatory in the Trust's sole discretion. He would then be the Authorized Signatory for any closing documents required at the closing of the loan sale.

(FREEBORN_54.) While the government did not argue at trial that the assignment of membership units actually transferred legal title to BWC Capital from Gereg to Kelly, a reasonable juror could certainly look at this document and the related documents (which, as FILER stresses, were *signed* but not dated) as evidence that Gereg was simply the "front guy" for Kelly. Indeed, Gereg's status as the "front guy" was described by FILER to Lichtenfeld when the latter was reviewing paperwork for part of the transaction, causing Lichtenfeld to make a contemporaneous note of same on the draft Assignment of Loan Documents admitted into evidence. (*See* FREEBORN_30, p. 2; 6/17/21 P.M. Transcript at 44:1-6.)

After the Loan Assignment Agreement with Harris Bank was entered into, the evidence shows that Kelly collected Barsanti Woodwork's accounts receivables to pay the $575,000 purchase price. (*See*, *e.g.*, FREEBORN_65, FREEBORN_67.) Because of distrust with Harris Bank, Kelly did not deposit the collected payments as he received

them, but rather held the checks so that they could be turned over directly to Harris Bank on or before the payment deadline. Due to a concern by Kelly that providing Harris Bank checks totaling in excess of $575,000 might not result in a refund, Kelly selected checks totaling as close to $575,000 as possible, and then wrote a check for $2,239.48 from his personal account to precisely reach the agreed purchase price. (FREEBORN_79-1; 6/15/21 A.M. Transcript at 87:15-16.) That it was Kelly, and not Gereg, who provided personal funds to make up the difference owed to Harris Bank is powerful evidence as to who really controlled BWC Capital.

Additional documentary evidence (to say nothing of the witnesses' testimony) could fairly be interpreted by the jury to support the conclusion that BWC Capital was simply a front for Kelly. To begin with, the loans purchased from Harris Bank weren't even payable to BWC Capital, due to an uncorrected mistake in the paperwork that made them payable to BWC Holdings. (*See* FREEBORN_60, p. 9.). If BWC Capital was really a 3rd party owner of the defaulted Harris Bank loans, then one would expect the mistake as to the identity of the payee would be corrected.

Moreover, when Kelly wanted to himself open up a bank account for BWC Capital (without Gereg's involvement), he queried FILER on April 25, 2013:

Ed,

Would I be able to set up a checking account in the name of BWC Capital? Or is it still under the direction of Bob [Gereg]?

(FREEBORN 68.) FILER responded: "I think you can. Sam [Lichtenfeld], can you opine?" (Id.) After Lichtenfeld concurred with FILER, Kelly responded to both:

11

OK. Thanks Sam.

I'd like to set it up at The National Bank. I will ask what documents they need which I assume you have.

Do we have any documentation that ties Barsanti Woodwork to BWC Capital? Meaning once I sent up an account for BWC Cap, I'd like it to be able to accept deposits of checks made out to "Barsanti Woodwork".

Paul

(Id.) Thereafter, Kelly informed Lichtenfeld and FILER of the documents he was sending to the National Bank in his attempt to open the account, documents that included the executed Assignment of Membership Units that purported to transfer ownership in the entity from Gereg to the K Family Trust. (FREEBORN_70; FREEBORN_69, p. 11.) After inquiring as to exactly who he was sending the documents to and learning that individual's identity, FILER announced "OK. Send away." (FREEBORN_70.) A rational juror looking at FILER's actions could view this evidence as indicative of his actual knowledge that Kelly had an ownership interest in BWC Capital, and that his trial testimony to the contrary was simply not credible.

On May 28, 2013, Kelly informed FILER, and later informed Gereg, that a creditor (the union benefit funds) had sent a citation to discover assets to 21 customers of Barsanti Woodwork Corporation. (*See* FREEBORN_92.) The citation concerned an approximately $18,000 judgment relating to a past audit, but the correspondence also referenced a larger claim against the entity then pending. (Id.) This caused FILER and his co-schemers to take action. After discussing sending a letter from BWC Capital to Barsanti Woodwork Corporation's customers directing

payments to BWC Capital (and asserting seniority over all creditors) (*see* id.), FILER turned his attention to obtaining a judgment against his client and in favor of BWC Capital. (*See* FREEBORN 95.) Near midnight on May 28, 2013,[4] FILER emailed his associate, Ashley Brandt:

> Per our convo. think about the attached form. Albeit not perfect, it is simple and the parties are agreeing to it. Harris assigned its rights to BWC Holdings, LLC. It is an Illinois LLC. Cathy Franczyk will get you the address. Bob Gereg is its sole owner and will sign. If there is a Consent Judgment clause in the Harris docs (like in DMD), then maybe use DMD form. See if Vivek will represent BWC. Either way, I want to utilize the route that allows Vivek to just walk in to Court and get it entered. The plan is to then wait whatever time is required to insure the judgment is solid (30 days is my guess) and then take Barsanti into BK. most likely does not completely make sense to you but ... it will tomorrow. Get started on the Consent with the goal being to get a Judgment Order entered this week, if possible. Gracias Amigo.

(FREEBORN_95.) The Harris Bank documents did not have the confession of judgment clause[5] that FILER hoped might exist (FREEBORN_97-2), so his associate,

---

[4] As set forth in Government Stipulation No. 4:

> Due to technological processes of certain computer programs, the times and dates recited on some email exhibits are reported in Greenwich Mean Time ("GMT"), which, depending on whether Daylight Savings Time is in effect, is five or six hours ahead of Central Standard Time ("CST"). As a result, the banner on an email that was actually sent at 10:30 PM CST on January 1st, might indicate that it was sent at 4:30 AM on January 2nd, due to the six-hour time difference. Because the email banners often report a time without specifying whether it is GMT or CST, it is possible that an email response might appear to have been sent before the email to which it responds. To aid in determining the chronology of emails, where relevant email threads have been used.

[5] FILER confirmed at trial that he meant confession of judgment, and not consent judgment. (*See* 6/28/21 P.M. Transcript at 3:11-15.)

Brandt, drafted Change in Terms Agreements that added a confession of judgment clause to the acquired Harris Bank loans in exchange for extending the maturity of the loans to May 20, 2013, a date that had already passed. (FREEBORN_97-3.) The Change in Terms Agreements were dated April 5, 2013 (despite not having been conceived until May 29, 2013), and FILER instructed Kelly to sign the fabricated agreements and date them April 5. (*See* FREEBORN_102, pp. 1-2.) Thereafter, at FILER's direction, Brandt prepared a complaint premised on the fabricated confessions of judgment, prepared an affidavit chalk full of falsehoods about BWC Capital and its *bona fides* as a creditor, and arranged for an outside attorney (Vivek Jayaram) to file the complaint against FILER's client, Barsanti Woodwork Corporation, in the Cook County Circuit Court. (FREEBORN_100, FREEBORN_101, FREEBORN_103, FREEBORN_104, FREEBORN_107, FREEBORN_108, FREEBORN_112, FREEBORN_136, FREEBORN_140). On July 3, 2013, the Cook County Circuit Court entered the judgment. (FREEBORN_150, p. 7)

After the judgment was entered, Brandt, working at FILER's direction, drafted a citation to discover assets against Barsanti Woodwork, and then a Motion to Convey Assets in Partial Satisfaction of Judgment, and then an assignment and conveyance of title, transferring all of the assets of Barsanti Woodwork Corporation to BWC Capital. (FREEBORN_151, FREEBORN_152, FREEBORN_153, FREEBORN_155, FREEBORN_156, FREEBORN_180.) While the conveyance of title document was signed on August 21, 2013 (just days before the Barsanti Woodwork Corporation

14

bankruptcy filing), it was dated July 3, 2013. (FREEBORN_180.) Kelly admitted in his trial testimony that the assets weren't really transferred, and that they were only transferred "on paper." (*See*, *e.g.*, 6/17/21 P.M. Transcript at 11:19-21.) And the evidence also showed that FILER knew Kelly retained control over the assets, which is why, for example, on August 26, 2013, FILER knew he could solicit a retainer from the company that "on paper" had no assets:

> Paulie, need you to get us an advance retainer today for BK for any amount you can get us. Dream would be $15,000. OK would be $5,000. It has to be before we file. Possible? There will be no more bills after this (except for work in the future for wherever and whatever you do). Gracias. Ed.

(KELLY_26-1.) When Kelly told FILER that it would be difficult to get him the requested payment that day, FILER proposed: "How about date the check today and give to me when you can?" (Id.) To which Kelly responded: "That I can do. We are expecting a couple checks late this week." (Id.) Thereafter, FILER accepted a check for $12,000 drawn on the Barsanti Woodwork Corporation bank account dated August 25, 2013. (FREEBORN_191, p. 5.)[6] A rational juror could certainly look at this evidence and conclude that FILER knew that Kelly had not, in reality, transferred all of Barsanti Woodwork Corporation's assets, but that the assets had only been moved on paper to deceive legitimate creditors, and that Kelly retained control of them.

---

[6] The check FILER accepted was returned for insufficient funds, as FILER's firm attempted to deposit the check before sufficient funds were deposited into the account. (6/17/21 A.M. Transcript at 55:25-56:6.)

Around the time that the union benefit funds froze Barsanti Woodwork Corporation's receivables with a citation to discover assets, the entity was involuntarily dissolved by the State of Illinois for failure to pay taxes. (FREEBORN_85, FREEBORN_86.) So that Kelly could continue to operate his business and continue to pursue a large contract with Turner Construction, FILER caused Barsanti Millwork LLC to be formed as yet another front company for Kelly. (*See* FREEBORN 127, p. 2.) Ultimately, Gereg was the paper owner of the entity with secret transfer agreements created just as had been done with BWC Capital (*see* FREEBORN_128, FREEBORN_131), but that was only after Kelly and FILER explored other options. Originally, FILER planned that Barsanti Millwork would be owned by Kelly through BWC Holdings, which itself was owned by the (non-existent) K Family Trust. (*See* KELLY_15, p. 2.) But for Barsanti Millwork to operate it would need an FEIN, and to get that FEIN, its member, BWC Holdings, would need an FEIN, which would require using Kelly's Social Security Number. (Id.) In a cryptic email, FILER asked Kelly to discuss this with Gereg, prompting Kelly to respond:

> I'm a bit confused on this. What do you want me to discuss with Bob? And what are you concerned about? That if the K Family Trust controls BWC Holdings, and Holdings is the sole member of Bar Millwork, that there isn't "enough daylight"?
>
> Call my cell if its [sic] easier to explain.

(Id.) A few minutes later, FILER responded to Kelly's email, inquiring: "They want your personal FEIN again. I assume that is ok?" (Id.) To which Kelly responded:

> I suppose, but can that open me up to the union and other creditors if its unraveled and believed that I am ultimately behind Barsanti Millwork?
>
> I'm a bit out of my depth on this topic, so I'll defer to your decision.

(Id. at 1.) Thereafter, Gereg became the "owner" of Barsanti Millwork. (FREEBORN_121.) FILER caused his own elderly father-in-law, Ralph Prawat, to be the manager "on paper" of this new entity, and Prawat's address was used with the Indiana Secretary of State. (FREEBORN_115.)

On August 13, 2013, the union benefit funds obtained a judgment against Barsanti Woodwork Corporation in the amount of $352,377.29. (FREEBORN_174.) Before that judgment became final, on August 26, 2013, Barsanti Woodwork Corporation was placed into Chapter 7 bankruptcy, where it was represented that the entity had no assets whatsoever and that BWC Capital was its largest creditor, based upon the paper maneuvers directed by FILER. (PUBDOC_008.)

### b. A Rational Juror Could Find All Elements of Wire Fraud Met by the Evidence

When viewed in the light most favorable to the government, there is no reasonable doubt that the evidence presented in this case establishes the elements of wire fraud.

There was a scheme to defraud the creditors of Barsanti Woodwork Corporation through Kelly gaining control over the Harris Bank lien so that it could be used to hold back the entity's legitimate creditors and transfer its assets out of their reach. The evidence shows that FILER knowingly participated in the scheme,

and that, indeed, the scheme would not have occurred but for his participation. The jury heard testimony from Kelly as to what reality was, but, more importantly, the jury *saw* the documentary evidence (a sampling of which is recounted above). A rational juror could certainly find that there was a scheme to defraud creditors of Barsanti Woodwork Corporation and FILER knowingly participated in it.

FILER intended to defraud Barsanti Woodwork Corporation's creditors. A rational juror could conclude FILER intended to deceive by, among other general activities: (1) his active efforts to conceal Gereg's true status as Kelly's agent from Harris Bank; (2) his attempts to set up BWC Holdings, BWC Capital, and Barsanti Millwork in ways that would conceal Kelly's true interest in and control of the entities; and (3) his causing fabricated Change in Terms Agreements to be created so that the Cook County Circuit Court would enter an expedited judgment against his client, Barsanti Woodwork Corporation, that he could then use as a pretext for the transfer (on paper) of all assets away from that entity.

A rational juror could certainly find that materially false and fraudulent pretenses or representations were employed in the scheme. To begin with, Harris Bank had to be deceived into believing that it was doing a deal with a real third-party for the scheme to even get off the ground, and FILER facilitated this deception through his introduction of Gereg to James Sullivan where he portrayed him (Gereg) as an investor, his follow-up communications with Sullivan where he maintained the fiction that Gereg was something other than Kelly's agent, and then his creation of

18

the BWC Holdings and BWC Capital entities so that Harris Bank thought they were selling the defaulted loans to an entity that was not a front for Kelly. After Kelly got control of the lien through Gereg, FILER caused materially fraudulent representations to be made to the Circuit Court of Cook County regarding the existence of a legitimate obligation owed by Barsanti Woodwork Corporation that included a confession of judgment provision. Without the confession of judgment provision (which was created by FILER out of thin air and then substantiated through fabricated Change in Terms Agreements), FILER would have been unable to obtain a judgment in the expeditious manner he desired.[7] After the fraudulent judgment was procured from the Circuit Court of Cook County, FILER caused that judgment to be used to further propagate the materially false pretense that Barsanti Woodwork Corporation was losing all of its assets to a legitimate creditor, through the Citation to Discover Assets (FREEBORN_156), Motion to Convey in Partial Satisfaction (FREEBORN_155), and then, ultimately, the Assignment and Conveyance of Title that purported to actually transfer the assets (FREEBORN_178). These documents were all parts of a façade to the "outside world" that Kelly and Barsanti Woodwork Corporation had lost all of the assets, when, in fact, the assets

---

[7] FILER now suggests that he could have caused a normal complaint to be filed against his client and then immediately filed an answer admitting all allegations in order to get an expedited judgment. But what representations would he have made in such a complaint? Would they have been truthful? FILER obviously *could* have told the Cook County Circuit Court exactly what he was up to, but there is no reasonable prospect that the Court would have entered the judgment he desired.

remained in Kelly's control, as FILER well knew and demonstrated through his contemporaneous conduct (*e.g.*, soliciting and accepting a check from Kelly drawn on the Barsanti Woodwork Corporation bank account after all of its assets, including deposit accounts, had purportedly been transferred away). In short, there is ample basis for a rational juror to find materially false pretenses and statements were a part of the scheme.

Lastly, a rational juror could find that the executions charged in Counts 1 and 2 were in furtherance of the scheme. To begin with, FILER stipulated that both executions were interstate. The first execution, an August 21, 2013, email from Kelly to Brandt, Gereg, Lichtenfeld and FILER transmitting Kelly's executed Assignment and Conveyance of Title document whereby he transferred (on paper) all of the assets of Barsanti Woodwork Corporation to BWC Capital, was clearly sent for the purpose of carrying out the scheme to keep the assets from the reach of the entity's legitimate creditors. (FREEBORN_178.) It was part of the façade FILER designed. In his Motion, FILER contends that "there is no evidence in the record that the Assignment and Conveyance of Title was sent to any creditor or used in any way to further the scheme" (Motion, p. 26), but that simply isn't true. The Assignment and Conveyance of Title was a document created on the eve of the bankruptcy filing (backdated to July 3, 2013) and held out to the "outside world" to misrepresent that the entity had lost all of its assets. On October 8, 2013, at the creditors' meeting in the bankruptcy case, the document was used for exactly that:

20

TRUSTEE CRANE: Well, who was operating from May of 2013 when BWC Capital took over the claim of Harris Bank, who was operating? Was that the woodworking or was that some other company?

MR. FAWKES: Barsanti Millwork did not come into being did not start operating with these assets until it actually took title to them in July 2013.

TRUSTEE CRANE: And after it took title in July, what happened?

MR. FAWKES: That is when Barsanti Millwork began operations. And Barsanti Woodwork would have ceased operations as of the time that it assigned its assets to BWC Capital.

TRUSTEE CRANE: Do you know what date in July?

MR. FAWKES: Yes, I do. It was July 18th. *And I believe we provided you with a copy of the assignment, but I have another copy here that I can show you.* I also have a copy of the signed -- this is something we've not provided previously. This is a copy of the signed order from the Circuit Court of Cook County granting BWC Capital's motion for assignment in convenience of title of Barsanti Woodwork's assets.

TRUSTEE CRANE: This is an ordered based on what?

MR. FAWKES: It's based on a complaint that BWC capital filed against Barsanti Woodwork. I'll walk through the documents here.

When BWC Capital acquired the note from BMO Harris, it entered into a change of terms agreement, which we had mentioned, which extended the maturity of the loan to May 20th . That changed the terms agreement included a provision -- a confession of judgment provision which provided that in the event of any default, that Barsanti Woodwork would confess judgment, and that would pave the way for BWC Capital to take assignment of the assets, basically remove foreclosure. So when the note matured and it was not paid, an event of default was declared and a complaint was filed by BWC Capital against Barsanti Woodwork in the Circuit Court of Cook County, and a judgment was then entered on July 3rd in the amount of $1,582,955.71. Subsequent to that, citation to discover assets was issued by. BWC to Barsanti, and subsequent to that *an assignment and conveyance of title was executed.* That was on July 18th.

21

(PUBDOC 10 at 14:4-16:11) (emphasis supplied.) The audio of this creditors' meeting was played for the jury and provided on a computer for their review in deliberations. FILER's claims to the contrary notwithstanding, there is ample evidentiary basis for a rational juror to find that the August 21, 2013, email was in furtherance of the scheme.

The second execution is the August 22, 2013, email in which Gereg suggests to FILER, Brandt, Kelly, and Lichtenfeld that in light of the contemplated bankruptcy filing, Kelly endorse checks Barsanti Woodwork Corporation received from its customers to BWC Capital so that the proceeds can be rolled into Barsanti Millwork. (FREEBORN_181.) Gereg also suggests that they consider sending a letter to Barsanti Woodwork Corporation's customers that directs the matter of payment and cites the (fraudulently obtained) court order. (Id.) Interestingly, FILER asserts in his Motion that this was not an execution because (1) there wasn't evidence that the specific tactical suggestions floated by Gereg were acted upon, and (2) "the alleged fraud scheme was completed prior to August 22, 2013." (Motion, p. 27.) Taking the last point first, the alleged fraud scheme began "in or about March 2013, and continu[ed] until in or about August 2015…" (Second Superseding Indictment, ¶ 2.) The ongoing actions by the schemers to conceal the assets of Barsanti Woodwork Corporation were not completed prior to August 22, 2013, and it is not within FILER's power to alter the grand jury's allegations. To FILER's first point, a rational juror could certainly find that the email facilitated the scheme since it addressed the issue

of concealing the funds received by Barsanti Woodwork Corporation in light of the contemplated bankruptcy filing, *and the concealment of these and other assets was the very heart of the scheme*. Schemers communications about how they will tactically accomplish an ongoing scheme – when conducted over interstate wires – are certainly in "furtherance" of the scheme, regardless of whether every tactical idea suggested is implemented.

### c. A Rule 29 Motion does not call for a weighing of the evidence

In his most recent Rule 29 Motion (consistent with his prior two motions), FILER improperly invites the Court to weigh the evidence.

Determinations of credibility are made by the jury, not the Court. For example, FILER quotes Gereg's deposition testimony throughout the Motion. As the Court knows, Gereg pled guilty to committing perjury at that deposition. While the government introduced the deposition testimony (not for truth of the matter asserted, but to show that FILER's deposition testimony for which he was charged with perjury was crafted to be consistent with Gereg's false testimony for which he was convicted of perjury), this testimony became a moot point when the Court granted FILER's first Rule 29 motion to acquit him of perjury. Nonetheless, after his acquittal for perjury, FILER's attorneys, under the notion that it was necessary for "completeness," read in numerous portions of Gereg's deposition testimony that the government had not previously read into evidence. FILER now cites to that testimony as if it is truthful,

but the fact is that a rational juror could reject this testimony as incredible, and the jury here obviously did.

The Motion is effectively FILER's attempt to reargue the evidence to the Court, hoping the Court will bite on incredible assertions that the jury rejected. FILER argues, for example:

> Fawkes also informed Mr. Filer that that the trustee had the power to waive Woodwork's attorney-client privilege, meaning the trustee would be able to obtain all of Filer's emails with Kelly related to the various transactions. Exhibit 8, at 109:2-16. Despite being fully aware of the detailed and thorough investigation that would result, Mr. Filer agreed with Fawkes that Woodwork should proceed with the bankruptcy filing and Mr. Filer never instructed Fawkes to withhold or conceal any information from the trustee. Id. at 109:17-110:5. After the filing, the trustee immediately commenced a thorough investigation, just as Fawkes predicted. Id. at 110:9-111:9. The act of filing for bankruptcy was the ultimate anti-concealment. If Mr. Filer actually believed he had participated in a fraud scheme, bankruptcy would have been unthinkable.

(Motion, p. 10.) This argument might be compelling, but for the *actual facts* that FILER concealed documents from the trustee when they were demanded by subpoena and did not acknowledge same.[8] So FILER can *say* that the bankruptcy was the

---

[8] The government recognizes the Court granted FILER's Rule 29 motion with respect to concealing records because the general counsel of FILER's former law firm turned over the records 15 months after FILER concealed them from the trustee, but respectfully submits that the ruling was clearly erroneous. The violation of 18 U.S.C. § 152(9) occurred when FILER instructed Brandt to withhold responsive documents and then transmitted the production to the trustee with a cover letter representing that all responsive documents had been produced (and specifically recognizing that the trustee had waived the attorney-client privilege between Barsanti Woodwork Corporation and its various counsel at Freeborn & Peters). The fact that a different attorney at Freeborn & Peters produced the documents 15 months later after discovering what FILER had done, doesn't undo the fact that FILER violated 18 U.S.C. § 152(9). For FILER to now argue in his Motion that the bankruptcy filing was the "ultimate anti-concealment" is disingenuous, in the extreme.

"ultimate anti-concealment," but a rational juror could *see* FILER's deliberate concealment during that matter from the evidence presented at trial, including FREEBORN_203, FREEBORN_204, and FREEBORN_207.

In sum, viewing the evidence in the light most favorable to the government, there was more than sufficient evidence for the jury to reasonably conclude that FILER knowingly and intentionally participated in the scheme to defraud as charged in Counts One and Two.

## IV. Legal Standard for New Trial Under Rule 33

Motions for a new trial are governed by Fed. R. Crim. P. 33(a), which provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."

Applying that standard, the Seventh Circuit has noted that a new trial is warranted only when the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985)). Stated differently, a district court "may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017)

"A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280,

285 (7th Cir. 1994) (internal quotation marks omitted). "[T]he exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (internal quotation marks omitted).

## V. Analysis

### a. FILER's complaints about Professor Markell's testimony are not based in reality, and are without merit

FILER complains at length in his Motion about the rebuttal testimony of Professor Bruce A. Markell. But FILER is substantially less than complete (and frequently inaccurate) in what he tells the Court. Before trial began, the government was clear with defense counsel as to when the specific rebuttal testimony from Professor Markell, if any, would be disclosed. Indeed, the timing was reiterated in the June 24, 2021, disclosure which FILER attaches to his Motion as Exhibit 18:

Dear Counsel,

As previously disclosed, the government intends to call Professor Bruce A. Markell as a rebuttal expert witness. Professor Markell will attend the testimony of defendant's expert witnesses so that he can rebut the testimony *actually delivered*, if necessary, as opposed to the testimony recounted in the March 23, 2021 expert disclosure, which relies in substantial part on "facts" that are not a part of the evidentiary record,[footnote omitted] and therefore, is presumably subject to material change.

The opinions in the March 23, 2021, disclosure that Professor Markell disagrees with (accepting the recounted factual premise(s) in the disclosure as true for the limited purpose of this exercise) and may be asked to testify about are:

Bivona Opinion 2: "Use of a 'friendly creditor' is not an uncommon practice in workout scenarios."

26

Factor Opinion 2: "The filing of the Chapter 7 bankruptcy petition did not harm Woodwork's creditors and in fact benefitted them." (Professor Markell concurs that creditors "benefitted" from the financial recovery obtained from defendant's law firm (in the same way that a tort victim benefits from the tort because s/he is able to sue the tortfeasor) and the sale of the equipment, realities alluded to in the explanation of Factor Opinion 2. However, if these items were not present, and it was a "no asset" case as indicated in the debtor's sworn bankruptcy disclosures, Professor Markell does not share Mr. Factor's view that the bankruptcy filing provided "a more efficient and cost effective alternative for resolution of the claims." Professor Markell also may be called upon to provide more complete explanations of post-bankruptcy litigation possibilities and derivative standing than are conveyed in the explanation of Factor Opinion 2.)

Factor Opinion 4: "Sufficient information was disclosed in the Woodwork bankruptcy petition to provide the case trustee the information he needed to identify potential causes of action and further areas of inquiry." (Assuming the recited factual premises in the explanation as true, Professor Markell disagrees with Mr. Factor's conclusions in ¶¶ 3 and 7 of the discussion of Factor Opinion 4, and disagrees with ¶¶ 5 and 7 to the extent of the level of investigation implied.)

Factor Opinion 8. "Whether a lien is enforceable is a legal question with gray areas."

As noted in prior discussions on the subject of rebuttal expert testimony, in the event that the conclusions of Messrs. Bivona, Factor and Chapman are unaffected by the actual evidence (*e.g.*, Chapman Opinion 1 does not yet acknowledge the falsified Change in Terms documents, or the false representations in the affidavit and complaint filed in Cook County premised on the falsified Change in Terms documents), then Professor Markell may be called to rebut such testimony.

The precise subjects of Professor Markell's rebuttal testimony will be provided in advance of his testimony, but obviously cannot be provided until after he has had the opportunity to observe the testimony of Messrs. Bivona, Chapman, and Factor.

Feel free to contact me with any questions.

27

(June 24, 2021, disclosure attached to FILER's Motion as Exhibit 18) (emphasis in original.) For FILER to now act as if the timing of the later disclosure was a surprise to him, is simply disingenuous. The government *could not* disclose the now complained of rebuttal testimony until after FILER's witnesses delivered the testimony that was to be rebutted. Professor Markell was the government's only rebuttal witness, and the disclosure was provided *after* FILER presented his case (his final witness being a designated expert, Robert Chapman) and *before* Professor Markell testified in rebuttal. For FILER to now say that "the Court should take the Government's late disclosure into account when determining whether a new trial is warranted in the 'interest of justice'" (Motion, p. 30) is cynical and desperate. FILER filed plenty of motions leading up to and throughout the trial. If FILER had an issue with the timing of expert disclosure, he could have filed a motion – *or at least raised his complaint with the government* – sometime before this Motion. FILER can't credibly claim surprise at the timing of the disclosure since it was provided exactly when the government had said it would be provided. FILER's attempt to obtain a new trial on this contrived ground should be rejected.

FILER's complaints about the substance of Professor Markell's testimony generally are curious. FILER *now* expresses a view of expert testimony that is similar to the views expressed in the government's April 8, 2021, Motion to Exclude and/or Limit Expert Witness Testimony. (Dkt. 96.) But it is untenable for FILER to offer experts to announce conclusions (as he did on multiple points here), only to complain

28

that a rebuttal expert offered differing conclusions on the same points. By his Motion, FILER makes clear that his real position is that he should be allowed to offer conclusions from paid witnesses designated as experts, and the government should be precluded from rebutting those conclusions with an expert witness.[9]

FILER spends 12 pages of his oversized Motion asserting that Professor Markell's rebuttal testimony (the transcript of which, in its entirety, totals 21 pages inclusive of the cover sheet and signature page) was improper in myriad respects. The simple fact though is that each *actual opinion offered* by Professor Markell was an explanation of why he disagreed with a conclusion delivered by Bivona.

In his first complaint, FILER contends:

> Perhaps the most prejudicial of Markell's opinions is that the debt between BWC Capital and Woodwork **was extinguished due to the mere "existence" of the membership assignment agreements** between the K Family Trust and BWC Capital, because those agreements essentially made Kelly the owner of BWC Capital. Exhibit 12, at 12:15-22. Markell told the jury that these agreements gave Kelly "an option to become the owner," and "the existence of an option to become the owner, that puts you in the same place as, basically, as an owner." Id. at 12:23-13:8.

(Motion, p. 33.) (emphasis supplied.) But Professor Markell **did not** actually testify to what FILER describes; his testimony was more nuanced and less conclusory than that. Professor Markell did not testify that the existence of the membership assignment agreements extinguished the debt. He testified that the agreements

---

[9] The government's expert, Professor Bruce A. Markell, is a professor at Northwestern University Pritzker School of Law, with a distinguished background that includes partnership at Sidley & Austin, serving as a federal bankruptcy judge, and numerous academic appointments.

would be relevant to reviewing the relationship between Kelly and Gereg to determine if the debt had been extinguished. (*See* 6/29/21 Tr. at 12:15-13:8.)[10] Indeed, Professor Markell **never testified that the debt in this case was extinguished**. FILER's first complaint describes testimony that did not occur.

In his second specific complaint, FILER represents that: "Markell also opined that BWC Capital's lien was invalid, and the debt between Woodwork and BWC Capital was extinguished, because BWC Capital was Woodwork's agent, and an agent cannot hold the debt of a principal." (Motion, 45.) **Again, FILER complains of testimony that is absent from the trial transcript.** Professor Markell never testified that "BWC Capital's lien was invalid." He never testified that that the debt was extinguished. He never testified that an agent cannot hold a debt of a principal.

---

[10] Q.   And would it be -- in reaching this determination about whether the debt would have been extinguished based on the relationship between Mr. Gereg and Mr. Kelly, would the existence of assignment of membership agreements between Mr. Gereg and Mr. Kelly and the signing of the assignment of membership with respect to both Capital and Millwork be relevant?

A. Absolutely, yes, to both.

Q. Can you explain why?

A. Well, if, in fact -- as I understood the testimony over Friday and yesterday and today, if there was an agreement between Kelly and Gereg of whatever type that Kelly could re-acquire the interests upon the happening of certain conditions, he would, in essence, be the owner. I mean, because he has an option to become the owner. And to treat him differently than an owner in that case when there are conditions on it -- I mean, the conditions normally would have to occur, but the existence of an option to become the owner, that puts you in the same place as, basically, as an owner.

FILER simply created this purported testimony to complain about and to try and trick this Court into granting him a new trial.

When not attributing nonexistent testimony to Professor Markell, FILER uses his oversized Motion to try and refute the nonexistent testimony. For example, Professor Markell never testified that an agent could not hold a debt of a principal. If FILER is confused about this reality, it is because he did not read the testimony where agents and debts were actually discussed:

Q. Mr. Bivona stated that, "So, in my opinion, based on -- based on my experience in dealing with loan assignment transactions throughout my career, I believe following the completion of the assignment agreement and payment of the purchase price, that BWC Capital was now, you know, the rightful owner of that note that was due from -- or the two notes that were due from -- Barsanti Woodwork."

Do you agree with his opinion; and, if not, can you explain why?

A. I'm not -- I'm not sure whether I agree or disagree because there are facts that would make that not true. For example, if -- there could be a level of connection between the purchaser of a note and the borrower on the note that would affect the debt.

Q. And why is that?

A. You want me to go into legal doctrine on this?

Q. Just explanation of the facts that would be relevant.

A. The facts that are relevant is that if someone owes a debt and someone is unwilling to talk with them about reduction or giving some relief and then someone else comes along and says, I want to buy the same debt -- and that happens fairly regularly -- the person who doesn't want to deal with the debtor because of a lack of trust or a lack of information will want to know that the third party is also free, if you will, of any connections with the debtor.

> Moreover, there's just a general policy that you can't owe money to yourself.

Q. Can you explain that as far as whether or not that would have an impact on the validity of the liens and whether the debt would be extinguished?

A. Yes. I mean, depending on the facts -- and that's obviously for the jury to decide -- if someone acquires their own debt, the debt's extinguished.

> And that extends to not only just debts in name only, but if debts are held -- there's been a lot of talk -- or at least I've heard the last couple days a lot of talk about front persons, nominees, holders, placeholders. I mean, if someone is, for example, an agent, that means they're acting on behalf of the principal. *And if they acquire the debt for their principal, then you have a situation the principal owes money and is owed money and there would be cancellation.*

(6/29/21 P.M. Transcript at 10:12-12:2) (emphasis supplied.) According to FILER, this

testimony is "wrong" because in *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 347

(7th Cir. 1997) the Seventh Circuit held "[a]ssuming there was no deception, we see

no reason to treat an insider's loan to a company more poorly than that of a third

party's." FILER fails to explain how the equitable subordination analysis of *Lifschultz*

renders Professor Markell's opinion "wrong." *Lifeshultz* involved loans *actually made*

by insiders to an entity that thereafter went bankrupt; it was not a situation where

an entity used (and funded) an agent to buy its own outstanding debt. The case is

simply and entirely inapplicable here.

In his third specific objection, FILER takes exception with Professor Markell's

disagreement with Bivona's opinion as to what constitutes a third party. (Motion, p.

38.) The relevant testimony from Professor Markell is as follows:

Q.     […] I'd like to start out with Mr. Bivona gave an opinion concerning what constitutes an arm's-length third party from the borrower. In particular, he stated -- his opinion was that, "Someone that the borrower hires as a consultant or agent is considered an independent, arm's-length third party, and that BWC Capital was an arm's-length third party from the borrower."

       So, do you agree with Mr. Bivona's definition of whether a consultant or agent can be a independent, arm's-length third party, and do you agree with his conclusion that BWC Capital was an arm's-length third party?

A.     I do not agree with his opinion as to the definition. I do not agree with his opinion as to the status of BWC Capital.

Q.     Can you explain with respect to the first opinion?

A.     When someone is an agent or hired by someone, they are perceived not as a third party, but as aligned with or in concert with the person for whom they are an agent.

       Among the documents I've also seen have been the retention agreement -- or at least seen the first page of the retention agreement -- between Kelly and Mr. Gereg and the entities. Anybody of who knew of that arrangement would know that these were not independent parties; that they were aligned.

Q.     And what are the duties between a principal and an agent? And who would be the principal in the relationship. I jumped ahead, but --

A.     Principal would probably be Mr. Kelly. The agent would be Mr. Gereg or Mr. Gereg's entities.

(6/29/21 P.M. Transcript at 3:8-4:5.) FILER contends that based on the Seventh Circuit's ruling in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), Professor Markell's opinion that Gereg was an agent acting for Kelly is "contrary to the law of the Seventh Circuit in criminal cases." FILER is simply wrong, and his reading of *Weimert* is irreconcilable with the actual majority opinion in that case.

In *Weimert*, the president of an investment company (IDI) that was selling its 50% interest in a real estate venture used deception to make himself a part of the deal, getting a small ownership stake when the interest was sold to the purchaser. Neither the purchaser nor the seller was deceived as to the fact that Mr. Weimert was going to get a stake as part of the sale, but, rather, they were deceived as to why (each thinking that the other desired or required it). In vacating Mr. Weimert's convictions, the majority of the Seventh Circuit panel noted:

> The government's strongest argument is that Weimert's actions amounted to a scheme to defraud IDI because, even if an outsider might be permitted to mislead it about negotiating positions, Weimert could not do so about his own role in the transaction. Based on the testimony of IDI directors, we must assume that they trusted Weimert on all aspects of the Chandler Creek deal, including what he told them about the buyer insisting that he participate in the deal.

> In light of the disclosure of all terms of the sale, as well as our doubts that an officer or other fiduciary must disclose his negotiating position when dealing with the company about his own compensation, we think the better approach is to treat this as closer to an arms-length transaction, at least for purposes of criminal law.

*United States v. Weimert*, 819 F.3d at 366. FILER attempts to take the above-quoted observation in *Weimert* and transform it into a rule that a front guy (or front company) isn't a front guy (or a front company). That isn't what the decision stands for.[11] *Weimert* is simply inapplicable here, as it addressed an allegation that an agent

---

[11] It should be noted that if FILER's desired rule were in fact the rule, then, for example, there could be no such thing as a straw purchaser in a mortgage fraud scheme.

deceived his principal, not, as here, that an agent deceived a third party for the benefit of his principal.

In his fourth specific complaint, FILER accuses Professor Markell of "provid[ing] the jury with an inaccurate statement of the law" (Motion, p. 39) based on the following exchange, where Professor Markell disagreed with Bivona's opinion:

> Q.   And, then, with respect to BWC Capital as to whether it was a friendly creditor?
>
> A.   I wouldn't say it was a friendly creditor. Given the arrangement, given the -- I mean, I was here for Mr. Filer's testimony and understood through him -- through that testimony -- the arrangements between the two. But when someone comes in less than a month, takes over a company without putting in any of their own money, it doesn't seem to me to be really a creditor. And it may be friendly, but it's more like an agency relationship.

(6/29/21 at 7:8-17.) The "statement of the law" FILER complains of was apparently Professor Markell's observation that Gereg put no money in to BWC Capital to purchase the debt from Harris Bank (the entire purchase price, of course, having been paid by the defaulted borrower, Barsanti Woodwork Corporation). FILER cites authorities for the proposition that a *third party* can pay for rights transferred to another, but that isn't something that has ever been questioned. Here, it wasn't a third party that paid for the loans, it was the defaulted borrower. And the issue is whether a defaulted borrower still actually owes a loan when the borrower has purchased the loan vis-à-vis a front company. None of FILER's cited authorities even come near that issue.

35

In his fifth specific complaint, FILER complains about Professor Markell providing an opinion as to whether sufficient information was disclosed to Harris Bank to satisfy the bank's requirement that the purchaser be an arms-length third party. Professor Markell was simply testifying on the same subject that Bivona testified to.[12] Professor Markell's testimony (unlike Bivona's), was consistent with the testimony of the bank's outside counsel, James Sullivan, about whether the bank would want to know about the Gereg/Kelly relationship in evaluating whether this was a third-party, arms-length sale. FILER's questioning of Professor Markell's credentials to hold his opinion, is, in short, ridiculous. Professor Markell has a breadth of experience including his years as a commercial lawyer that rose to the level of partner at Sidley & Austin. As the evidence showed in this case, the bank's outside counsel, James Sullivan, was the bank's point of contact with Gereg in completing the deal they *thought* was being done with a third party (and not a front for the defaulted borrower). The idea that a commercial lawyer is not competent to speak to the type of information a bank would find material in this instance is ridiculous, particularly when the expert witness who purports to possess the competence to deliver the opinion, Bivona, is oblivious to the notion that there can be

---

[12] It should be noted that FILER vigorously opposed the government's multiple attempts to call in its case-in-chief, and in rebuttal to Bivona, a witness from Harris Bank itself, namely Pamela Wicker, who was actually involved in the BWC Capital-Harris Bank transaction. Similarly, FILER also opposed testimony on materiality from other witnesses actually involved in the transaction on that basis that it was irrelevant because materiality was an objective and not subjective inquiry.

any interest other than title ownership (thus constricting his view of what a "third party" is). (*See*, *e.g.*, 6/25/21 A.M. Transcript at 138:19-140:1.) This is, again, an instance of FILER's assertion that he should be able to pay a witness to say ridiculous things, and the government should not be allowed to call an actual expert to rebut the testimony FILER purchased.

In his sixth specific complaint, FILER says that Professor Markell "opined that it is not appropriate for a senior lienholder to assert a lien in bad faith or for an improper purpose" and that "[t]he only purpose this testimony served was to insinuate that BWC Capital's assertion of its lien was improper or wrong." (Motion, pp. 40-41.) The fact is though that Professor Markell simply noted that there have been cases where a senior lender's bad faith or improper motive have been an issue, and "[i]n essence, just because you have a senior position doesn't mean you can do everything -- anything. It's subject to being acting in good faith and in an effort to collect the debt in a reasonable manner." (6/29/21 P.M. Transcript at 15:13-16.) Professor Markell's observations were made in rebuttal to Bivona's much more certain views that it is "appropriate for a borrower to use senior liens that it has against its assets as leverage to negotiate with its junior creditors" and that it is "appropriate for friendly creditors to use a senior lien as leverage against another creditor." (6/25/21 A.M. Transcript at 109:18-20, 110:9-11.)

**b. The Jury's Verdict Is Not Contrary to the Weight of the Evidence**

FILER's assertions that verdict was contrary to the weight of the evidence are unfounded. First, FILER claims he lacked "motive" to engage in fraud, apparently because he didn't make a substantial amount of money from it. But FILER has not been accused of properly pricing the risk of his criminal behavior; FILER has been accused (and convicted) of knowingly participating in a fraud scheme. And, contrary to FILER's arguments, it's not as if he never expected to be paid by Kelly for his conduct. As he told Kelly on July 13, 2013:

> Paul, I know times are tough but I was wondering if the Co. has any cash around to apply to at least some of the work that Tom, Ashley, Sam and now Vivek are doing. I have not nor will I (until you are back on your feet) bill you for my own time. Under the BK rules we can call it an advance retainer. Obviously I know you will not be able to cover all of it but these guys are really putting in a lot of time on some complicated issues. Vivek is also out of pocket for me. *I was planning on just allowing you to pay us out of Newco later* but Tom says that the advance retainer would help with the separation optics we have been seeking. anything you could do would be appreciated. Have a good weekend. Thanks. Ed.

(FREEBORN_159) (emphasis supplied.) Notably, FILER fails to mention this email showing his (1) expectation of eventual payment, and (2) full knowledge of who "Newco" actually was, in contending that he was convicted against the weight of the evidence.

FILER's claims about transparency by virtue of the bankruptcy filing are particularly bold in light of his obstructive conduct during that proceeding. He now claims to have known all of the incriminating emails and documents would be turned over to the Chapter 7 trustee, but the fact is that he tried to stop that. And the jury

saw that. And while the Court acquitted Filer of violating 18 U.S.C. § 152(9) because someone else turned over the documents FILER concealed 15 months after they were concealed, it is remarkably meritless for FILER to now claim that he

> knew that all of the Freeborn attorneys' emails regarding the representation—the very emails that the Government contends evidence the fraud scheme—would be turned over to the trustee. Mr. Filer's actions are inconsistent with the actions of someone who was knowingly engaged in a scheme to defraud.

(Motion, p. 43.) FILER's present contention – *in light of his documented conduct* – is specious. FILER's concealment of records showing his involvement in the scheme was rightly considered as evidence of his fraudulent intent.

FILER says that no "credible" witness testified that he did anything "wrong." The witnesses in this trial testified to the occurrences they participated in or observed. It was not the function of a witness to pronounce FILER's conduct as "wrong," and FILER most certainly would have objected if the government had sought to elicit such testimony. This case was largely made on the emails and other documentary evidence. What the totality of the evidence showed – beyond a reasonable doubt – is that FILER participated in a scheme to defraud the creditors of Barsanti Woodwork Corporation.

### c. FILER's Contention that Misleading, Confusing, and Prejudicial Evidence was Presented to the Jury is Not Well Founded

FILER claims that the government has had "constantly shifting theories regarding why BWC Capital was not entitled to enforce its lien." (Motion, p. 48.) In support of this contention, FILER points to different words used to describe the same

concepts at various points. The reality is – and the evidence has shown – that the transaction FILER orchestrated enabled Kelly to use Barsanti Woodwork Corporation's funds to purchase the defaulted loans and liens, and caused them to be transferred to BWC Capital, an entity that Kelly had an interest in and controlled through his "front guy," Gereg.

FILER is correct that the government did previously argue that the Kelly was the owner of BWC Capital, but the government discontinued this ownership argument after the Court accepted FILER's interpretation of the membership assignment transfer agreement and argument in his motion *in limine* that because not *all* of the transfer related documents that Gereg signed were dated, that the Assignment of Membership Units, reprinted below, was ineffective.

### ASSIGNMENT OF MEMBERSHIP UNITS

**NOW THEREFORE, FOR VALUE RECEIVED,** the undersigned, Robert Gereg, as the sole member of BWC Capital, LLC (the "Company"), individually, does hereby sell, assign, and transfer unto The K Family Trust, all of his rights, claims, title, and interest to all of the Units of the Company, standing in the name of the undersigned on the Company's books. The undersigned does hereby irrevocably constitute and appoint any duly authorized officer, agent, or Manager of the Company as its attorney-in-fact to transfer the said Units on the Company's books with full power of substitution in the premises.

The undersigned hereby designates Assignee to become a Substitute Member of the Company, subject to the approval of the Members of the Company.

Date: April 5th, 2013.                    _____
                                            Robert Gereg, the Sole Member of the Company

(FREEBORN_58.) While the government stopped arguing that the Assignment of Membership Units did what it purported to do after the Court's ruling, the fact is that

title ownership to BWC Capital was never a critical part of the charged fraud scheme. What was critical – and what was proven – was that Kelly gained control of the lien against his own company and used it to defraud his company's legitimate creditors. He did this through his control of and interest in BWC Capital, which was made possible through the direction and actions of FILER. The government's argument has not shifted. Gereg was the "front guy," and irrespective of what words were on a piece of paper, BWC Capital was subject to Kelly's interest and control.

FILER accuses the government of making improper arguments to the jury regarding Harris Bank during closing argument, using statements the Court made in denying FILER's proposed instruction to support his position. But FILER ignores the contemporaneous clarification the Court provided regarding its ruling:

> MR. NETOLS:        Just for clarity, Judge, you're going to deny the instruction, but the case, as charged, is that Harris was deceived into thinking that they were dealing with the third party, and that caused them to assign the lien. This is not like -- this is not a question of parties' motivation. And *Weimert* is clear, the issue is it's material facts. In *Weimert*, it was relationships between parties and compensation. In this case, it was directly the bank, based on the documents, was not going to deal -- do a deal with the third party –
>
> THE COURT:        Well, I'm denying the instruction.
>
> MR. NETOLS:        But I say it sounds like you're arguing that -- saying that we can't argue that Harris Bank was deceived as part of the scheme.
>
> THE COURT:        **Well, it could be argued as part of the scheme, but it would not support a scheme itself.** All right. That's the court's ruling, in any event. We will proceed accordingly. So do the best you can on your --

41

(6/30/21 at 17:2-18) (emphasis supplied.) The Court specifically noted that the government could argue the false representations to Harris Bank. While the Court may have ruled immediately before closing that Harris Bank could not be a victim of the scheme under *Weimert*, it is established law in this circuit that "wire fraud does not require the false statement to be made to the victim of the scheme." *Weimert* at 355. And the fact is that if Harris Bank had not been deceived into believing that Gereg was a real third-party purchaser, then the loans and liens would not have been assigned and the scheme that occurred would not have been possible.

FILER accuses the government of eliciting testimony from Kelly regarding FILER's presence at a meeting, when the government knew FILER was not in fact present. First, the meeting did occur. Second, the testimony from Kelly concerned what Fawkes, not FILER, told him at the meeting. Third, the government provided FILER with a stipulation in advance of trial and FILER impeached Kelly on cross-examination regarding his absence from the meeting. FILER does not suggest that Kelly was testifying to anything other than his true recollection of the meeting. The government acknowledged that Kelly's recollection does not reconcile with building access records which show FILER's entry into the building after the meeting had concluded, which is why the government agreed to a stipulation in advance of trial. All of this was presented to the jury, and the government never argued to the jury that FILER was present. The apparently mistaken recollection of Kelly was hardly prejudicial to FILER. Rather, it was beneficial to FILER as his counsel used it in the

42

concluding segment of his cross-examination to question the accuracy of Kelly's recollection. (6/16.21 Tr. at 63:1-65:15.)

FILER's assertion that the government misused his "Let's attack the Union next" email is ridiculous. The moment that FILER and the co-schemers obtained a deal to get control of the Harris Bank lien, Gereg says "TOUCHDOWN," Kelly offers words of reflection, and FILER says "Let's attack the Union next." (*See* FREEBORN_61.) FILER was clearly aware that the lien, which they had obtained control of through deception, gave them leverage over the union.

FILER's contention that the government made "repeated statements designed to make the jury dislike [him] based on his successful career and high income" is misplaced. The government is not the one who raised these issues; it was FILER. He raised these issues in his opening, during the course of the case, and in his closing. FILER showed the jury charts with his legal billings, and made arguments such as:

> What are their [the government's] arguments, that Millwork is going to pay down the road because he says pay me out of Newco for some of what is owed? That's ridiculous. **He's got a very large practice with a lot of clients. We didn't show you that to say he's a big shot. We showed you that to say where does Barsanti fit in the scheme of things. They're not a blip on the radar screen. They're not somebody.** There is no way he would get involved in this, in a fraud scheme, for something where he gets absolutely nothing except a headache. He helps a neighbor, and he ends up here.

> He had nothing to gain, and he had everything to lose, his law license, his family's security, his entire career, his reputation. It does not make any sense to me that he would risk this if he thought there was anything remotely wrong with it. Why? Nobody commits a crime for no reason, and they haven't given you a shred of evidence of why.

(6/30/21 A.M. Transcript at 68:2-17) (emphasis supplied.) At the outset of his closing, FILER's counsel opined to the jury: "You get to hear a criminal case in federal court, and unfortunately it's pretty dry." (Id. at 59:11-13.) The government simply responded to these arguments during rebuttal by noting that there is not a different burden of proof applicable to successful defendants, and while there might be other crimes that were less "dry" (to borrower FILER's phrase), the government expended resources prosecuting a corrupt lawyer in this case.[13] Commenting on the $80,000

---

[13] The specific rebuttal statements FILER complains of, *in context*, are:

> I -- at the very beginning, Mr. Safer apologized to you because you got brought in here. And I appreciate your sacrifice too. And he talked about it was no crime and it was essentially a boring civil case. I'm sure Mr. Filer would wish we spent our resources prosecuting street crime and not actually looking into the activities of corrupt lawyers, but that's what we did in this case.

(6/30/21 P.M. Transcript at 21:9-15.)

> Mr. Safer talked a lot about the impact on Ed and his success and his practice and everything like that. You're also not going to get an instruction that the burden of proof is higher to convict a successful person versus a regular guy.

(Id. at 21:21-24.)

> I don't know why Mr. Filer used that name [Ralph Prawat]. Frankly, that was stupid. But he's at a big firm. You see they've opened other companies. There's actually a company called CT that could be the agent. There's no reason to put somebody on. But what he was, you know what Prawat was? He was somebody who wasn't named Kelly. He was a last name other than Kelly that Mr. Filer knew it was his octogenarian father-in-law and wouldn't even know what was going on. And they just used the name. And they needed an address in Indiana. And was it stupid? Yes. But you think this is how a big firm lawyer that bills millions of dollars does, you just throw your father-in-law's name down on a document? Does that make any sense to you if this is legit? Of course, it doesn't.

(Id. at 27:6-19.)

paid to Bivona was in no way improper; it was relevant to the credibility of Bivona's testimony. In short, it is not *unfairly* prejudicial for the government to counter the arguments raised by a defendant.

In sum, the verdict reached by the jury was entirely consistent with the evidentiary record. FILER has failed to cite any *well-founded* basis for the Court to grant a new trial under Rule 33.

## VI. Conclusion

For the reasons set forth above, the government respectfully requests that the Court deny defendant FILER's motions for a judgment of acquittal and a new trial.

Respectfully submitted:

TIMOTHY M. O'SHEA
Acting United States Attorney

By:   */s/ Brian Netols*
BRIAN NETOLS
Assistant United States Attorney
JEFFREY SNELL
Special Assistant U.S. Attorney
219 South Dearborn Street
Chicago, Illinois 60604
August 5, 2021                    (312) 613-5100