IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

        v.

EDWARD LEE FILER, ROBERT
JOSEPH GEREG, and PAUL MICHAEL
KELLY,

               Defendants.

Case No. 19 CR 565

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

### I. BACKGROUND

The Defendant, Edward Lee Filer ("Filer"), along with two others, was indicted by the Government in a 21-count Second Superseding Indictment (the "Indictment") with 12 joint counts of wire and bankruptcy fraud (Indict., Counts 1–7, 9–11, 13–14, Dkt. No. 64), an individual count of bankruptcy fraud (*id.*, Count 8), and a single count of making a false statement under penalty of perjury. (*Id.*, Count 15). The Indictment alleges in 123 paragraphs a litany of acts taken in an attempt to prevent liquidation of a failing business, at the expense of the firm's creditors. The acts taken together are described in the Indictment as a scheme to defraud creditors of the firm. The Defendants in the case are Filer, the lawyer; Paul Michael Kelly ("Kelly"), the owner of Barsanti Woodwork Corporation ("Woodwork"); and Robert Joseph Gereg ("Gereg"), a financial consultant retained by Woodwork. Both Kelly and Gereg pled

guilty to tax crimes prior to trial, and the Government moved to dismiss certain counts. The Court, at the conclusion of the Government's case and at the conclusion of the trial dismissed all but two counts charging Filer with wire fraud. The jury found Filer guilty of these two counts. Filer now moves for a judgment of acquittal or, in the alternative, a new trial.

The facts that follow are drawn from trial testimony and exhibits. The story begins with a conversation between the spouses of Filer and Kelly—spouses who were friends and neighbors. Kelly's wife asked Filer's wife to ask her husband, an attorney, if he could possibly help her husband salvage his carpentry business. The business, Woodwork, was ailing as a result of the real estate recession. Being a good Samaritan, Filer acceded to his wife's request and agreed to see if he could help.

It turned out that Woodwork was indeed in dire straits. The firm, which performs major carpentry work for businesses, was delinquent on its loan with Harris Bank, its major financer. The loan balance at the time was approximately $1,100,000 which was secured by all of Woodwork's assets, including accounts receivables and equipment. By the time Filer was brought in, Harris had filed a state court action for appointment of a receiver to take possession of and liquidate the business. The bank had also swept Woodwork's account at Harris and seized all the firm's cash on deposit. Finally, Harris had sent demand letters to all Woodwork's customers advising

them of Harris' lien and instructing them to pay any receivables directly to the bank. Filer also discovered that Woodwork was delinquent in payments of pension and benefit funds due to the Chicago Regional Council of Carpenters' Union (the "Union"), in unpaid income taxes due the to IRS and the State of Illinois Department of Revenue, and to Woodwork's vendors.

The situation facing Filer was indeed unpromising. Obviously the first problem to address was the Harris Bank delinquency. The debt to Harris far exceeded Woodwork's cash on hand. If Harris was not placated, the business was going to be liquidated, end of story. The death of the business would also have consequences for Woodwork's remaining creditors. According to Harris' High Risk/Impairment Report (the "Report"), Woodwork's liquidation value would not come close to satisfying Harris' loan balance. With Woodwork out of business there would be no assets available for any other creditor.

Filer's initial efforts on Woodwork's behalf focused on identifying a lender who would lend Woodwork enough money to settle with Harris and stave off liquidation. These efforts were unsuccessful. Filer knew that it was Harris' policy to refuse to negotiate a lower payment with defaulting borrowers because it was viewed as bad precedent and could lead other borrowers to seek loan reductions. To be sure, this strategy had been attempted by Kelly's previous attorney. At that time Harris rejected offers to settle the debt at less than face value by putting together Woodwork receivables

and some money from Kelly's family. For this avenue to be available, it was necessary to identify a third-party that could negotiate with Harris.

Running out of time, Filer's next move was to follow up on a suggestion from Signature Bank that Woodwork contact Gereg whose specialty was corporate finance. The contact resulted in Woodwork hiring Gereg to obtain financing and negotiate a settlement with Harris in return for a fee. After failing to obtain financing, Gereg suggested that a settlement with Harris might be obtained if a new entity was created to negotiate directly with Harris. This met with Filer's approval and BWC Holdings LLC ("Holdings") was created with Kelly as its sole member. Gereg was given authority to act on Holding's behalf.

Gereg commenced negotiating with James Sullivan ("Sullivan"), Harris' outside counsel. Gereg described himself to Sullivan as an "angel investor" working on Woodwork's behalf. The two proceeded to negotiate a settlement, whereby Harris, in return for the payment of $575,000, paid within 30 days, would assign the Woodwork loan agreement and lien to Holdings. Gereg was negotiating from a position of strength. Harris had been unable to obtain payments from any of Woodwork's customers because Kelly had been uncooperative. Many of the receivables were due from jobs which had not been completed and Kelly was refusing to issue lien waivers on any of them. Harris had

- 4 -

been so unsuccessful in recovering receivables that its Report listed the receivables as practically worthless.

Gereg was able to negotiate a reduction of the loan payoff amount from $1,100,000 to $575,000, provided the amount was paid to Harris within 30 days. Gereg also assured Sullivan that Kelly would be cooperative in the recovery of the receivables and that Kelly would not abscond with the customer payments. The agreement provided that Harris would accept payments directly from customer accounts. Sullivan and Harris were aware that most, if not all the payoff amount was to come from the Woodwork receivables, with Holdings being responsible for any shortfall. Harris also agreed that it would accept in payment checks drawn on the customer's accounts.

A problem arose when Harris was insisted that the settlement be an arms-length transaction without Kelly's involvement. Harris demanded proof that Gereg was a member of Holdings and had authority to execute the agreement on Holdings' behalf. But Kelly, not Gereg, was the sole member of Holdings. To solve this problem, Filer created BWC Capital LLC ("Capital"), with Gereg as its sole member. A corporate resolution was then adopted granting Gereg authority to execute the agreement with Harris.

While necessary to consummate the Harris transaction, giving Gereg exclusive ownership of Capital was a concern for Filer. Gereg could go "rogue" and, once the transaction was completed, Capital might refuse to transfer ownership of the Woodwork loan and lien to

- 5 -

Kelly's control. As a remedy Filer proposed the creation of a trust that Kelly would control which would hold the membership in Capital. Filer created the trust documents and an assignment for Gereg to execute and assign his membership in Capital to the Kelly Family Trust. This arrangement would protect Kelly without disclosing his proposed ownership interest in Capital to Harris. Although Gereg dutifully executed the assignment, the trust agreement was never executed by Kelly and the Kelly Family Trust was never created. Consequently, on paper Gereg still held the sole membership in Capital.

The agreement between Harris and Capital was thereafter executed by Gereg on behalf of Capital and a Harris Vice-President on behalf of Harris. At the closing Harris delivered the assignment of the Woodwork loan agreement and lien to Capital, and Capital turned over $575,000 to Harris in the form of $572,760.52 in customer payments and the balance of $2,239.48 by a personal check from Kelly. It is undisputed that Harris was aware that all the funds came from Woodwork and Kelly and none from either Capital or Gereg. Nothing in the agreement required that any of the purchase amount come from Capital or Gereg. In addition, there was nothing in the agreement to prevent Capital from transferring the Woodwork loan and lien to any other entity at any time after the transaction was closed, including Kelly himself.

- 6 -

Having taken care of Harris, Filer next turned to placating the Union, which had obtained an $18,000 judgment against Woodwork for past due premiums. The Union had sent citations to discover assets to all of Woodwork's customers, which again prevented Woodwork from receiving any customer payments. To remedy this problem Woodwork satisfied the judgment which released the citation holds and allowed Woodwork to recommence operations.

The Union, however, was about to present Woodwork with a much larger problem. The Union had filed another suit against Woodwork for current arrearages for unpaid premiums which totaled over $200,000. If and when the Union was successful in obtaining such a judgment, it would likely again serve citations on Woodwork's customers. Because Woodwork did not have the wherewithal to satisfy such a judgment these citations would again shut down Woodwork's business.

To meet this complication Filer suggested that Capital enforce its superior lien on Woodwork's assets. To accomplish this, Capital would need to reduce the Harris loan to judgment prior to the Union obtaining judgment. Once perfected, Capital's secured interest in Woodwork's assets would be superior to the Union's unsecured judgment. The Harris loan agreement, however, did not have a confession of judgment clause, which would allow for an immediate judgment. So, Filer decided to have Capital and Woodwork amend the Harris loan agreement to include such a clause. Because time was of

the essence, the amendment was backdated and Capital immediately filed suit against Woodwork over the defaulted loan, the judgment was confessed, and judgment was entered against Woodwork in the amount of $1,100,000. The amount of the judgment was erroneous because Capital failed to credit Woodwork with the $575,000 paid to Harris. After the judgment was entered, Capital commenced a citation proceeding and obtained a court order transferring all of Woodwork's assets to Capital. Kelly and Gereg intended temporarily to operate the carpentry business through Capital and later return the assets to Woodwork. At that time Gereg and Kelly were negotiating with Turner Construction Company for a $2 million dollar contract which, if obtained, could allow Kelly to satisfy the remainder of Woodwork's debts and make the company viable again.

Unfortunately, a new problem arose. Due to unpaid state income taxes, the Illinois Secretary of State had revoked Woodwork's charter. Filer attempted to work out a payment schedule to reinstate Woodwork. But the State of Illinois would not reinstate Woodwork's charter unless the tax deficiency was paid in full—an impossibility under Woodwork's then financial situation. To meet this problem, Filer created a new entity, Barsanti Millwork LLC ("Millwork") with Gereg was its sole member. Capital then assigned Woodwork's assets to Millwork.

Shortly after creating Millwork, Filer, on the recommendation of another partner at his firm, placed Woodwork into bankruptcy. The

- 8 -

expressed reason for this was a belief that the legality of the proceeding activities could be more quickly resolved in one proceeding in one court. However, the bankruptcy proceeding created a host of new problems for Filer and his client. The bankruptcy filing resulted in the appointment of a bankruptcy trustee with the power to engage in discovery without the protection of the attorney-client privilege.

After the transfer of assets, Millwork attempted to run the carpentry business using the same location and personnel as Woodwork. Despite its efforts, Millwork was unable to land the Turner contract and Kelly's carpentry business was forced to close once and for all. The rest of the story then took place within the bankruptcy court with all the rules of equity.

## II. <u>LEGAL STANDARD</u>

After the jury has returned a verdict, "the court may set aside the verdict and enter an acquittal." FED. R. CRIM. P. 29(c). A defendant has an "uphill battle" in challenging a jury verdict. A challenged verdict will be overturned only if no rational trier of fact could have found beyond a reasonable doubt that the defendants committed the essential elements of the crime. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003) ("Rule 29(c) does not authorize the judge to play thirteenth juror."). When considering a post-conviction Rule 29 motion, the court views the evidence in a light

most favorable to the prosecution. *United States v. Warren,* 593 F.3d 540 (7th Cir. 2010).

According to the Seventh Circuit, "after a guilty verdict, a defendant seeking a judgment of acquittal faces a "nearly insurmountable hurdle" and "successful challenges are relatively rare." *United States v. Garcia*, 919 F.3d 489, 497-98 (7th Cir. 2019); *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). Nevertheless, because the government bears the burden of proof, the Rule 29 standard is not wholly insurmountable. Instead, "the height of the hurdle depends directly on the strength of the government's evidence." *Jones*, 713 F.3d at 339. If the evidence is insufficient to sustain the conviction, this Court must grant a motion for judgment of acquittal. *See id.* at 339-40.

### III. **DISCUSSION**

Filer was convicted of two counts of wire fraud. 18 U.S.C. § 1343. To convict a person under Section 1343 the Government must prove that he (1) was involved in a scheme to defraud, (2) had an intent to defraud, and (3) used the wires in furtherance of the scheme." *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016). To prove a scheme to defraud the Government must show that the defendant (here Filer) made a materially false statement, misrepresentation, or promise, or concealed a material fact. *Id.*

The Government describes the "scheme" as follows:

- 10 -

The scheme in this case – at its core – was not complex. It was about FILER arranging transactions for Paul Kelly to: (1) get control of the Harris Bank senior loan and accompanying lien, (2) use that lien as a shield against his business's other creditors, and (3) try to evade detection. To accomplish these goals, FILER facilitated the deception of Harris Bank so that they would sell the loan to BWC Capital, a front company for Kelly that FILER caused to be created. After the Harris Bank loan and lien were transferred to BWC Capital, and after a creditor engaged in collection efforts against Barsanti Woodwork Corporation, FILER caused fabricated loan documents to be created so that he could trick the Cook County Circuit Court into entering judgment against Barsanti Woodwork Corporation in favor of the newly created BWC Capital. With that judgment in hand, FILER then caused attorneys working at his direction to take steps to strip all assets from Barsanti Woodwork Corporation (at least on paper, to the "outside world") so that the assets would not be subject to the claims of the entity's other creditors and were instead available for Kelly to use for his business as it changed to operating under a new legal entity FILER caused to be created, Barsanti Millwork, which, on paper, Kelly did not "own."

(Opp'n at 4–5, Dkt. No. 182.)

The problem with the Government's alleged scheme begins with step one and it's view that the Harris transaction was the product of fraud. The Seventh Circuit, however, has held that a lack of candor, even on the part of one with a fiduciary relationship, should not be equated with criminal fraud. Weimert, 819 F.3d at 354. In *Weimert,* the defendant, president of a corporation negotiated a real estate transaction on behalf of the company. *Id.* at 362. When presenting the proposed transaction to his board, Weimert falsely stated that the transaction could not be consummated without him acquiring an interest in the property to be sold. *Id.* The board was

concerned about the conflict of interest resulting from Weimert being on the seller's side (as president of the seller) and on the buyer's side (as the recipient of an ownership interest in the property purchased). *Id.* The board waived the conflict and approved the transaction based on Weimert's false statement that his participation was necessary. *Id.* The board would not have waived the conflict and approved the transaction if it had known that Weimert's participation was elective. *Id.* at 362-63.

The Seventh Circuit held that Weimert's lack of candor and breach of fiduciary duty were manifest, nevertheless "sharp and self-interested" dealings, while perhaps important to "the corporate boardroom and the civil law" did not amount to criminal wire fraud. *Id.* at 370. The Seventh Circuit proceeded to caution trial courts not to criminalize mere deception about a party's negotiating position. *Id.* Negotiating parties are normally sophisticated businessmen and do not expect complete candor. *Id.* Stated another way, cases distinguish schemes that do no more than cause victims to enter transactions they would otherwise avoid. These types of situations do not violate the wire fraud statute. Schemes that depend on a misrepresentation of an essential element of the transaction for their completion do violate the statute. *U.S. v. Shellef,* 507 F.3d 82, 108 (2d Cir. 2007).

In this case, Filer's actions were similar to those of Weimert. Filer knew that Harris would not negotiate with Kelly because of its

policy of not negotiating with a bank debtor. So, he (and Gereg and Kelly) created a new entity, Capital, to consummate the purchase. At the time Harris knew the extent of Woodwork's assets including the company's receivables. Indeed, Harris undervalued Woodwork's receivables because it believed that their recovery would be difficult, if not impossible, without Kelly's cooperation. As Sullivan testified, Harris obviously wanted to receive as much as it could from the sale of the loan. Their recovery would therefore be greater with Kelly's cooperation.

Sullivan and Harris knew that the transaction was funded by Woodwork's receivables. The agreement specified that Harris would accept checks payable to Woodwork and, in fact, Harris received over 99% of the purchase price in customer checks (with the miniscule balance paid by Kelly himself from a personal checking account). Harris also knew Gereg was trying to negotiate for the purchase of the Harris loan and lien to avoid Woodwork's liquidation. This would allow Woodwork to resume the carpentry business with the company's remaining assets. Indeed the Parties agree that Gereg was viewed as a "friendly creditor" who would work with Woodwork to rehabilitate the business. Gereg, however, had no experience with carpentry and Kelly remained the owner of Woodwork. Harris therefore had to know Kelly would be involved in the business resumption. Gereg's failure explicitly to state that Kelly's involvement could also include an interest in Capital going forward is not different from Weimert's

- 13 -

deception that his participation was necessary for the transaction to occur. In both scenarios, the continued involvement of the interested party was readily apparent, even if the circumstances surrounding that involvement were not fully disclosed. For these reasons, step one of the alleged scheme was not fraud.

The next step of the alleged scheme, according to the Government, was Capital enforcing its lien on Woodwork's assets. The Government contends that enforcement of the lien was part of a scheme to defraud because Filer, Gereg, and Kelly fraudulently induced Harris to accept the settlement agreement and convey the loan and lien to Capital. Because the transaction between Harris and Capital was based on fraud, the loan documents were void as a matter of law, therefore Capital did not hold a valid lien on Woodwork's assets, and Filer knew the lien was invalid when he pursued its enforcement in state court.

This theory, however, fails as a matter of law. Fraud in the inducement is a defense that renders a contract voidable at the election of the injured party and not void *ab initio*. *Cannon v. Burge,* 752 F.3d 1079, 1092-93 (7th Cir. 2014). If Harris felt aggrieved perhaps it could have had the agreement with Capital voided but it did not and has not done so. Because the lien had not been voided at the time Capital's judgment was obtained, Capital was indeed the valid lienholder. It follows that there was nothing illegal about Woodwork and Capital agreeing to amend the loan

- 14 -

agreement and provide for a confession of judgment in return for a loan extension, and there was nothing illegal in utilizing statutory procedures provided by Illinois law to obtain post judgment relief.

The Government also contends that the lien was void because, in its view, Kelly controlled Capital in addition to owning Woodwork. Therefore, according to the Government, when Capital purchased the lien the debtor and the lienholder were one in the same. At that time the debt was extinguished and the lien no longer existed and thus was unenforceable. However, this position requires that the separate corporate structures of Capital and Woodwork be ignored. There is no question that Capital and Woodwork are separate entities created under state laws. While there are civil law procedures "to pierce the corporate veil" there was no testimony that this was accomplished (at least prior to the bankruptcy).

The Court is aware that "piercing," or disregarding a corporation's separate existence, is one mechanism under Illinois law to avoid obstacles to the protection of private or public rights. *See Fitzgerald v. Pratt,* 585 N.E.2d 1222, 1226 (Ill. App. Ct. 1992). There is, however, a presumption of corporate regularity. *Gass v. Anna Hospital Corporation,* 911 N.E.2d 1084, 1091 (Ill. App. Ct. 2016). Illinois courts do not disregard corporate separateness without a substantial showing of a unity of interest that separate corporate existence would promote a fraud. *Id.* Moreover, the one seeking to pierce the corporate veil, here the Government, has the

burden of proof. *Id.* This is a job for the civil law, such as a bankruptcy court. The Court is unaware of any federal fraud cases, and the Government has cited none, that based a criminal fraud conviction on piercing a corporate veil. For these reasons, the Court concludes that Capital held a valid, enforceable lien against Woodwork. Enforcement of such a lien cannot, therefore, serve as the basis for a criminal conviction.

The final steps in the Government's alleged scheme were the creation of Millwork and the transfer of Woodwork's (now Capital's) assets to Millwork to thwart Woodwork's creditors. This move was necessitated because the State of Illinois revoked Woodwork's charter for nonpayment of taxes, and legally Woodwork no longer existed. Under Illinois civil law these ploys were of questionable legality and quite probably would have been (and probably were in the bankruptcy proceeding) set aside as a fraudulent transfer. Fraudulent transfer, however, is a tort and can lead to civil liability as well as the invalidation of the transaction. The alternative was for Millwork to go out of business, give up seeking the Turner contract, and let the creditors fight over the crumbs.

Filer, Gereg, and Kelly appeared to have had a legitimate prospect of securing the large Turner contract that possibly could have saved the carpentry business. The procedures that Filer utilized were designed to delay creditors from forcing Woodwork out of business, in order to obtain that contract. In doing so Filer

- 16 -

suggested and instituted several procedures that are legitimate, but of course subject to abuse. Lawyers are entitled to take positions on behalf of clients that are not clearly justified under existing law. This is how the law is advanced. And where a lawyer adopts a position that is clearly unjustified the civil law provides remedies such as awarding costs and attorneys' fees. In addition, the law of equity provides remedies for taking away the benefits obtained by civil fraud, undoing those that are clearly unjustified. *Ronan v. Rittmueller,* 434 N.E.2d 38, 43 (Ill. App. Ct. 1982). If an attorney's dealings are particularly egregious, courts strike pleadings or dismiss suits. However, a court should be very wary of criminalizing vexatious conduct by lawyers who are acting on behalf of their clients.

The "crime" for which Filer could be held accountable is that he took on an apparent hopeless case, without much of a chance of success, in a metaphorical attempt of making a silk purse out of a sow's ear. When Filer found out that Woodwork no longer existed, it should have been obvious that end of the line had been reached. However, turning zealous, if misguided, legal representation into wire fraud is criminalizing civil law. Filer's intent clearly was to try to salvage Woodwork's business, to save jobs, to pay Woodwork's vendors, and perhaps earn a fee, if Woodwork could have been successfully turned around. There never was any attempt to extract money from Woodwork's creditors.

- 17 -

The Government contends that Filer attempted to cover up his illegal activities. But the filing of a bankruptcy petition and enlisting his law firm's partners, associates, and employees, belies any attempt at a coverup. In addition, the use of the internet and other electronic communications and records leaves an indelible record of all activities and is not consistent with a cover up.

The Court realizes that it heard these arguments at the time Filer moved for judgment of acquittal under Rule 29 and denied them as to Counts 1 and 2. The Court in so ruling stated that the issue was "whether the lien is enforceable is a question of fact for the jury." This was error. The validity or invalidity of the lien was not for the jury to decide. Even if so, the issue was whether Filer knew it was invalid. Under the facts of this case there were four possibilities:

(1) The lien was void for one of the reasons enunciated by one of the Government's experts and Filer believed it void.

(2) The lien was void for one of the reasons enunciated by the Government's experts and Filer did not believe it void.

(3) The lien was not void but Filer believed it to be void.

(4) The lien was not void and Filer did not believe it void.

On the first scenario that could lead to conviction under the Government's theory. There was, however, no evidence that Filer

believed the lien was void. He testified in his own defense that he did not so believe and there was no evidence otherwise. It is for this reason that the Filer's Motion for Judgment of Acquittal is granted.

The case epitomizes the old saying "no good deed goes unpunished." Filer took on a hopeless task as a favor without expectation of significant financial reward. He zealously (perhaps excessively) utilized the procedures provided by law to attempt to save his client's business. In doing so, he set himself up, as well as his law firm, for punishment exacted through civil law in the bankruptcy court. This is sufficient. He should not be punished by the criminal law.

### III. <u>CONCLUSION</u>

For the reasons stated herein, the Motion for Judgment of Acquittal (Dkt. No. 179) is granted. The Motion for a New Trial is denied as moot.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 9/23/2021

- 19 -