**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 19-cr-565 |
| | ) | |
| EDWARD LEE FILER | ) | Hon. Steven C. Seeger |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

An indictment charged Edward Lee Filer, an attorney, with two counts of wire fraud, plus a bunch of other crimes. Basically, the government charged Filer with a scheme to defraud the unsecured creditors of Barsanti Woodwork, a debtor in bankruptcy.

In a nutshell, the scheme involved getting the company's assets out of the reach of the creditors through fraudulent means. Filer allegedly contributed to that scheme while representing Defendant Paul Kelly, his client. Kelly owned Barsanti Woodwork.

Filer helped Kelly get his hands on a lien held by a bank that had loaned money to Barsanti Woodwork. Kelly then used that lien to obtain the company's assets through a judgment in state court. The indictment alleged that Filer helped Kelly obtain that lien, and obtain the state court judgment, through fraud.

The fraud enabled Kelly to get control of the company's assets, at the expense of everyone else. When Barsanti Woodwork later filed for bankruptcy, there was nothing left for the creditors. The assets had left the proverbial building, and the other creditors were left in the cold.

Filer moved to dismiss the indictment based on the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). That case rejected the right-to-control theory of wire fraud, where a defendant deprives a victim only of valuable economic information.

For the reasons stated below, the motion to dismiss is denied.

### Background

The case has a long procedural history, and this Court assumes that any interested reader knows the full backstory. *See generally United States v. Filer*, 56 F.4th 421 (7th Cir. 2022). The punchline is that only two counts of wire fraud remain in the case.

In 2020, a grand jury returned an indictment against Edward Lee Filer, Robert Joseph Gereg, and Paul Michael Kelly, charging them with twenty-one counts in connection with a multi-faceted fraud scheme.

Filer is an attorney. *See* Second Superseding Indictment, at ¶ 1(a) (Dckt. No. 64). Gereg is a financial advisor and workout specialist. *Id.* at ¶ 1(b). Kelly was the owner of Barsanti Woodwork Corporation, which designed and installed woodwork. *Id.* at ¶ 1(c).

Barsanti Woodwork employed union carpenters, and had to pay benefit contributions to the union's funds. *Id.* at ¶ 1(d). Barsanti Woodwork had a line of credit and loans from Harris Bank. *Id.* at ¶ 1(e). The bank had a senior lien on all of Barsanti Woodwork's assets. *Id.*

Barsanti Woodwork stopped paying Harris Bank, and stopped paying contributions to the union funds. *Id.* at ¶ 1(f)–(g). So Harris Bank exercised its rights and instructed those who owed money to Barsanti Woodwork to pay Harris Bank instead. *Id.* at ¶ 1(h). Before long, the union funds sued Barsanti Woodwork to collect the unpaid contributions. *Id.* at ¶ 1(i).

The company's financial woes went from bad to worse. Harris Bank sued Barsanti Woodwork and Kelly to recover the balance of the unpaid loan. *Id.* at ¶ 1(k). Kelly retained Filer, his neighbor and friend, to represent him and the company. *Id.* at ¶ 1(l).

Negotiations with the bank failed. The bank refused to whittle down the amount owed by Kelly, based on the bank's policy against negotiating with debtors.

So Filer and Kelly allegedly concocted a scheme to get control of the company's assets through false pretenses. Kelly introduced Gereg to the bank as a would-be potential purchaser of the debt. In reality, Gereg was simply a front person, and Kelly was pulling the strings behind the scenes. Kelly needed to stay in the shadows, because the bank had a policy against negotiating with its borrowers about their debts. *See Filer*, 56 F.4th at 425.

Harris Bank ultimately agreed to sell the loans to Gereg. Filer created a new company, BWC Holdings, to get the deal done and buy the debt. *See* Second Superseding Indictment, at ¶ 9 (Dckt. No. 64). Kelly was the "sole owner" of BWC Holdings. *See Filer*, 56 F.4th at 426.

Using a company owned by Kelly to do the deal created a problem. The bank wanted proof that Gereg had the authority to sign on behalf of BWC Holdings. *See* Second Superseding Indictment, at ¶ 11 (Dckt. No. 64). That request, in turn, created a risk that the bank would figure out that Kelly was behind the curtain. Any document authorizing Gereg to act on behalf of BWC Holdings would expose the fact that Kelly lurked in the shadows. *Id.*

As a work-around, Filer created a new company, BWC *Capital*, to purchase the debt from the bank, with Gereg as the sole owner of that new company. *Id.* at ¶¶ 11–12. But Kelly was concerned that Gereg might go rogue, and foreclose on the loans once he got ahold of them. So Kelly had Gereg sign an agreement assigning Gereg's interest in BWC Capital to the "K Family Trust." *Id.* at ¶ 13. The K Family Trust was a purported trust that Kelly controlled. *Id.*

The plan worked. Harris Bank sold and assigned the debt and the lien to BWC Capital. *Id.* at ¶ 9. At that point, BWC Capital stepped into the shoes of Harris Bank and became the senior lienholder on Barsanti Woodwork's assets.

The next step in the scheme involved getting the company's assets out of the hands of the company, and thus out of the reach of the company's creditors. They took that step by filing a lawsuit in state court, obtaining a judgment, and using the judgment to get control of the assets.

Specifically, BWC Capital sued Barsanti Woodwork to enforce the lien, and obtained a judgment for $1.58 million (an inflated amount). *Id.* at ¶ 46. Filer then obtained a court order transferring the assets of Barsanti Woodwork to BWC Capital, to satisfy the judgment. *Id.* at ¶ 49. BWC Capital, in turn, transferred the assets to Barsanti *Millwork*, another new company created by Filer and Gereg. *Id.* at ¶¶ 36, 55.

After the transfer, Barsanti Woodwork filed for bankruptcy. *Id.* at ¶ 59. At that point, the company was a shell of its former self. And the shell was empty. The company's assets were gone. The creditors were left out to dry, and left holding the bag.

Viewed as a whole, the indictment alleges that Filer defrauded the company's creditors by putting Barsanti Woodwork's assets outside the reach of the union funds. He put the assets under the control of BWC Capital, a senior lienholder that had priority over the union funds. And then, after the assets were gone, Barsanti Woodwork declared bankruptcy, leaving nothing for the union funds. The indictment alleges that Defendants carried out their plan by creating sham companies and then using fraudulent documents to trick the state court into granting them a favorable judgment.

The case went to trial before Judge Leinenweber. The government presented evidence that Filer defrauded the company's creditors by taking two steps. Filer first helped Kelly get his hands on the assets, and then put them out of the reach of the company's other creditors. *See Filer*, 56 F.4th at 425 ("First, Filer helped the owner of Barsanti Woodwork, Paul Kelly, obtain effective control of Harris Bank's senior lien against his company's assets through the use of a nominee purchaser. Second, Filer, Kelly, and others then used that lien to obtain a state court judgment that allowed them to transfer Barsanti Woodwork's assets – but not its liabilities – to a new company effectively but secretly controlled by Kelly before putting Barsanti Woodwork into bankruptcy.").

Judge Leinenweber dismissed all but two of the counts before the jury returned its verdict. The jury returned a guilty verdict on the two remaining counts of wire fraud. Judge Leinenweber then granted Filer's motions for a judgment of acquittal and, in the alternative, a new trial.

The government appealed the judgment of acquittal, and the Seventh Circuit reversed. The case was later reassigned to this Court on remand.

The case is now headed back to trial. In the meantime, Filer challenges the legal sufficiency of the indictment.

**Legal Standard**

An indictment must be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." *See* Fed. R. Crim. P. 7(c)(1). "When considering a motion to dismiss an indictment the Court assumes all of the facts alleged in the indictment as true and views all of the facts alleged in the indictment in the light most favorable to the government." *United States v. Linder*, 2013 WL 812382, at *30 (N.D. Ill. 2013) (quoting *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)).

An indictment is "legally sufficient if it (1) states all the elements of the crime charged, (2) adequately informs the defendant of the nature of the charges against him, and (3) allows the defendant to assert the judgment as a bar to future prosecutions of the same offense." *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013). To "challenge the sufficiency of an indictment, a defendant must show that the indictment failed to satisfy one or more of these requirements." *United States v. Dooley*, 578 F.3d 582, 590 (7th Cir. 2009).

"Facial sufficiency is not a high hurdle." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996). Instead, an indictment needs to make the defendant "aware of the specific conduct against which he will have to defend himself at trial." *See United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010). And when the charge is wire fraud, courts use a broad rather than a technical standard to determine the sufficiency of an indictment. *See United States v. Schwartz*, 2024 WL 3226575, at *4 (N.D. Ill. 2024) (Kness, J.) (citing *United States v. Palumbo Bros.*, 145 F.3d 850, 868 (7th Cir. 1998)).

**Analysis**

Filer seeks dismissal of the indictment based on the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). That case addressed the viability of the right-to-control theory of wire fraud.

*Ciminelli* involved a scheme to rig a state-funded bidding process to ensure that Louis Ciminelli's construction company would win the business. *See Ciminelli*, 598 U.S. at 310. The defendants built proverbial barriers and roadblocks to channel the flow of work to Ciminelli. The victim, Fort Schuyler Management Corporation, ultimately selected Ciminelli's company as the developer based on that rigged process.

The government charged Ciminelli with wire fraud under 18 U.S.C. § 1343. The statute criminalizes the use of interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *See* 18 U.S.C. § 1343.

The government relied on the Second Circuit's so-called right-to-control theory. *See Ciminelli*, 598 U.S. at 310. Under that theory, the government "can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." *Id.* The concept of valuable economic information swept broadly, covering "information that affects the victim's assessment

4

of the benefits or burdens of a transaction, or relates to the quality of goods or services received or the economic risks of the transaction." *Id.* at 311.

The right-to-control theory was the cornerstone of the indictment in *Ciminelli*. In fact, it was the only stone, because the government alleged nothing else. *Id.* at 310. That is, the indictment in *Ciminelli* "did not allege that contracts were the property the defendants sought to obtain." *See Schwartz*, 2024 WL 3226575, at *3 (citing *Ciminelli*, 598 U.S. at 310 n.1).

The Supreme Court unanimously held that the "right-to-control theory cannot form the basis for a conviction" under § 1343. *See Ciminelli*, 598 U.S. at 316. The Supreme Court reinforced the longstanding understanding that "money or property" refers to "traditional property rights." *Id.*

The right-to-control theory overstepped those textual boundaries. "The so-called 'right to control' is not an interest that had 'long been recognized as property' when the wire fraud statute was enacted." *Id.* at 314 (citation omitted). That is, the "right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest." *Id.* at 316. So "the right-to-control theory cannot form the basis for a conviction" under the wire fraud statute. *Id.*

By departing from the original meaning of the text, the right-to-control theory "criminalizes traditionally civil matters and federalizes traditionally state matters." *Id.* In fact, "almost any deceptive act could be criminal" by "treat[ing] mere information as the protected interest." *Id.* at 315.

Filer believes that *Ciminelli* pulls the rug out from under the indictment at hand. *See generally* Mtn. to Dismiss (Dckt. No. 279). He argues that the indictment does not sufficiently allege a scheme to defraud Harris Bank or Barsanti Woodwork's creditors. *Id.* at 9, 13.

In Filer's view, the indictment "does not allege that anyone took 'money or property' from Harris [Bank]." *Id.* at 12. Instead, the alleged fraud boils down to the notion that Harris Bank "would not have agreed to assign the loans and lien on [Barsanti] Woodwork's assets to BWC Capital" if it had known that Kelly was pulling the strings. *Id.* As Filer sees things, that is "exactly the type of 'discretionary economic decision' contemplated by *Ciminelli*." *Id.* at 13.

In a similar vein, Filer also argues that the indictment "does not allege that Filer or anyone else took the Union's money or the money of any other creditor." *Id.* at 16. Instead, the creditors "remained at all times in possession of their purported claims." *Id.* In Filer's view, the indictment only alleges that the creditors were denied "information that could have informed their decision whether, when, and in what way to assert th[eir] claims." *Id.* at 17.

The government argues that Filer's motion "strays far from the indictment's actual allegations to present the allegations and evidence as Filer wishes they would be." *See* Resp., at 16 (Dckt. No. 302). The government offers two responses.

5

First, the government argues that Filer's argument about Harris Bank "is a moot point" because the government does "not alleg[e] that Harris Bank is a victim within the § 1343 scheme." *Id.* at 18. The government does intend to show at trial that Filer deceived Harris Bank, but only to prove Filer's broader scheme to defraud Barsanti Woodwork's creditors. *Id.* at 18–19 n.8.

Second, the government argues that traditional property interests *were* the object of Filer's scheme. *Id.* at 20. In its view, the goal was to "take all of Barsanti Woodwork's assets and thereby deprive Barsanti Woodwork's creditors of their lawful claims by essentially rendering them valueless." *Id.* And the right to be paid money is "property" for purposes of § 1343. *Id.* (citing *Pasquantino v. United States*, 544 U.S. 349, 355–57 (2005)). By rendering the claims worthless, the scheme deprived the creditors of their property.

The Court agrees that the indictment clears the hurdle of *Ciminelli*, by a comfortable margin.

The indictment alleges that Filer defrauded the company's unsecured creditors. The union funds had a right to payment under the labor agreement. They also had a right to bring a claim against the company's assets in the bankruptcy proceeding. And they lost something of value – the right to their share of the assets – when Filer removed the company's assets from their reach.

In effect, the company had a bucket of assets. The creditors had a right to dip into the bucket. But Filer fraudulently moved the assets out of the bucket and put them in Kelly's hands. So after the fraud, the bucket was empty – nothing was left for the creditors.

The right to payment is a property interest, and so is a right to assert a claim and bring a cause of action. *See United States v. Griffin*, 76 F.4th 728, 738 (7th Cir. 2023) ("[A]n entitlement to collect money is 'property' as that term ordinarily is employed.") (citing *Pasquantino*, 544 U.S. at 355–56) (cleaned up); *United States v. Sullivan*, 118 F.4th 170, 209 (2d Cir. 2024) ("[C]ourts interpreting the mail and wire fraud statutes have repeatedly concluded that enforceable rights to payment are 'property' that, when wrongfully thwarted by a defendant, may underlie a criminal prosecution."); *see also United States v. Gumrukcu*, 2024 WL 3849963, at *6 (D. Vt. 2024) (noting that *Ciminelli* "does not foreclose all wire fraud cases predicated on the existence of a contract," even where the alleged victim "was not deprived of his '[cause] of action' to sue to recover this money"); *United States v. Kousisis*, 82 F.4th 230, 242 (3d Cir. 2023) ("[D]isputed contracts themselves do indeed constitute 'property.' . . . It is well settled that 'the privilege of contracting is a property right, without which there cannot be full and free use and enjoyment of property.'") (footnotes omitted).

A contractual right to payment is a traditional property interest. If anything, a right to payment is *the* property interest, because it is the foundation for every exchange in our economic system. Capitalism itself depends on it. A right to payment is the foundation of property, and makes the economic world go round.

A right to payment is not an intangible interest at a high level of abstraction, like a so-called right to control one's own economic decision-making. A right to payment can be bought and sold. It's worth something.

Here, the unsecured creditors lost "property" within the meaning of the wire fraud statute. The scheme rendered worthless their contractual right to payment and their right to bring a claim and receive their fair share of the company's assets. They had a property interest as creditors in the bankruptcy, and the fraud took that property away. The right to something became the right to nothing.

The union funds lost more than information. They lost their fair share of the company's assets. It's the difference between a right to a half-empty bucket, and a right to an empty bucket. The right to a share of an empty bucket isn't much of a right.

Filer tries to hang his hat on the use of the word "discourage" in the Seventh Circuit's opinion. *See* Mtn. to Dismiss, at 15 (Dckt. No. 279). The Seventh Circuit noted that "[a]t the very least, the scheme was designed to deceive the unsecured creditors and thus discourage them from even trying to recover on their claims." *See Filer*, 56 F.4th at 433. According to Filer, "[a] scheme designed not to take money or property from a creditor, but rather to 'discourage' the creditor from deciding to pursue its purported claims, is not a wire fraud scheme within the meaning of 18 U.S.C. § 1343." *See* Mtn. to Dismiss, at 15–16 (Dckt. No. 279).

Filer overly parses the phraseology of a snippet in the Seventh Circuit's decision. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration."). The Seventh Circuit's language does not limit the scheme to mere "discourge[ment]." *See Filer*, 56 F.4th at 433. The indictment is what matters.

The indictment squarely alleges that Filer orchestrated a scheme to siphon off the company's assets, at the expense of the creditors. "It was part of the scheme that defendants FILER, GEREG and KELLY attempted to and did defraud creditors and later the bankruptcy trustee of Barsanti Woodwork by creating a sham secured creditor with a fraudulent senior lien on all of Barsanti Woodwork's assets for the purpose of fraudulently shielding the assets from legitimate creditors." *See* Second Superseding Indictment, at ¶ 3 (Dckt. No. 64).

Filer did more than "'discourage' the creditors from deciding to pursue its purported claims." *See* Mtn. to Dismiss, at 16 (Dckt. No. 279). The creditors held the right to payment and the right to bring claims in the bankruptcy, and the claims became worthless. Filer left them holding an empty bag. He drained the bucket of value, and the bucket became bone dry.

Simply put, the indictment squarely alleges that Filer "attempted to and did defraud creditors" by using a lien to "fraudulently shield[] the assets from legitimate creditors." *See* Second Superseding Indictment, at ¶ 3 (Dckt. No. 64). Given that allegation, it is hard to understand Filer's suggestion that the indictment "does not assert, nor could it, that the object of the fraud was to deprive Woodwork's unsecured creditors of any money or property." *See* Mtn. to Dismiss, at 15 (Dckt. No. 279).

At times, Filer seems to argue that *Ciminelli* forecloses any charge of wire fraud that involves depriving a victim of information. If that's the argument, it's a non-starter.

*Ciminelli* does not preclude a charge of wire fraud simply because the fraud involved depriving the victim of information. *See, e.g.*, *Ciminelli*, 598 U.S. at 317–18 (Alito, J., concurring) ("I do not understand the Court's opinion to address fact-specific issues on remedy outside the question presented, including . . . the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts."); *United States v. An*, 733 F. Supp. 3d 77, 93 (E.D.N.Y. 2024) ("*Ciminelli* did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud. *Ciminelli* simply rejected the notion that *information itself can be property*."); *see also United States v. Venkata*, 709 F. Supp. 3d 9, 28–29 (D.D.C. 2024).

After all, fraud *is* the deprivation of information. Fraud necessarily leaves the victim in the dark. By definition, fraud deprives the victim of truthful and accurate information.

At other times, Filer suggests that *Ciminelli* controls because the victims in question lost nothing except information. As he sees it, *Ciminelli* prevents a wire fraud charge if the victims only lost information. And then, Filer attempts to recast the scheme in question, by suggesting that the victims lost nothing except information.

In his view, the victims lost nothing except information because they retained the opportunity to submit a claim in the bankruptcy proceeding. That is, the victims never lost their ability to assert a claim in bankruptcy. As Filer sees things, maybe the claim became worthless – that's a pretty big disclaimer – but the ability to bring a claim never went away. And the victims retained the ability to pursue other relief, too, including relief against other entities (like Filer's law firm).

That theory sweeps too broadly. Fraud victims routinely retain the ability to seek relief on their own. The ability to seek civil relief does not un-fraud the fraud. And in any event, rendering a claim worthless is the epitome of "thwart[ing]" an enforceable right to payment. *See Sullivan*, 118 F.4th at 209.

Filer highlights the fact that the victims suffered no harm. In fact, "they actually ended up better off then they would have had the alleged scheme never taken place." *See* Mtn. to Dismiss, at 2 (Dckt. No. 279); *see also id.* at 5 ("Through the bankruptcy, Woodwork's creditors ultimately received more than they ever would have had Harris shut Woodwork's business down at the outset, as it was going to do before Gereg became involved."); *id.* at 2 ("[I]ndeed the 'victims' of the fraud lost no property . . . they actually ended up better off than they would have had the alleged scheme never taken place.").

That makes no difference. Wire fraud does not require proof of actual losses. In fact, a defendant can be guilty of fraud even if the victims *came out ahead*. *See United States v. Lupton*, 620 F.3d 790, 805 (7th Cir. 2010) ("[The] wire fraud statutes criminalize the fraudulent acts undertaken to secure illicit gains, not their ultimate successes."); *United States v. Aslan*, 644

F.3d 526, 545 (7th Cir. 2011) (citing *Pasquantino*, 544 U.S. at 371) ("The wire fraud statute punishes the scheme, not its success. . . . The fraud is therefore complete once a defendant with the requisite intent has used the wires in furtherance of a scheme to defraud, whether or not the defendant actually collects any money or property from the victim of the scheme."); *United States v. Leahy*, 464 F.3d 773, 786–87 (7th Cir. 2006) ("[Wire fraud and mail fraud] do not require the government to prove either contemplated harm to the victim or any loss."); *see also Seventh Circuit Pattern Jury Instruction (Criminal)* 623 (2023 ed.) ("18 U.S.C. §§ 1341 & 1343 Success Not Required").

Doubling down, Filer points out that "[t]o the extent that civil wrongs were alleged to have occurred, they appropriately produced a civil remedy." *See* Mtn. to Dismiss, at 5 (Dckt. No. 279). Again, that's neither here nor there.

The existence of a civil remedy does not foreclose criminal liability. A defendant can commit wire fraud even if the victim ultimately receives 100 cents on the dollar. *See Shaw v. United States*, 580 U.S. 63, 67 (2016) ("Many years ago Judge Learned Hand pointed out that '[a] man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'") (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)).

Overall, the indictment alleges that Filer schemed to deprive the unsecured creditors of their ability to recover payment for debts owed by Barsanti Woodwork. A right to payment is a traditional property interest, not an intangible interest in valuable economic information. So *Ciminelli* does not apply.[1]

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss the indictment is denied.

---

[1] The Court wonders whether the indictment would independently pass muster under *Ciminelli* based on the notion that the bank was a victim. After all, the indictment alleges that Filer induced the bank to engage in an economic transaction – the sale of debt and a lien – through false pretenses. Again, a right to payment is a traditional property interest, and so is a lien. So the bank lost more than simply "valuable economic information." *See Ciminelli*, 598 U.S. at 316. It lost ownership of debt and a lien, both of which are traditional forms of property. Filer argues that "[n]ot only was there was no money or property taken from Harris, Harris was paid to assign the loans and liens – a payment that was indisputably many times larger than what Harris could have hoped to recover in the foreclosure proceedings." *See* Mtn. to Dismiss, at 13 (Dckt. No. 279). That's triply wrong. Harris sold debt, so it surrendered its property based on false pretenses. It makes no difference that Harris received something in exchange. And it makes no difference that Harris received something that might have been as valuable – or even *more* valuable – than what it gave up. The point is that the victim surrendered its property based on fraud – *full stop*. Also, Filer seems to think that *Ciminelli* applies because the bank made a "discretionary economic decision" to engage in the transaction for the sale of its assets. But that's true in countless fraud cases. Victims routinely make discretionary economic decisions whenever they get duped – like, say, the decision to fork over money in the first place. *Id.* at 12. A discretionary decision by the victim is a bread-and-butter part of countless fraud cases. Even so, the government is not pursuing the theory that the bank was a victim, so the Court won't address the sufficiency of the indictment on that alternate ground.

9

Date:   January 13, 2025

_____

Steven C. Seeger
United States District Judge