UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 19-cr-565 |
| | ) | |
| EDWARD LEE FILER | ) | Hon. Steven C. Seeger |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

An indictment charged Edward Lee Filer, an attorney, with two counts of wire fraud, plus a bunch of other crimes. Basically, the government charged Filer with a scheme to defraud the unsecured creditors of Barsanti Woodwork, a debtor in bankruptcy.

Filer moved to dismiss the indictment based on statements made by prosecutors to the grand jury. As Filer sees things, the government engaged in prosecutorial misconduct. In his view, the statements were so extreme that, in effect, there was no grand jury at all. He believes that the prosecutors took away his Fifth Amendment right not to stand trial "unless on presentment or indictment of a Grand Jury." *See* U.S. Const. amend. V.

For the reasons stated below, the motion to dismiss is denied.

### Background

Any interested reader is probably familiar with the backstory of the case. The case already went up and down on appeal, and the Seventh Circuit's opinion contains a detailed summary of the allegations and the procedural history. *See generally United States v. Filer*, 56 F.4th 421 (7th Cir. 2022).

The Court will begin by summarizing the allegations of the indictment, before turning to the procedural history. "When considering a motion to dismiss an indictment the Court assumes all of the facts alleged in the indictment as true and views all of the facts alleged in the indictment in the light most favorable to the government." *United States v. Linder*, 2013 WL 812382, at *30 (N.D. Ill. 2013) (quoting *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)).

In July 2018, a special grand jury in this district began investigating a complicated scheme to defraud. The grand jury returned an indictment against Filer and two co-defendants in July 2019, one year later. It returned a superseding indictment in February 2020 and a second superseding indictment in September 2020. The second superseding indictment is the operative indictment, so the Court will refer to it as the "indictment."

The gist of the indictment is that Filer (a lawyer) allegedly helped his client, Defendant Paul Kelly, put his company's assets out of the reach of its creditors through fraudulent means.

Specifically, the indictment alleges that Paul Kelly owned and operated Barsanti Woodwork, a woodworking company. *See* Indictment, at ¶ 1(c) (Dckt. No. 64). Barsanti Woodwork ran into financial trouble and stopped paying on a loan from Harris Bank. *Id.* at ¶ 1(e). That loan gave Harris Bank a senior lien on all of Barsanti Woodwork's assets. *Id.*

Barsanti Woodwork stopped paying on the loan. So Harris Bank sued Barsanti Woodwork and Kelly to recover what it was owed. *Id.* at ¶ 1(k).

Around this time, Barsanti Woodwork also stopped paying benefit contributions to certain union funds. *Id.* at ¶ 1(f)–(g). Barsanti Woodwork was required to make those payments because it employed union carpenters. *Id.* at ¶ 1(d). Those union funds also filed suit against Barsanti Woodwork to collect the delinquent contributions. *Id.* at ¶ 1(i).

Facing multiple lawsuits, Kelly retained Filer and his law firm to represent him and Barsanti Woodwork. *Id.* at ¶ 1(l).

Kelly and Barsanti Woodwork also entered into an agreement with Defendant Robert Gereg, a financial consultant and workout specialist. Gereg and his affiliated companies agreed to provide financing to Barsanti Woodwork in exchange for a percentage-based fee. *Id.* at ¶ 1(m).

To facilitate this plan, Filer created BWC Holdings, which the government alleges was a sham company. *Id.* at ¶ 9. Kelly was the sole owner of BWC Holdings (as an aside, there is a wrinkle involving the K Family Trust, but the Court won't iron it out). *Id.* The plan was for Gereg to direct BWC Holdings to buy Barsanti Woodwork's secured debt from Harris Bank. *Id.* at ¶ 10. Basically, the idea was for Kelly to buy the company's debt at a discount through a sham purchaser, without the bank knowing that Kelly was behind the curtain.

Using a company owned by Kelly to do the deal created a problem. The bank wanted proof that Gereg had the authority to sign on behalf of BWC Holdings. *Id.* at ¶ 11. That request, in turn, created a risk that the bank would figure out that Kelly was behind the curtain and pulling the strings. Any document authorizing Gereg to act on behalf of BWC Holdings would expose the fact that Kelly lurked in the shadows. *Id.*

The indictment alleges that Filer responded by creating BWC *Capital* to serve as a sham secured creditor of Barsanti Woodwork, with Gereg as the sole member of BWC Capital. *Id.* at ¶ 12. According to the indictment, Gereg's ownership of BWC Capital was a sham meant to conceal Kelly's true control. *Id.* at ¶ 5(a). Gereg was just "the front guy." *Id.* at ¶ 8.

The indictment alleges that BWC Capital offered to buy Barsanti Woodwork's debt from Harris Bank. And the plan worked. Harris Bank sold and assigned the lien to BWC Capital. *Id.* at ¶ 9. So for purposes of the debt, BWC Capital stepped into the shoes of Harris Bank, and BWC Capital became the senior lienholder of Barsanti Woodwork's debt.

The indictment alleges that Filer then fraudulently altered and backdated the credit agreement between Barsanti Woodwork and BWC Capital. *Id.* at ¶ 28. These changes would allow BWC Capital to quickly obtain a judgment and force a transfer of Barsanti Woodwork's assets to BWC Capital. *Id.*

Defendants filed a state-court lawsuit to carry out that plan. *Id.* at ¶ 44. BWC Capital was able to quickly receive and enforce a seven-figure judgment, taking hold of Barsanti Woodwork's assets while the union funds' lawsuit was still pending. *Id.* at ¶¶ 46, 49.

In short, BWC Capital allegedly tricked the state court into becoming its battering ram, to legally compel Barsanti Woodwork to hand its assets over to BWC Capital.

Once the assets had been transferred to BWC Capital, Defendants put Barsanti Woodwork into bankruptcy. *Id.* at ¶ 59. At that point, BWC Capital had all the assets, leaving the union funds out to dry and holding the bag.

Filer also allegedly created another company, Barsanti *Millwork*, to permit Kelly to maintain control over the assets. *Id.* at ¶¶ 36–40.

In a nutshell, the indictment alleges that Defendants defrauded the company's unsecured creditors. They put Barsanti Woodwork's assets beyond the reach of the union funds by placing the assets under the control of BWC Capital. When Barsanti Woodwork declared bankruptcy, nothing was left in the tank for the union funds. The indictment alleges that Defendants carried out their plan by creating sham companies and then using fraudulent documents to trick the state court into granting them a favorable judgment. In the end, Barsanti Woodwork was a shell of its former self, and the shell was empty.

The indictment contained 21 counts against Filer, Kelly, and Gereg.

The grand jury did not reach that decision lightly, or in a blaze of speed. Quite the opposite. The grand jury heard an extensive collection of evidence, over an extended period of time.

The grand jury began hearing evidence in July 2018, and returned the original indictment on July 11, 2019. They took another six months before returning the superseding indictment (on February 6, 2020), and another six months before returning the second superseding indictment (on September 18, 2020).

All in all, the grand jury met over 20 times, spanning 16 separate days, during those 18 months. They heard from at least seven different witnesses.

The proceedings span 811 pages of transcripts. They saw 1,615 pages of exhibits.

The grand jury did not return an indictment quickly. They engaged in a slow and deliberative process.

3

Kelly and Gereg ultimately pled guilty, but Filer exercised his right to go to trial. In June 2021, Judge Leinenweber presided over Filer's trial. The trial lasted two weeks.

Judge Leinenweber dismissed many of the counts before the jury returned its verdict. Judge Leinenweber dismissed all counts against Filer except the two counts of wire fraud at the close of the government's case, an unreviewable decision.

The jury later returned a guilty verdict on the two remaining counts of wire fraud. Judge Leinenweber then granted Filer's motions for a judgment of acquittal, and in the alternative, a new trial.

The government appealed the judgment of acquittal. The Seventh Circuit reversed and remanded. *See United States v. Filer*, 56 F.4th 421 (7th Cir. 2022).

After remand, the case was reassigned to this Court. On February 10, 2023, this Court set a trial date of March 4, 2024 (*i.e.*, the next available date for everyone).

One year passed. On February 19, 2024 – one year after this Court set a trial date, and roughly two weeks before trial – Filer dropped a bit of a bombshell. Filer moved to dismiss the indictment based on prosecutorial misconduct. *See* Def.'s Mtn. to Dismiss (Dckt. No. 336).

The timing of the motion was less than ideal, to put it mildly. It arrived four days after the final pretrial conference on February 15, 2024. It spanned 29 pages. Counsel's explanation for the late arrival wasn't satisfying either. Counsel hadn't taken the time to review the grand jury transcripts until shortly before trial. *Id.* at 4.

This Court held a prompt hearing. This Court flagged the fact that it was caught off guard by the motion to dismiss. After all, at the final pretrial conference on February 15, 2024, defense counsel didn't flag that the motion to dismiss was on the horizon. Counsel explained that they didn't start working on the motion to dismiss until the day after the final pretrial conference.

The government moved to continue the trial, which this Court granted. The parties needed time to brief the motion. The parties also wanted to get their hands on transcripts of other portions of the grand jury proceedings, meaning passages when a witness was not testifying. At that point, defense counsel had the transcripts for the testimony by the witnesses, but not the rest of the proceedings.

After receiving all of the transcripts, Filer submitted an updated motion to dismiss. *See* Def.'s Suppl. Mtn. to Dismiss (Dckt. No. 354). The government responded, and Filer replied.

## Grand Juries

Filer moved to dismiss the indictment based on prosecutorial misconduct. He takes issue with a number of the statements that the prosecutors made to the grand jury. As he sees things, the conduct was so extreme that there was, in effect, no grand jury at all.

Before diving in, the Court will set the table by offering some background about the role played by grand juries in our constitutional order. After all, it is rare to see a challenge to a prosecutor's conduct or statements before a grand jury. The grand jury conducts its business in secret. Most of the time, there is no issue. So the Court will start with first principles.

The Fifth Amendment's Grand Jury Clause prevents the federal government from taking away a person's life or liberty "unless on presentment or indictment of a Grand Jury." *See* U.S. Const. amend. V.

The Framers proposed, and the state ratifying conventions adopted, the Grand Jury Clause without a lot of debate. The need for protection by a grand jury didn't require a lot of discussion.

The grand jury is a means to protect individual liberty from government tyranny at the hands of the executive branch. It's a structural protection for We the People, at the earliest moments of a potential criminal case. The grand jury is a way that We the People protect We the People from government overreach in form of overzealous, arbitrary, or meritless prosecutions.

James Wilson – a Justice on the first Supreme Court – described the grand jury as the "great channel of communication between those who make and administer the laws, and those for whom the laws are made and administered." *See* 2 *The Works of James Wilson* 537 (Robert Green McCloskey ed., 1967). A generation later, Justice Joseph Story called the grand jury "a great security to the citizens against vindictive prosecutions." *See* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1779 (1833).

The grand jury "serves the invaluable function in our society of standing between the accuser and the accused . . . ." *Wood v. Georgia*, 370 U.S. 375, 390 (1962). The grand jury has served that role as the guardian of liberty since time immemorial:

> The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instated by "a presentment or indictment of a Grand Jury." . . . The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a

5

crime has been committed and the protection of citizens against unfounded
criminal prosecutions.

*United States v. Calandra*, 414 U.S. 338, 342–43 (1974).

The purpose of a grand jury is to serve as a shield against unjust prosecutions, not as a
sword to rubber-stamp criminal charges. That said, the grand jury is designed to protect against
*unjust* prosecutions. A grand jury must do the work of returning an indictment when warranted.
At the end of the day, a grand jury exists "to provide a fair method for instituting criminal
proceedings against persons believed to have committed crimes." *Costello v. United States*, 350
U.S. 359, 362 (1956).

A grand jury cannot be all-in for the government, *or* all-in for the defendant. It must be
"fair and unbiased." *United States v. Gold*, 470 F. Supp. 1336, 1345 (N.D. Ill. 1979).

The nature of the grand jury process poses a risk of abuse by prosecutors. The grand jury
is one-sided, by design. There is no adversarial presentment, and there is no ongoing judicial
oversight. There is risk of abuse whenever the government acts without public scrutiny and
without judicial review:

> [T]he prosecutor operates without the check of a judge or a trained legal
> adversary, and virtually immune from public scrutiny. The prosecutor's
> abuse of his special relationship to the grand jury poses an enormous risk
> to defendants as well. For while in theory a trial provides the defendant
> with a full opportunity to contest and disprove the charges against him, in
> practice, the handing up of an indictment will often have a devastating
> personal and professional impact that a later dismissal or acquittal can
> never undo.

*United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979).

On the other hand, the grand jury's independence has its virtues, and deserves respect.
The "virtual immun[ity] from public scrutiny" is by design. *Id.* The grand jury "is a
constitutional fixture in its own right." *United States v. Williams*, 504 U.S. 36, 47 (1992)
(quoting *United States v. Chanen*, 549 F.2d 1306, 1312 (9th Cir. 1977)).

The grand jury is not part of the executive branch or the judicial branch. "[I]t belongs to
no branch of the institutional Government." *Id.* Instead, it "serv[es] as a kind of buffer or
referee between the government and the people." *Id.* "Under the constitutional scheme, the
grand jury is not and should not be captive to any of the three branches." *United States v.
Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983).

As a result of its purposeful independence, "[t]he grand jury gets to say – without any
review, oversight, or second-guessing – whether probable cause exists to think that a person
committed a crime." *Kaley v. United States*, 571 U.S. 320, 328 (2014).

The Framers "intended [the grand jury] to operate substantially like its English progenitor." *Costello*, 350 U.S. at 362. And in England, the grand jury had "acquired [] an independence free from control by the Crown or judges." *Id.*

That history of independence helps to explain the reluctance of courts to interfere with the grand jury process. For example, in *Costello*, the Supreme Court rejected the argument that an indictment based only on hearsay evidence must be dismissed. *Id.* at 364. And in *Holt*, the Court refused to dismiss an indictment based only on an inadmissible confession by the defendant. *See Holt v. United States*, 218 U.S. 245, 247–48 (1910). The Supreme Court noted that "the abuses of criminal practice would be enhanced if indictments could be upset" on the ground that they were based on evidence inadmissible at trial. *Id.* at 248.

Grand juries operate in secret, and enjoy independence. District courts respect the authority of grand juries, and rarely open the door to peer inside.

## Legal Standard

The grand jury is entitled to respect as an independent institution. The grand jury *is* We the People, and the decision to indict is an exercise of popular sovereignty. For that reason, indictments enjoy the presumption of validity.

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Costello*, 350 U.S. at 363.

Grand juries are "unfettered by technical rules." *Id.* at 364. Courts do not inquire into the extent, quality, or nature of evidence supporting an indictment. If they did, and "indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed." *Id.*

But deference to the grand jury only goes so far. "Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States." *Linder*, 2013 WL 812382, at *31 (quoting *United States v. Holloway*, 74 F.3d 249, 253 (11th Cir. 1996)).

The ability to dismiss an indictment stems from two overlapping and intertwined sources of power: constitutional authority and so-called "supervisory" authority.

First, a district court may dismiss an indictment "when it violates the Constitution or laws of the United States, when there has been some constitutional error in the prosecution of the indictment . . . ." *Linder*, 2013 WL 812382, at *3.

Here, Filer invokes this Court's constitutional authority, based on the Fifth Amendment's Grand Jury Clause. Again, the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend V.

Filer believes that the prosecutors took away that constitutional guarantee by making a string of improper statements. In his view, the statements crossed the line by such a wide margin that the indictment was not truly "of a Grand Jury." So he makes a constitutional argument.

Second, a district court may dismiss an indictment "pursuant to its supervisory powers, such as when the government exhibits outrageous misconduct in prosecuting the indictment, causing prejudice to the defendant; such a dismissal is a prophylactic tool used to discourage future deliberate governmental impropriety." *Linder*, 2013 WL 812382, at *31.

At times, Filer appeals to this Court's supervisory authority. He argues that this Court should dismiss the indictment because of prejudicial misconduct by prosecutors. But that argument points back to the Fifth Amendment.

Based on the filings, this Court will treat the motion as primarily making a constitutional argument under the Fifth Amendment, as opposed to making an appeal to supervisory authority on other grounds. But regardless of which authority the Court uses, the result is the same, because Filer's arguments rely on the Grand Jury Clause.

Here's why. The district court's exercise of supervisory power over grand jury proceedings is limited to enforcing previously established rules of grand jury conduct, not creating new rules.

The Supreme Court emphasized the limits of supervisory power over grand juries in *United States v. Williams*, 504 U.S. 36 (1992). There, the Court distinguished between supervisory power used "merely as a means of enforcing or vindicating legally compelled standards," and supervisory power used as "a means of *prescribing* those standards of prosecutorial conduct in the first instance." *See Williams*, 504 U.S. at 46–47 (emphasis in original). The Supreme Court explained that "this latter exercise" of supervisory power was impermissible because "as a general matter at least, no such 'supervisory' judicial authority exists." *Id.* at 47.

That said, there is still some supervisory power in some specific instances. "Supervisory power can be used to dismiss an indictment because of misconduct before the grand jury." *Id.* at 46. A district court can exercise that power "at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* (quoting *United States v. Mechanik,* 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment)).

As a result, the supervisory power is best conceptualized as a power "invoked to enforce those legally compelled standards, which come from [an existing] 'Rule, statute, or the Constitution.'" *Id.* (quoting *Williams*, 504 U.S. at 46 n.6).

In other words, a district court cannot go rogue and create its own prophylactic rules of what prosecutors can and cannot do in front of a grand jury. But a district court can dismiss an indictment for violations of existing rules. So, the Court must have some *other* rule to point to

8

when it exercises its ostensibly "supervisory" authority. And here, that rule is the Grand Jury Clause.

That leads to constitutional authority. Again, a district court has the power to dismiss an indictment when there is a constitutional violation. But after *Williams*, the line between constitutional power and supervisory power is a bit fuzzy, at least when it comes to constitutional violations. As the Eleventh Circuit has noted, "language in *Williams* about the courts' supervisory authority encompassing constitutional violations casts some doubt over whether the two sources [of power] remain distinct or if the [Supreme] Court has conflated them." *United States v. Sigma Int'l, Inc.*, 244 F.3d 841, 857 n.41 (11th Cir. 2001), *reh'g en banc granted, opinion vacated*, 287 F.3d 1325 (11th Cir. 2002).[1]

So, applying the Court's supervisory authority in this case creates similar results to applying the Court's constitutional authority, because both kinds of authority invoke the Grand Jury Clause. In the end, it doesn't make much difference, because the argument boils down to a debate about whether the statements crossed the Fifth Amendment line.

The parties appear to implicitly agree with that framing. While they invoke the Court's supervisory authority at times, the parties focus their briefs on the Grand Jury Clause. They debate whether the indictment was an "indictment 'of a Grand Jury.'" *See, e.g.*, Def.'s Reply, at 23 (Dckt. No. 371).

At the end of the day, the source of power matters less than what courts do with it. "[R]egardless of whether the Fifth Amendment's Grand Jury Clause remains a distinct source of authority that courts can draw upon, or the Fifth Amendment has now been folded into the courts' supervisory power, courts still can and should remedy violations of the Grand Jury Clause." *Sigma Int'l*, 244 F.3d at 857 n.41.

Either way, district courts can, and must, dismiss indictments secured or returned in violation of the Grand Jury Clause. "[U]nder either understanding [of the source of a court's power to dismiss], where a grand jury is so overborne by a prosecutor's or judge's influence that the indictment that issues cannot meaningfully be called 'of a Grand Jury' . . . the indictment must be dismissed." *Id.*

In other words, when an indictment has been so sullied by prosecutorial misconduct that it is not truly "of a Grand Jury," a district court must dismiss the indictment. "Courts therefore will act when the grand jury's function has been so subverted as to compromise the integrity of the judicial process." *Al Mudarris*, 695 F.2d at 1185.

---

[1] As the parties point out, *Sigma International* has an unusual procedural history. The parties settled after the panel's decision was vacated, but before the *en banc* court heard the case. *See* Def.'s Mtn. to Dismiss, at 11–12 n.8 (Dckt No. 336); Gov't's Obj., at 28 n.9 (Dckt. No. 365). Nonetheless, the panel's decision offers a detailed analysis of prosecutorial misconduct and has been cited by courts nationwide. *See* Def.'s Mtn. to Dismiss, at 11–12 n.8 (Dckt. No. 336).

Simply put, a district court has the "power to dismiss an indictment based on prosecutorial misconduct." *United States v. Breslin*, 916 F. Supp. 438, 441 (E.D. Pa. 1996). But dismissal is appropriate only if the prosecutorial misconduct impairs the grand jury process.

A district court must approach the prospect of dismissing an indictment with caution and circumspection, giving the grand jury its due regard as an independent institution. "Federal courts are advised to exhibit a modicum of restraint when considering whether to dismiss an indictment because a dismissal encroaches not only upon the fundamental role of the grand jury, but also upon the role of the prosecutor . . . ." *See Linder*, 2013 WL 812382, at *29. Again, the grand jury is "a constitutional fixture in its own right." *Williams*, 504 U.S. at 47.

Dismissing an indictment "encroaches on the fundamental role of the grand jury," so dismissal is reserved for "extremely limited circumstances." *Whitehouse v. United States Dist. Court*, 53 F.3d 1349, 1359 (1st Cir. 1995). Similarly, "[b]ecause the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step." *Linder*, 2013 WL 812382, at *29 (quoting *United States v. Li*, 206 F.3d 56, 62 (1st Cir. 2000)).

"The basic rule is that, because of the constitutionally mandated independence of the grand jury *and the prosecutor*, courts should be reluctant to dismiss an indictment. A dismissal will, therefore, be ordered only for serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." *United States v. Ogden*, 703 F.2d 629, 636 (1st Cir. 1983) (emphasis added).

Dismissing an indictment for prosecutorial misconduct is reserved for unusual cases with serious misconduct. Otherwise, courts must respect the decision by We the People to return an indictment against a fellow member of We the People.

Even serious prosecutorial misconduct is not enough to justify dismissal. A motion to dismiss an indictment for prosecutorial misconduct is subject to harmless-error analysis under Rule 52, unless the situation involves "fundamental" errors (so far, limited to race or gender discrimination in the selection of grand jurors). *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256–57 (1988); *see also Breslin*, 916 F. Supp. at 441.

The Supreme Court has made clear that a district court "may not invoke its supervisory power to circumvent the harmless-error inquiry." *Bank of Nova Scotia*, 487 U.S. at 254. "[A] district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." *Id.* at 255.

In other words, dismissal of an indictment requires a showing of prejudice to the defendant. The fact that the grand jury returned an indictment isn't enough. Otherwise, every case that resulted in an indictment would involve prejudice, by definition.

Prejudice is a high hurdle and a steep climb. Prejudice exists only "'if it is established that the violations substantially influenced the grand jury's decision to indict,' or if there is

'grave doubt' that that decision was free from such substantial influence." *Id.* at 251 (quoting *Mechanik,* 475 U.S. at 74 (O'Connor, J., concurring in the judgment)).

Whether a defendant suffered prejudice from alleged prosecutorial misconduct will depend not only on what prosecutors *said and did*, but also on what *effect* that conduct had on the grand jury. Even if prosecutors made inartful or improper statements, there is no prejudice if those statements had little actual effect on the grand jury. No harm, no foul.

Putting it all together, a district court must respect the decision of a grand jury to return an indictment. District courts must exercise caution, and then some, before dismissing an indictment based on statements made to the grand jury.

The Court can dismiss an indictment only if two things are true. First, the prosecutorial misconduct must be so serious that the indictment was not truly "of a Grand Jury." Second, the defendant must have suffered prejudice. And again, prejudice is a high standard. The Court must have "grave" doubt about whether the indictment was free of the corrupting influence by the executive branch.

These bedrock principles about the role of a grand jury are on solid ground. But when it comes to specifics about what a prosecutor can and can't say, the guideposts are more up in the air. The Supreme Court has painted in broad strokes with a wide brush. Lower courts have added some color and filled in some gaps. But there is still plenty of blank space on the canvas.

## Analysis

Before digging into the merits, the Court must address a threshold issue. The government argues that the motion to dismiss is too late.[2] After addressing that issue, the Court will turn to the statements by the prosecutors.

## I. Timeliness

Out of the gate, the government argues that Filer's motion is untimely. The Court disagrees.

Rule 12 of the Federal Rules of Criminal Procedure governs motions to dismiss an indictment. It permits a district court to set a deadline for all pretrial motions. And it creates a default deadline, too. Unless the district court sets another deadline, "the deadline is the start of the trial." *See* Fed. R. Crim. P. 12(c)(1).

---

[2] The government also contends that the motion is a dead letter, because the petit jury at the first trial convicted Filer, and the Seventh Circuit later ruled that the record included enough evidence to convict. At this point, this Court elects not to reach that issue. This Court has reviewed the statements in question, and concluded that there was no prosecutorial misconduct that caused prejudice. So there is no need to decide whether there is a second, independent ground to deny the motion.

Local Rule 12.1 alters the second part of that rule. When a district court does not set a deadline, a motion to dismiss an indictment is due 21 days from the date of the arraignment. *See* N.D. Ill. Crim. R. 12.1.

Here, this Court did not explicitly set a deadline. This Court did set a deadline of December 15, 2023 for motions *in limine*, but not pretrial motions generally. *See* Order (Dckt. No. 258). And by the look of things, Judge Leinweber didn't set a deadline for motions to dismiss, either. So Federal Rule 12 and Local Rule 12.1 govern.

Filer was arraigned on the current indictment on October 7, 2020, before his first trial. *See* Order (Dckt. No. 70); Gov't's Obj., at 12 (Dckt. No. 365). Filer was never re-arraigned after his first trial. *See* Def.'s Reply, at 30 (Dckt. No. 371).

Filer did not file his motion to dismiss until February 19, 2024. As the government sees things, Local Rule 12.1 set a long-since-passed deadline of October 28, 2020 for pretrial motions. That's 21 days after the arraignment on October 7, 2020.

It is hard to see how Local Rule 12.1 could have started the clock ticking. True, Filer did receive some of the grand jury transcripts in 2020, meaning the transcripts of the testimony of the witnesses. The government produced the grand jury transcripts in three tranches, on February 19, 2020, June 19, 2020, and October 2, 2020. That is, in 2020, Filer had in his hands the transcripts that provided the basis for the motion to dismiss filed on February 19, 2024.

Even so, Filer had some – but not all – of the transcripts at that point. In the motion, Filer relies on a large collection of grand jury transcripts, and he didn't have the complete collection in the first three weeks after the arraignment in 2020. In fact, Filer didn't have the full collection until *after* he filed the original motion to dismiss the indictment on February 19, 2024. That's when the government began transcribing the colloquies with the grand jurors.

Given that reality, Local Rule 12.1 is an odd fit with the case at hand. It is hard to fault Filer for failing to file a motion to dismiss based on transcripts that he didn't yet have.

So Federal Rule 12 governs. Federal Rule 12 allows a motion to dismiss an indictment anytime before trial. True, one trial already took place. But the second trial is what matters.

Other courts have greenlighted motions to dismiss an indictment after an initial trial. The leading case on this issue is *United States v. Mauskar*, 557 F.3d 219, 225 (5th Cir. 2009). There, the Fifth Circuit invoked the maxim that "a mistrial renders nugatory all trial proceedings with the same result as if there had been no trial at all." *Id.* at 225. The Court of Appeals rejected the argument that the defendant needed to file his motion to dismiss before his *first* trial. *Id.*

*Mauskar* is not an exact fit with the case at hand. The Fifth Circuit addressed Federal Rule 12 motions after a mistrial, rather than on remand from an appeal. That said, the Court sees no good reason to draw a distinction between new trials stemming from a mistrial and new trial stemming from an appeal. A new trial is a new trial.

There's one additional wrinkle. Filer points to this Court's generous invitation for pretrial motions (which the parties have accepted). At the final pretrial conference on February 15, 2024, this Court opened the door to additional motions. "You all can file anything you want to file between now and trial. If there's other things you think I ought to know, just file it. If there are any other motions, you can file them." *See* Feb. 15, 2024 Hearing Tr., at 57:6-9.

It seems a bit late to rescind the invitation. And given the gravity of the issue, this Court prefers to resolve this motion on the merits.

That said, the timing of Filer's motion was less than ideal. Filer waited until the eve of trial in early 2024 to bring a motion to dismiss for prosecutorial misconduct. The explanation was candid (to counsel's credit), but it wasn't the best. Defense counsel didn't look at the grand jury transcripts until an evidentiary motion *in limine* forced counsel to review them. Before then, counsel hadn't taken the time to review the transcripts because "[g]rand jury abuse is so rare." *See* Def.'s Mtn. to Dismiss, at 4 (Dckt. No. 336).

That's not a great look. There is a benefit to reviewing grand jury transcripts sooner rather than later. Filer received the grand jury transcripts almost 5 years ago, in February 2020.

Even so, the Federal Rules and the Local Rules did not close the door on filing a motion to dismiss. Judge Leinenweber and this Court did not close the door, either, by setting a deadline. If anything, this Court left the door open, and it is too late to close it.

## II. The Merits

The Court will now turn to the main event. Filer argues that the prosecutors engaged in misconduct when they made certain statements to the grand jury. Sometimes the statements took place while a witness was testifying. And sometimes the statements happened during direct conversations between the prosecutors and the grand jury, known as colloquies.

Filer points to literally dozens of statements, spread across hundreds of pages of transcripts from months of grand jury sessions. To make things digestible, the Court will analyze a sampling of statements made by the prosecutors in front of the grand jury. For organizational purposes, the Court will divide the statements into nine different categories.

Filer alleges that the prosecutors:

1. used the words "fraud" or "crime" to describe the alleged scheme, predisposing the grand jury to assume that Filer had committed a crime;

2. told the grand jury how they should view certain evidence;

3. presented inaccurate facts to the grand jury;

4. engaged in unsworn and improper "testimony" and abused their role as legal advisors to the grand jury by passing off this "testimony" as legal advice;

5.      provided prejudicial information about a civil settlement related to this case;

6.      made prejudicial statements about Defendants and implied that they were criminals;

7.      discussed the exercise of their prosecutorial discretion with the grand jury;

8.      argued – or "fenced" – with the grand jurors and overbore their independent opinions; and

9.      bonded with and enlisted the grand jury as trial consultants, which implied that the grand jurors were on the same "team" as prosecutors and that there inevitably would be a trial.

This Court will address each of those categories, one at a time.

Before embarking on that nine-stop journey, one overarching point bears repetition. The grand jury met over 20 times, spanning 16 separate days, during a period that stretched for 18 months. They heard from at least 7 different witnesses. The proceedings spanned 811 pages of transcripts. They saw 1,615 pages of exhibits. *See* Gov't's Obj., at 1 (Dckt. No. 365).

That process inspires confidence. And it stands in stark contrast with how grand juries returned indictments in other cases that involved potential prosecutorial misconduct.

For example, in both *Breslin* and *Sigma International* – two cases that Filer relies on heavily – the grand jury was rushed to indict in a short period of time based on mere snippets of testimony that *prior* grand juries had heard. *Id.* at 22–29. In contrast, the grand jury here had copious time and material to consider any charges.

And this grand jury was reminded that it was the grand jury's decision alone whether there was probable cause to indict. For example, the prosecutors gave the following instruction before the grand jury started hearing evidence: "To the extent that we give you any kind of summary on the case and to the extent we give you a summary of what we expect the testimony will be or certain kind of evidence, that can't be used as the finding for probable cause." *See* July 26, 2018 Colloquy Tr., at 4:2-7 (Dckt. No. 370-1).

Later that day, the prosecutors reminded the grand jury that the evidence is what matters. "And again this is where the caveat I gave you at the beginning that what I'm telling you is not the basis for probable cause. At this point from now on I'm going to give you a summary of the case. Everything I tell you has to be supported by the evidence." *Id.* at 46:7-13.

Given these warnings and admonitions, the quantum of evidence necessary to show that the grand jury's will was overborne and that the indictment was not truly "of a Grand Jury" will be higher than, say, a case like *Breslin* or *Sigma International*. Those cases involved grand juries that were rushed into making a decision after hearing misleading instructions.

14

With that reminder, the Court will now embark on the nine-stop journey through the grand jury statements.

## 1.      Using the Words "Fraud" or "Crime"

Filer argues that the prosecutors "pronounced" his guilt to the grand jury. He says that the prosecutors used words like "fraud" and "crime" in describing the alleged scheme, and that the phraseology predisposed the grand jury to assume that Filer had committed a crime.

For example, in describing the alleged scheme, the prosecutors gave their point of view about when the fraud began. "That's the start of the fraud." *See* Aug. 2, 2018 Tr. of Special Agent ("SA") Dahlgren, at 119:17-18 (Dckt. No. 370-5).

At one point, the prosecutors explained to the grand jury the significance of aspects of the relationship between the K Family Trust and BWC Capital. They stated: "That shows they were doing a fraud." *Id.* at 134:20-21.

The prosecutors also described Filer's actions as criminal conduct. "Now does everyone understand how this kind of crime, how the lawyers' involvement is really important?" *Id.* at 42:5-8.

Filer alleges that "the prosecutor pronounced the defendants guilty[,] . . . usurped the province of the grand jury, [and] stated his own conclusions." *See* Def.'s Mtn. to Dismiss, at 7 (Dckt. No. 336). Filer argues that these kinds of statements "shut down grand jurors' independent thought and exclusive province as the fact-finder." *Id.*

In other words, Filer thinks that the grand jury swallowed those statements hook, line, and sinker. He believes that the grand jury indicted him based on the government's pronouncements of guilt.

The Court disagrees. The statements were explanatory in nature, and were not unduly argumentative. And in any event, Filer suffered no prejudice. It is hard to see how those scattered statements could have so overwhelmed the grand jury that it rendered the grand jury a nullity. It's a stretch to believe that the statements caused the grand jury to be present in body and absent in mind.

Prosecutors are legal advisors to the grand jury. In that role, they are not limited to merely parroting the law. They can comment on how the evidence might support a determination of probable cause. They can answer questions, too.

"[S]ome jurisdictions permit the prosecutor, who serves as legal adviser to the grand jury, to comment on the nature or sufficiency of the evidence." *See* 2 Sara Sun Beale *et al.*, *Grand Jury Law & Practice* § 9:2 (2d ed. 2023). Federal court is one of those jurisdictions.

"[A prosecutor] informs the jurors about the relevant law and explains how it applies – or does not apply – to the available evidence." *See* 1 Susan W. Brenner & Lori E. Shaw, *Federal Grand Jury: A Guide to Law and Practice* § 6:2 (2d ed. 2006).

That's exactly what the government did here. The prosecutors explained the evidence and explained *why* they thought there was a fraud. An explanation isn't particularly surprising in a case like this one, which involved a complicated fraud.

Guideposts in a complex case are especially understandable when they take place relatively early in the proceeding, like they did here. The comments in question took place in August 2018, only a month after the grand jury kicked off in July 2018. At that point, everyone was getting their footing, and getting their bearings.

A prosecutor can help the grand jury connect the dots and understand what they're hearing, including why it is significant. "A prosecutor may state an opinion to the grand jury that the evidence warrants the return of an indictment so long as that opinion is *based on evidence actually presented to the grand jury.*" U.S. Dep't of Just., *Federal Grand Jury Practice* 463 (1993) (emphasis added).

That's exactly what the prosecutors did here. They pointed to specific evidence that, in their view, showed a fraudulent scheme. They used the word "fraud" to explain the upshot of the evidence.

As Filer himself points out, "[a] prosecutor may state 'I believe the evidence has shown the defendant's guilt,' but he may not state, 'I believe that the defendant is guilty.'" *United States v. McKenzie*, 678 F.2d 629, 632–33 (5th Cir. 1982).

Here, the prosecutors pointed to evidence that "shows" a fraud, and discussed where the fraud "starts." *See* Aug. 2, 2018 Tr. of SA Dahlgren, at 134:20-21 (Dckt. No. 370-5); *id.* at 119:17-18. They didn't call Filer a fraudster and say "he's guilty," without more. In context, the statements merely gave the upshot of the evidence.

The prosecutors perhaps could have phrased things better. They could have used phrases like "we think," "we allege," and so forth to make extra clear to the grand jurors that these statements were their interpretation of the evidence.

But a failure to include such caveats does not somehow turn these imprecise statements into misconduct. The imperfect phraseology does not justify upending the decision of the grand jury.

In general, "a prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury." *See* American Bar Association, *Criminal Justice Standards: Prosecution Function*, Standard 3-4.5(c). "As a useful guide, the prosecutor should say nothing in summation to a grand jury that would not be proper in a summation before a petit jury." *See Federal Grand Jury*

*Practice*, at 463.  Courts in this district have said the same thing.  *See United States v. Gold*, 470 F. Supp. 1336, 1351 (N.D. Ill. 1979).

During closing arguments at trial, prosecutors can explain how they think the evidence comes together.  They can say "this evidence shows that XYZ crime was committed," without qualifications like "we allege" or "we think."  Prosecutors can do the same thing before the grand jury.

True, the statements in question came near the beginning, not near the end, of the grand jury proceeding.  But in the grand scheme of things, the statements were not overly argumentative, either.

Nonetheless, Filer suggests that the use of word "fraud" by prosecutors is something approaching a *per se* instance of misconduct.  He cites the Tenth Circuit's opinion in *Hillman* for the proposition that it is improper and prejudicial for a prosecutor to use the word "fraud."

The Tenth Circuit in *Hillman* cautioned against the conclusory use of the term "fraud."  Still, the Tenth Circuit concluded that, under the circumstances, the use of the term "fraud" did not prejudice the defendant.  "While the AUSA's use of the term 'fraud' was conclusory and should not have been used, the question was an attempt to establish a time-frame and not the ultimate fact of whether Hillman was involved in the [] scheme."  *United States v. Hillman*, 642 F.3d 929, 935 (10th Cir. 2011).

Filer is up against a wall when relying on *Hillman*, because the Tenth Circuit in *Hillman* found no prejudice.  Still, Filer argues that the situation at hand is worse than the situation in *Hillman*.

In *Hillman*, a charge of fraud wasn't on the table.  But a charge of fraud *was* on the table when the grand jury heard evidence about Filer.  So, as Filer sees things, this case is worse.  Unlike in *Hillman*, the "ultimate fact" to be proven before *this* grand jury was whether there was probable cause that Filer had engaged in fraud.  *See* Def.'s Mtn. to Dismiss, at 7 (Dckt. No. 336).

*Hillman* does not lend Filer much of a hand.  The defendant in *Hillman* was charged with money laundering, conspiracy to commit money laundering, and false statements.  *See Hillman*, 642 F.3d at 932.  There is no indication that prosecutors sought to indict him for fraud.

Instead, the "fraud" that the prosecutor mentioned was that of his co-schemer, whom the grand jury knew had already been convicted.  *Id.* at 935.  So there was a danger of guilt by association in bringing up the co-schemer's fraud.

That danger of guilt by association doesn't exist here.  Unlike *Hillman*, the prosecutors in the case at hand *did* seek an indictment for fraud.  They were simply describing the offense they believed Filer had committed, not running the risk of guilt by association.

It would be strange if prosecutors seeking an indictment for fraud couldn't use the word "fraud." If Filer's view prevailed, government attorneys would essentially be prohibited from referring to the crime for which they sought an indictment.

In that situation, prosecutors would not be able to explain how they believe the evidence elicited in front of the grand jury shows the elements of the offense, as they are plainly allowed to do. They would be limited to asking sterilized questions of agents and reading statutes or pattern jury instructions.

It is hard to see how prosecutors could "comment on the nature or sufficiency of the evidence" – as they are allowed to do – without referring to the alleged offense. *See* Beale *et al.*, at § 9:2. The government can call a spade a spade. The government doesn't have to seek an indictment for fraud without uttering the word "fraud."

Ultimately, Filer cites no authority for the novel proposition that prosecutors cannot use the name of the crime for which they seek an indictment when explaining the significance of the evidence.

In short, viewing everything in context, the prosecutors' use of the word "fraud" does not rise to the level of misconduct, and does not seem prejudicial.

Similarly, the prosecutors' use of the word "crime" was not prejudicial misconduct, either.

The grand jury knew that they were sitting in a grand jury room in the federal courthouse, listening to statements by prosecutors. They knew that they were there to consider whether to indict a crime. They knew that the prosecutors thought that a crime occurred. Otherwise, the grand jury wouldn't have been there at all.

No grand juror sitting in a grand jury room would be surprised to learn that the government believed that a crime had taken place. That's the whole point of a grand jury. "Since grand jurors ordinarily are aware that the prosecutor is presenting evidence because he or she feels an indictment is warranted, the fact that the prosecutor's behavior conveys such an impression does not significantly prejudice the defendant." *See* Beale *et al.*, at § 9:3.

As the government points out, "presenting a proposed indictment without belief that probable cause exists would itself be a miscarriage of justice." *See* Gov't's Obj., at 51 (Dckt. No. 365).

Filer argues that by calling the conduct a "crime," the prosecutors "instructed the grand jury as to what ultimate conclusion they should draw from the evidence." *See* Def.'s Mtn. to Dismiss, at 9 (Dckt. No. 336). That's hyperbolic.

Filer relies heavily on *Breslin*. There, a prosecutor told the grand jurors: "I think you'll be able to come to a determination of probable cause before we read very much." *Breslin*, 916 F. Supp. at 443.

18

In *Breslin*, a prosecutor essentially told the grand jurors how they should view the evidence, before the grand jury heard any evidence. The prosecutors preemptively gave the grand jury the punch line, before the opening bell.

Here, in contrast, the prosecutors discussed a type of crime that, in their view, Filer had committed. They didn't say words to the effect of "we think you'll be able to find probable cause that Filer was involved here."

The statement in question wasn't particularly overbearing. In the alleged scheme, Filer was at the center. The prosecutors explained their legal theory. But the prosecutors left it to the grand jury to decide whether that crime actually occurred.

In sum, the Court does not see any prosecutorial misconduct in the prosecutors' use of the words "fraud" and "crime" before the grand jury. The Court also does not see any real-world prejudice.

### 2.      Telling the Grand Jury How to View the Evidence

Filer alleges that prosecutors instructed the grand jury on *how* to view certain evidence, usurping "the grand jury's province to determine 'how they look at' the evidence." *See* Mtn. to Dismiss, at 11 (Dckt. No. 336).

The government described the structure of the various entities, meaning BWC Holdings, BWC Capital, and the K Family Trust. Along the way, prosecutors alleged that Defendants aimed to conceal Paul Kelly's control of the Barsanti Woodwork assets. "Does everyone understand it's designed to conceal the fact that Kelly controls the company that's going to have a lien on all of this company's property?" *See* Aug. 2, 2018 Tr. of SA Dahlgren, at 77:4-8 (Dckt. No. 370-5).

Similarly, the prosecutors offered their own spin, telling the grand jury how they should view aspects of the alleged scheme. "But the way you should look at this is this is not the situation where it's like a real contract." *Id.* at 85:3-5.

Those statements are similar to the statements discussed in the last section of this opinion. Once again, the prosecutors explained the significance of the evidence. Prosecutors can explain to the grand jury what they're hearing.

Prosecutors can help the grand jury connect the dots. The key question is whether the dots have an evidentiary foundation. Again, "[a] prosecutor may state an opinion to the grand jury that the evidence warrants the return of an indictment so long as that opinion is based on evidence *actually presented* to the grand jury." *See Federal Grand Jury Practice*, at 463 (emphasis added).

Here, the prosecutors had an evidentiary basis for their statements. Maybe the statements had a dash of interpretation, with a scoop of argumentation. Even so, the prosecutors were

19

merely "express[ing] an opinion on the legal significance," as the ABA standards allow. *See* ABA, *Prosecution Function*, at Standard 3-4.5(b).

The grand jury was free to take it or leave it. The record does not support the conclusion that the prosecutors bulldozed the grand jury into submission.

To be sure, the prosecutors could have phrased things more artfully to avoid giving the impression that there was only one way to view the evidence. But on this record, it is a stretch to conclude that the grand jury believed that it had to buy what the prosecutors were selling.

If anything, the record shows that the grand jurors felt comfortable asking questions and pushing back against the government. This Court will offer a few examples in the sections that follow. Suffice it to say that there was some give-and-take between the prosecutors and the grand jury.

And the prosecutors regularly gave admonitions to the grand jury that they had to make their own determination. They reminded the grand jurors that anything that the prosecutors said was not evidence that could support probable cause.

In any case, prosecutors can encourage grand jurors – as they would with petit jurors at closing argument – to adopt a certain view of evidence. Here, the prosecutors made a few explanatory statements to the grand jury, and suggested how the grand jury should view the evidence. The statements did not cross the line. And in any event, it is hard to see any prejudice, especially given the volume of statements during months of grand jury proceedings.

### 3.    Providing Inaccurate or Misleading Facts

Filer argues that the government presented misleading or inaccurate facts to the grand jury that the government knew not to be true.

Filer primarily cites an exchange about the documents forming the K Family Trust. Specifically:

| | |
|---|---|
| Prosecutor: | And so at this point it appears that Kelly doesn't understand the ramifications of the fact that Gereg has already assigned the – assigned his interest to the K Family Trust. |
| Agent: | Yeah, that's what it appears. |
| Prosecutor: | His interest in BWC Capital? |
| Agent: | Yes. |

*See* Aug. 2, 2018 Tr. of SA Dahlgren, at 111:4-11 (Dckt. No. 370-5).

Filer argues that this exchange was an affirmative misstatement because the prosecutors already knew that the K Family Trust documents were not effective. *See* Def.'s Mtn. to Dismiss, at 19–20 (Dckt. No. 336).

But the government was entitled to present its interpretation of the evidence. The government had no obligation to present Filer's preferred view of the record.

Filer points to the fact that Kelly never formalized control of BWC Capital because "the Trust was never formed, the documentation was never properly executed" and "the consideration for the assignment was never agreed, much less paid." *Id.* at 20. But the lack of formalities doesn't mean that Kelly was not the true owner and did not control BWC Capital.

The Seventh Circuit itself rejected Filer's argument that "paper should trump reality" because "sufficient evidence showed that, while Gereg might have owned BWC Capital and Barsanti Millwork on paper, Kelly actually controlled both companies." *Filer*, 56 F.4th at 433.

Putting aside whether the K Family Trust documents were effective, the evidence arguably supported the notion that Kelly controlled BWC Capital, and thus controlled the assets in question. After all, that's exactly what Judge Leinenweber permitted the government to argue at the first trial. *See* Def.'s Mtn. *in Limine* No. 2 to Enforce Law of the Case, at 2 (Dckt. No. 281) (describing Judge Leinenweber's pretrial rulings on motions *in limine*).

The government's view was that Kelly controlled BWC Capital from behind the scenes. It was not a factual misstatement for the prosecutors to present this view by questioning Special Agent Dahlgren about the "ramifications" of the K Family Trust documents.

In other words, the parties disagree about the significance of the evidence. That's the kind of dispute that needs to be resolved at trial. It's not prosecutorial misconduct.

Simply put, the prosecutors were allowed to present their view of evidence, especially when it is susceptible to different interpretations. Filer is entitled to his view, but offering a different view to the grand jury is not prosecutorial misconduct.

Again, it is important to keep everything in perspective. The grand jury sat for months, and heard untold hours of testimony. The notion that this exchange caused any prejudice is a bridge too far.

### 4.    Providing Unsworn "Testimony" and Improper Legal Advice

Filer contends that the prosecutors engaged in unsworn and improper "testimony," and that they abused their responsibility to provide legal advice to the grand jury.

For example, Filer points to statements made by the prosecutors on the first day, which he compares to a "law school type lecture." *See* Def.'s Suppl., at 7–8 (Dckt. No. 354). The prosecutors spent much of the first day explaining key concepts about wire fraud and bankruptcy law to the grand jurors. *See* July 26, 2018 Colloquy Tr., at 1–20 (Dckt. No. 370-1).

Similarly, Filer points to several examples of the prosecutors explaining legal concepts throughout the grand jury proceedings. For example, the prosecutors explained what a confession of judgment was. *See* June 13, 2019 Colloquy Tr., at 6:6-12 (Dckt. No. 370-19) ("As your legal advisor, the difference is basically a confession of judgment is something that you agree to before a lawsuit is filed and it's usually part of a contract and it basically says if you file a lawsuit, I'll default.").

Filer contends that such comments were improper because they amounted to unsworn factual testimony by the prosecutors.

The Court disagrees. The prosecutors did not engage in unsworn *factual* testimony. Instead, they gave background on the underlying *law*.

Consider the second example, when the prosecutors explained the concept of a confession of judgment. The statement did not become improper factual testimony simply because the prosecutors mentioned what "usually" occurs with a confession of judgment. Even if the prosecutors did not phrase their statements in the most artful way, the substance merely explained the background about a legal concept. And explaining the law is within the field of play, because the grand jury needs to understand what it is hearing.

Again, the prosecutors are the legal advisors to the grand jury. And as the legal advisors, the prosecutors "inform[] the jurors about the relevant law and explain[] how it applies – or does not apply – to the available evidence." *See* Brenner & Shaw, at § 6:2.

True, the prosecutors could have called an expert witness to explain the background principles of fraud and bankruptcy law. Later, that expert could have explained a confession of judgment. Calling a witness would have complied with the Federal Rules of Evidence, and that's what the prosecutors will have to do at trial.

But the Federal Rules of Evidence do not apply to grand jury proceedings. And in any event, the statements in question were introductory and explanatory, not overly argumentative. At most, the prosecutors laid the legal backdrop, and not much else. It was innocuous – and maybe too dry to matter.

Filer also points to another set of statements. In those statements, the prosecutors intermingled the law with the facts of the case.

Consider, for example, the following statement from a prosecutor: "What happened is we created another company and on [sic] to the world it looks like this one guy, the business consultant, owns the company; but in reality what's happened is the – that business consultant has already assigned his entire interest in that company back to the guy that gave the security. So he – effectively, you have a lien on your own property." *See* July 26, 2018 Colloquy Tr., at 23:2-10 (Dckt. No. 370-1). (As an aside, that sentence was too mumbled and jumbled to move the needle.)

In response, one of the grand jurors asked, "And that's illegal?" *Id.* at 23:11. The prosecutor replied, "You can't do that. You can do it, but there's issues with how it would stand up." *Id.* at 23:12-14.

Filer thinks that those statements are problematic, because the prosecutors strayed too far into the facts of the case. He points to *Sigma International*. There, the Eleventh Circuit looked unfavorably upon prosecutors using a hypothetical that mirrored the facts of the underlying case to explain the law. *See Sigma Int'l*, 244 F.3d at 861.[3]

This Court disagrees. Prosecutors can explain the law. Hypothetical examples are a common way to explain complicated subjects. There is no *per se* bar against prosecutors using hypotheticals, even if they closely resemble the facts of the case. If anything, hypotheticals that resemble the facts of the case might be *less* prejudicial than hypotheticals that are a stretch.

Using an example with similar facts is functionally the same as explaining why the evidence warrants an indictment. They both explain how the prosecutors think the facts should map onto the law.

Explaining the scheme is within the prosecutors' role as legal advisor to the grand jury. Recall that a prosecutor must "inform[] the jurors about the relevant law and explain[] how it applies – or does not apply – *to the available evidence*." *See* Brenner & Shaw, at § 6:2 (emphasis added). In other words, the prosecutors are *supposed* to talk about how they view the scheme.

This Court does not see any reason why prosecutors should be allowed to describe the actual scheme, but be disallowed from using hypotheticals to explain the situation.

And in any event, the grand jurors knew that they had a duty to determine whether the evidence supported the government's rendition of the facts. The prosecutors frequently reminded the grand jury that they could indict only if the facts coincided with the law as the prosecutors explained it.

The bottom line is that this Court does not see any prejudicial misconduct in the use of examples to explain the law to the grand jury. The prosecutors explained the law, and the grand jury then had to apply that law to the evidence. There was no improper and unsworn "factual" testimony from the prosecutors.

Viewed as a whole, the prosecutors explained the law, and did so in an innocuous way. The notion that any of these statements affected the outcome is another bridge too far.

---

[3] As a vacated panel decision (and one from another Circuit), *Sigma International* is only authoritative as far as it is persuasive. For the reasons explained in more detail below, this Court does not find *Sigma International* persuasive on this point.

### 5. Providing Prejudicial Information about a Civil Settlement

Next, Filer argues that the prosecutors introduced prejudicial information. He points to statements about the $1 million civil settlement that Filer's law firm (Freeborn & Peters) paid as part of a civil settlement related to this case.

The prosecutors did tell the grand jury about the civil settlement. But they didn't suddenly discuss the settlement on their own. Instead, they discussed the settlement in response to a question from one of the grand jurors.

On April 4, 2019, the prosecutors handed out a draft copy of the indictment that they would ask the grand jurors to return. A grand juror then specifically asked whether the government was seeking forfeiture.

The prosecutor responded that the government was not seeking forfeiture. The prosecutor then took the extra step of explaining why, and brought up the civil settlement. *See* Apr. 4, 2019 Colloquy Tr., at 36:8-15 (Dckt. No. 370-17) ("The Freeborn firm paid, I believe, $1 million towards the settlement and that money was along with – the value of the assets. It was used to hand out to the creditors. So there's no – there's no money – there's not going to be a basis to do a forfeiture.").

Filer believes that there was no need to tell the grand jury about the civil settlement. And he believes that he suffered prejudice as a result. In his view, telling the grand jury about the settlement "delivered the clear message that the settlement was relevant evidence bearing on the defendants' guilt." *See* Def.'s Suppl., at 7 (Dckt. No. 354). And the government did not soften the prejudice with "any admonition to the grand jury about settlements of civil lawsuits, the different issues and burdens of proof involved, or that this information had no place in their consideration of probable cause." *Id.*

Filer has a point. But it gets him only so far.

During trial, courts often prevent parties from telling a jury about a civil settlement. There is risk that a petit jury may not understand what it means, and what it doesn't mean. Parties settle cases for all sorts of reasons, and a settlement doesn't necessarily imply an admission of anything. Sometimes people simply want to put a dispute behind them. There is risk that a petit jury could read too much into a settlement. That principle probably applies to grand juries, too.

On the other hand, "[s]ome courts have concluded that the prosecutor may properly volunteer information to respond to the grand jurors' questions about the prior proceedings in the case or the reason particular charges were brought." *See* Beale *et al.*, at § 9:2. Here, the civil settlement could be thought of as "prior proceedings." And the prosecutors were explaining why a "particular charge" – forfeiture – was not brought.

Here, telling the grand jury that the government was not seeking forfeiture, without explaining why, seems like the better course. That course of action is the Department of

Justice's preferred approach to avoid giving the grand jury irrelevant or prejudicial information. *See* Brenner & Shaw, at § 6:3 ("If a juror's questions would elicit irrelevant and/or prejudicial information, the Department [of Justice] advises prosecutors either to respond and then explain the limited utility of their answer, or to explain that they cannot answer because doing so could generate a claim of grand jury abuse.") (citing *Federal Grand Jury Practice*, at 54).

That said, giving the jury potentially prejudicial information does not necessarily give rise to a constitutional violation. After all, the Rules of Evidence do not apply to grand jury proceedings. The DOJ's grand jury manual advises prosecutors to play it safe, to prevent even a specter of grand-jury abuse. Not every violation of DOJ's manual rises to the level of misconduct, let alone a constitutional violation.

It is important to view the statement in context, too. Based on the record, the government did not hammer home the point about the civil settlement. The government did not argue that the grand jury should indict Filer because his law firm settled the civil case. And the government did not return to the point later in the proceedings, either. At worst, the sentence was an island in a sea of testimony.

And in any event, even though the prosecutors did not provide warnings immediately after answering the grand juror's question, they regularly reminded the grand jury that they had to reach their probable cause decision based only on the evidence.

At bottom, the Court cannot say that it has a "grave" concern that the grand jury indicted based on one line about a civil settlement during 18 months of proceedings with thousands of pages of documentary evidence. The Court concludes that Filer suffered no prejudice.

### 6. Making Prejudicial Statements about Defendants

Filer argues that the prosecutors made various prejudicial statements that depicted him as a criminal. He believes that the grand jury must have acted upon those statements.

For example, the prosecutors explained that they thought Defendants did not trust each other. The prosecutor said that "based on the evidence that Gereg thought that the trust existed," the prosecutor thought that "[Gereg] thought that the trust existed because [Defendants] wanted him to think the trust existed because they wanted him to think – this is your classic no honor among thieves." *See* Aug. 2, 2018 Colloquy Tr., at 18:25 – 19:1 (Dckt. No. 370-5).

The prosecutors could have picked a better phrase.

But this statement was one small quip about what the prosecutors saw as a lack of trust between Defendants. It is a far cry from calling the subject of a grand jury investigation a "hoodlum" or referring to the subject's violent conduct and associations with organized crimes – the kinds of situations where courts have identified prejudicial misconduct from prosecutors. *See, e.g.*, *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983); *Serubo*, 604 F.2d at 818.

Filer believes that the prosecutors were calling him and his co-defendants "thieves." *See* Def.'s Suppl., at 26 (Dckt. No. 354).

But fraud is a form of theft. At the very least, the concepts are in the same neighborhood, if not on the same block. And as this Court noted above in its discussion of the *Hillman* case, it is not improper for a prosecutor to use the term "fraud" in front of a grand jury when the prosecutor is trying to indict for fraud.

True, it might sound inflammatory to call Filer and the other participants "thieves." But that's not exactly what the prosecutor did. The prosecutor used a common idiom, and did so to convey a concept. It wasn't name-calling.

So in the Court's view, the use of the word "thieves" is not an ideal turn of phrase. But it wasn't overly prejudicial, either. And the concept was not miles away from the core of the case. Unlike using the term "hoodlum" or describing unrelated violent conduct, the word "thieves" describes the alleged conduct, albeit in an imperfect way.

Filer also argues that prosecutors equated him with a bank robber. The prosecutor said he thought the scheme was "extremely calculated," and that "it would have been easier to rob a bank. . . . But this is what you call is a true lawyer-assisted crime." *See* Aug. 2, 2018 Colloquy Tr., at 21:25 – 22:7 (Dckt. No. 370-5).

In the Court's view, this is another mere quip about the complicated nature of the scheme and why it was important to have a lawyer involved. Prosecutors contrasted the complicated nature of the scheme – in which they allege legal documents played a crucial role – with a "low-tech" crime like bank robbery. So if anything, the prosecutors were drawing distinctions between Filer and a bank robber – not equating him with one.

To take one more example, Filer alleges that prosecutors "impl[ied] that [Defendants] were involved in other crimes like money laundering and obstruction of justice." *See* Def.'s Suppl., at 26 (Dckt. No. 354). The prosecutor said that "this is like money laundering. Money laundering is when you take money and you put it through a series of transactions . . . [to make it] difficult to figure out where the money started." *See* Aug. 9, 2018 Colloquy Tr., at 8:5-11 (Dckt. No. 370-6). "It starts, for example, – not this case, but as an example – drug money." *Id.* at 8:12-14. "In this case . . . [Defendants] were concealing Kelly's interest in a series of properties – companies and entities but then laundering the money from a company he controlled to another company he controlled to another company he controlled, so it got more difficult to figure out where it came from." *Id.* at 8:20 – 9:2.

As the Court reads this statement, the prosecutors were not trying to accuse Defendants of money laundering. In fact, they explicitly cautioned that the example they gave was "not this case." *Id.* at 8:13.

Instead, the prosecutors merely explained why the scheme is so complicated. At times, the grand jury questioned why they needed to hear more evidence. *See* Gov't's Obj., at 8 (Dckt. No. 365). For example, a grand juror asked: "With all the evidence now that we've seen thus

26

far, why would we continue to see more evidence if we feel like there is enough information to lead to an indictment?" *See* Aug. 23, 2018 Colloquy Tr., at 10:14-18 (Dckt. No. 370-9).

So it was important for the prosecutors to explain the significance of each and every part of the multi-faceted scheme that they alleged. And as far as the Court can see, that is exactly what the prosecutors did. They explained how they saw the role of the K Family Trust and BWC Capital in the scheme: to hide the true ownership of the assets. In that way, the structure *is* similar to how money laundering disguises the source of proceeds.

To be sure, the money-laundering analogy wasn't perfect. The prosecutors probably would have been better off with a different example. It isn't prudent practice to confuse a grand jury (or a petit jury, for that matter) by using *other crimes* as examples to explain the charges at hand.

At the same time, it is a stretch to say that the prosecutors were somehow trying to equate Defendants to money-laundering drug dealers. That's not a fair reading of what happened.

In short, the Court does not believe any of these statements warrant dismissal. The prosecutors could have used better turns of phrase. But it is hard to see any real-world prejudice.

### 7.    Discussing the Exercise of Prosecutorial Discretion

Filer alleges that the prosecutors committed misconduct by "discuss[ing] matters involving their prosecutorial discretion, further distorting the role of the grand jury." *See* Def.'s Suppl., at 20 (Dckt. No. 354).

One example stands out. In July 2018, the month that the grand jury convened, a grand juror asked about other attorneys at Filer's law firm. A grand juror asked whether the grand jurors should look at four attorneys at Freeborn & Peters individually or all together. "When we examine the whole process for this case, are we looking at the Freeborn & Peters, the four attorneys there, are we looking at the other individuals separately, uniquely or working in harmony with each other?" *See* July 26, 2018 Colloquy Tr., at 69:1-6 (Dckt. No. 370-1).

The question put the prosecutors in a bit of a pickle, because the grand juror asked about the scope of their inquiry. The grand juror wanted to know if they were supposed to consider charges against "four attorneys." *Id.* Or, at the very least, a reasonable person could have understood the question that way (especially when hearing the question on the fly, in real time).

In response, the prosecutor offered the following explanation:

> What we're probably going to be it's going to look like it's going to end up being that there's a fraud scheme where they're working together and that it's Kelly and it's Filer and Fawkes. And then at some lesser level based on the proof that we have that *I don't think we're going to ask for charges against [two junior lawyers]* . . . . The fact that Lichtenfeld is involved in a smaller little section and you know sometimes people in

> hindsight should have realized stuff but *we're not in the business of proposing charges against people unless we have quite strong evidence and way more than what we need to find charges*.

*Id.* at 69:7-25 (emphasis added).

Bringing the grand jurors behind the scenes of charging decisions is generally inappropriate. The executive branch operates behind the veil, and prosecutors should not invite the grand jury to peer behind the curtain.

In fact, the DOJ's grand jury manual instructs prosecutors not to do it. "If a juror should ask why the jury is not being presented with an indictment at that time or some similar question, the attorney should answer in a general way that internal procedures, which require a certain amount of paperwork, have not been completed. . . . Details of internal office procedures, such as review of indictments and other case controls and analysis, should not be explained as to avoid any allegation that discussions of the procedures improperly influenced the jury." *Federal Grand Jury Practice*, at 46.

The manual helps prosecutors play it safe, so they can "avoid any allegation that discussions of the procedures improperly influenced the jury." *Id.* But a violation of DOJ's practice manual does not necessarily rise to the level of prosecutorial misconduct.

It does not seem problematic to tell the grand jury that the government was not seeking charges against the other lawyers. After all, the grand jury needs to have an understanding of its task. Grand jurors naturally want to know what charges the government is seeking, including who might be charged. And at the end of the day, the grand jury inevitably will know whether the government is seeking charges against particular individuals.

The prosecutors also had a reason to explain why they were bringing charges against Filer, but not against the other lawyers. The other three Freeborn & Peters attorneys were all junior lawyers working for Filer. Each of them testified before the grand jury. *See* Gov't's Obj., at 6–7 (Dckt. No. 365).

The junior lawyers received immunity. Prosecutors are allowed to explain "what it means when a witness is granted immunity." *See* Brenner & Shaw, at § 6:3.

That said, the last line in the colloquy transcript leaves something to be desired. The prosecutors said that they had "quite strong evidence and way more than what we need to find charges" against Filer. *See* July 26, 2018 Colloquy Tr., at 69:23-25 (Dckt. 370-1).

That argumentative statement took place in July 2018, before the grand jury had heard the evidence. That statement would be too argumentative for an opening statement before a petit jury at trial.

Filer argues that that statement was like the statement by the prosecutor in *Breslin*, who said: "I think you'll be able to come to a determination of probable cause before we read very

much." *See Breslin*, 916 F. Supp. at 443. The court in *Breslin* took issue with the prosecutor's implication that the grand jury would easily be able to indict. *Id.* at 443–44.

Here, the statement was conclusory and argumentative. And it was premature, too, because the jury hadn't heard any evidence yet.

Even so, the prosecutors introduced an overwhelming number of documents. Again, the grand jury saw over 1,600 pages of exhibits introduced. The grand jury heard plenty of testimony, too. The proceedings totaled over 800 pages of transcripts.

As a result, the Court is less concerned about any one individual statement. The Court doubts that one line implying the strength of the government's case would be sufficient to prejudice a jury that heard such a huge volume of evidence over such a long period of time.

That comment didn't rush the grand jury into returning an indictment. They didn't return an indictment until 12 months later.

In contrast, the grand jury in *Breslin* was rushed into returning an indictment. The grand jurors "clearly received the message that they needed to act quickly because time was running out on the prosecution." *Id.* at 445. In fact, they deliberated on the indictment for only 15 minutes.

Overall, the government's one stray statement does not give this Court "grave doubt" about whether the indictment survived the potentially corrupting influence. *See Bank of Nova Scotia*, 487 U.S. at 251.

### 8.    Arguing or "Fencing" with the Grand Jury

Filer contends that the prosecutors argued, or "fenced," with grand jurors who didn't buy the prosecutors' interpretation of the evidence. He argues that the prosecutors essentially cross-examined a particular grand juror until that grand juror accepted the government's view of the evidence. *See* Def.'s Mtn. to Dismiss, at 12–16 (Dckt. No. 336). He points to a lengthy exchange between that grand juror and the prosecutors. *See* Aug. 2, 2018 Tr. of SA Dahlgren, at 130:7 – 135:23 (Dckt. No. 370-5).

At the beginning of the exchange, the grand juror expressed skepticism that there was enough evidence to indict. The grand juror commented that Kelly seemed more like a "millwork man as opposed to a scam artist who's just trying to suck the company dry." *Id.* at 131:17-18.

Midway through the exchange, the grand juror voiced skepticism again. The grand juror thought that "[u]ntil [Kelly] does sign [a document] and files it, then there is really nothing illegal," and Defendants were "just talking." *Id.* at 133:10-13.

But by the end of the conversation, the grand juror appeared convinced by the prosecutor's interpretation of the evidence. The prosecutor asked a rhetorical question: "So it's not like – I meant this is the joke, okay, it was a scheme to defraud. What was he saying, every

one [sic] was scheming to profit me?" *Id.* at 135:19-22. And the grand juror appeared to agree: "Right." *Id.* at 135:23.

Basically, Filer thinks that the grand juror was skeptical until the prosecutor "cross-examin[ed] the grand juror and instruct[ed] the juror that there was a scheme to defraud." Def.'s Mtn. to Dismiss, at 16 (Dckt. No. 336). And if that's the case, then the indictment was arguably not "of a Grand Jury."

The grand juror did appear initially skeptical. And after the exchange with the prosecutor, the grand juror seemed less skeptical, and seemed to support the government's take on what happened.

Even so, it is not necessarily prosecutorial misconduct to answer a grand juror's questions in a manner that satisfies a grand juror's concerns. In fact, presenting information that supports potential charges to a grand jury is part of the prosecutor's job.

The prosecutor did convince the grand juror, but he did not use any inappropriate statements to do so. He used reason and argumentation. He "comment[ed] on the nature or sufficiency of the evidence" and provided his own gloss on the evidence's meaning, as he was allowed to do. *See* Beale *et al.*, at § 9:2.

On this record, this Court cannot conclude that the prosecutor was overbearing the will of the grand jury. After all, dismissing an indictment is "an extraordinary step." *Linder*, 2013 WL 812382, at *29 (quoting *United States v. Li,* 206 F.3d 56, 62 (1st Cir. 2000)). Perhaps the prosecutors could have adopted a better approach. But that's not enough to give rise to a constitutional violation.

Filer rests his argument on Judge Friendly's dissent in the Second Circuit's decision in *Ciambrone*. There, Judge Friendly confirmed that a prosecutor does not have to go to bat for a defendant. But Judge Friendly warned that a prosecutor shouldn't "fence" with a grand juror, either:

> While . . . "a prosecutor is not presently obliged to search for and submit to a grand jury evidence favorable to the defense or negating guilt, when it has not been requested by the grand jury," the corollary is that when a grand juror requests advice, the prosecutor may not fence with him but must respond fully and fairly.

*United States v. Ciambrone*, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting) (quoting the majority opinion).

Filer reads the term "fence" to suggest arguing. Admittedly, "fence with" does suggest two parties going after each other with sabers, at least metaphorically.

Still, Judge Friendly used the term "fenc[ing]" as a "corollary" to the rule that prosecutors are not obligated to seek out and provide exculpatory evidence to the grand jury. *See*

30

*id.* In that context, maybe the word "fence" suggests something like presenting incomplete exculpatory information. *Id.* The government must play "fair," and respond in "full." *Id.*

This Court is not necessarily convinced that the dissent in *Ciambrone* – the primary authority that Filer relies upon for the prohibition against "fencing" – actually means what Filer says it does. At the very least, it does not prohibit a back-and-forth with grand jurors, especially when they raise questions or express concerns. Maybe the dissent in *Ciambrone* simply reaffirmed the duty to respond "fully and fairly," not that a prosecutor should not respond at all. *Id.*

Last, even if the prosecutors had overwhelmed the will of one single grand juror, that does not necessarily give the Court a "grave doubt" that the decision to indict was free of that corrupting influence.

One grand juror is only one grand juror. A grand jury has 23 grand jurors. And, unlike a petit jury, a grand jury does not need to be unanimous. Only 16 of the 23 grand jurors must be present to indict. *See* Fed. R. Crim. P. 6(a). Only 12 of those grand jurors must vote in favor of indictment. *See* Fed. R. Crim. P. 6(b)(2).

As a result, the Court does not even know whether this particular grand juror voted to indict, or whether that made any difference at all. Maybe this particular grand juror voted against the indictment, or maybe the vote made no difference.

In sum, the prosecutors were allowed to comment on the nature and sufficiency of the evidence, even if it resulted in some back-and-forth with a grand juror. Doing so was not "fencing." And even if it were, the Court does not see any prejudice.

## 9. Bonding with the Grand Jury and Enlisting Them as Trial Consultants

Last, Filer argues that the prosecutors "enlisted" the grand jury to be on their team, rather than an independent check on the government. He points to a collection of statements, including statements discussing trial strategy.

For example, the prosecutors advised the grand jurors to speak up with any misunderstandings. The government pointed to its desire for the petit jury to understand the case too:

> [I]f you don't understand something, it's going to be important that I understand that because the trial jury may not understand it too. And I want to be able to anticipate. And that's one of reasons that we're going through all these documents.

*See* Aug. 2, 2018 Tr. of SA Dahlgren, at 43:8-14 (Dckt. No. 370-5).

The prosecutors also asked the grand jury which documents they found most convincing: "[W]e're going to show you a couple different versions and I'm going to ask

31

you which one you think is best and *that's going to help me pick what I'm going to use at trial*." *Id.* at 43:24 – 44:5 (emphasis added).

In Filer's view, "these comments likely encouraged the grand jurors to consider themselves an arm of the prosecution," pushing them to adopt a "collaborative role with the government" rather than the grand jury's "historical function" of "shielding the accused from the prosecutor." *See* Def.'s Mtn. to Dismiss, at 19 (Dckt. No. 336) (quoting *State v. Martin*, 823 N.W.2d 913 (Minn. Ct. App. 2012)).

The Court disagrees, at least in part. For starters, there was nothing wrong with asking the grand jurors to speak up if they didn't understand something. Clarity is better than confusion. And no one comes out ahead if a grand juror is confused.

Even so, the government should not treat the grand jury as a mock jury exercise. The goal is not to gather intelligence about how a petit jury would view the case at trial. The goal is to decide whether a petit jury should exist at all.

The statements implied that the grand jury should help prosecutors sharpen their case. To that extent, the statements left something to be desired.

Still, the prosecutors told and reminded the grand jury that it was their decision whether to indict, and that they had to find probable cause in the evidence, not in what the prosecutors said. *See* July 26, 2018 Colloquy Tr., at 4:2-7 (Dckt. No. 370-1); *id.* at 46:7-13. So the Court does not see any prejudice in the prosecutors' discussion of a future jury trial, even if they could have been more circumspect in mentioning that possibility.

Filer points to another statement, where the prosecutors apparently emphasized their magnanimity. "[I] heard you guys had not done fraud before [so] I'll donate this time to your general education." *Id.* at 42:24 – 43:1.

Filer compares this statement to the actions of the *Breslin* prosecutor, who brought donuts for the grand jury. There is no comparison to donuts.

The *Breslin* court treated those snacks as a form of "[b]onding with the grand jury," and noted that "engag[ing] in techniques, either knowingly or inadvertently, to curry favor with the grand jurors and lead them to abrogate their role as unbiased factfinders" can constitute prosecutorial misconduct. *See Breslin*, 916 F. Supp. at 443.

In contrast, the prosecutor's comment here about "donat[ing] this time" (July 26, 2018 Colloquy Tr., at 42:24 – 43:1) seems much more like an offhand quip rather than an attempt to "curry favor." *Breslin*, 916 F. Supp. at 443. Bringing donuts was a much more deliberate action than the prosecutors' impromptu comment here.

In addition, the *Breslin* court focused on the donuts as only one part of a broader pattern of misconduct, in a case where the prosecutors pressured the grand jury to indict on an expedited timeline. That grand jury was the *fourth* grand jury to consider the case, and the prosecutor read

from grand jury transcripts only, while implying that live witnesses were not available to the grand jury. *See Breslin*, 916 F. Supp. at 444.

The prosecutor also said that the grand jury "did not have to agree with everything in the indictment; only the 'critical' parts.'" *Id.* at 445. The prejudice there was unmistakable: the grand jury returned an indictment after only 15 minutes of deliberations. *Id.*

The donuts were just the icing on the cake. So *Breslin* is a different case.

It is doubtful that the court in *Breslin* would have dismissed an indictment based on donuts alone. By the same token, a comment about educating the jury is not much of a basis for dismissal. Again, dismissal of an indictment is an "extraordinary step," unwarranted by one comment amidst a sea of evidence and testimony. *See Linder*, 2013 WL 812382, at *29 (quoting *United States v. Li*, 206 F.3d 56, 62 (1st Cir. 2000)).

Filer offers one more example. The prosecutors showed the grand jury a draft indictment, and asked how the "trial jury" might view things.

> Then we're going to go through the indictment with you for a couple of reasons. One, I'd like to get your input about whether – given the nature of the case – you know, you're well aware – you know if you think the documents are going to serve its purpose when the *trial jury* sees it. I generally do this with fraud cases and ask for your advice on it.

*See* Apr. 4, 2019 Colloquy Tr., at 4:3-12 (Dckt. No. 370-17) (emphasis added).

Once again, the statement presumes that there will be a trial jury. And it suggests that the role of the grand jury is to help the prosecutors prepare for trial.

Even so, asking the grand jury whether the "documents are going to serve its purpose when the trial jury sees it" could be an inartful way of asking the grand jury whether they feel they need any additional information to indict. *Id.* at 4:9-11.

If a grand jury does not believe that the documents would allow conviction at trial, then a prosecutor should put on more witnesses who are responsive to those grand jurors' concerns. Here, the prosecutors did just that.

In short, prosecutors should not treat a grand jury as the government's helper. The statements in question were better left unsaid. But the statements were not sufficiently prejudicial to give rise to grave doubts about the indictment itself.

\*       \*       \*

Having marched through all of the statements, it is worth taking a step back and surveying the landscape as a whole. It is important to view the field of play through the lens laid down by the Supreme Court.

Dismissal of an indictment under the Grand Jury Clause is a tall order. Dismissing an indictment based on prosecutorial misconduct before the grand jury is appropriate only "'if it is established that the violations substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that that decision was free from such substantial influence." *See Bank of Nova Scotia*, 487 U.S. at 251 (citation omitted).

This Court has taken a close look at the record. Overall, this Court is not convinced that the prosecutors engaged in misconduct. And even if they did, this Court is convinced that Filer suffered no prejudice. That's true regardless of whether the Court views the statements individually, or collectively.

Some of the statements might have been imprecise, imperfect, or argumentative. But viewed as a whole, the statements did not deprive Filer of his right to an indictment by a grand jury. There's no (grave) doubt about it.

The simple reality is that the grand jury listened to the evidence, and We the People decided to indict Filer. At trial, the petit jury will represent We the People again, and will decide whether the government proved its case beyond a reasonable doubt. We the People spoke once, and We the People will speak a second time.

## Conclusion

For the foregoing reasons, the Court denies Filer's motion to dismiss the indictment (Dckt. No. 336).

Date:   January 14, 2025

Steven C. Seeger
United States District Judge

34