# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD LEE FILER | Case No.: 19 CR 565-1<br><br>Hon. Steven C. Seeger |

### DEFENDANT EDWARD FILER'S UNSEALED REDACTED RESPONSE TO THE GOVERNMENT'S PROPOSED REMEDY FOR VIOLATIONS OF MR. FILER'S ATTORNEY-CLIENT PRIVILEGE

The government's Statement Regarding Remedy (the "Statement"), Dkt. 444, is as remarkable as the prosecutors' prevarication before this Court at the January 31, 2025 hearing. Although the government dutifully begins by professing its "regret," the remainder of its filing makes clear those are empty words. The government believes it did nothing wrong, and that the remedy for its violation of Mr. Filer's attorney-client privilege and the order defining that privilege should be nothing: exclude evidence that has already been excluded. The requested remedy is, quite literally, no remedy at all.

In a lengthy footnote purporting to provide "background" context to the Court, the government *again* seeks to assert the correctness of its conduct, just as it did in its response to Mr. Filer's motion and at the beginning of Friday's hearing. It contends, in essence, that the prosecutors did nothing wrong in their recent interview because Mr. Hartmann "was asked to provide a chronological narrative" and "volunteered two new items of information." *Id.* at 6 n.2. In a stunning statement of continued defiance of this Court's ruling, the government once again makes its true position clear:

> **Based on the Court's *conclusion* that the law of the case is that Judge Leinenweber found an attorney-client privilege existed** between Mr. Hartmann and the defendant, the government *concedes*

>that information conveyed in the January 27, 2025 interview violated defendant's attorney-client privilege with Mr. Hartmann.

*Id.* (emphasis added).

So, just as it did at the hearing, the government: (1) does not acknowledge, and tacitly rejects, the existence of an attorney-client privilege between Mr. Hartmann and Mr. Filer personally, (2) does not acknowledge, and tacitly rejects, that Judge Leinenweber ruled that privilege existed, (3) acknowledges, but fails to agree with, this Court's ruling that Judge Leinenweber's ruling was law-of-the-case, (4) mischaracterizes this Court's findings by omitting that, after carefully reviewing the record, and after giving the prosecutors a fulsome opportunity to explain themselves, the Court found not only that Judge Leinenweber's order was law-of-the-case, but that "the government violated Defendant Filer's attorney-client privilege," (Dkt. 440), and (5) only begrudgingly "concedes" that because of those findings—neither of which it acknowledges is correct—it violated Mr. Filer's attorney-client privilege. It is as if the hearing that the Court conducted on January 31, 2025 never took place. At that hearing, the government eventually conceded (after pointed questioning by the Court, necessitated by the lack of direct answers to straight-forward questions) what it refuses to concede in the Statement: Judge Leinenweber found the existence of a personal attorney-client privilege between Mr. Hartmann and Mr. Filer, and their recent interview violated that privilege. The government has retrenched.

It is difficult to imagine a clearer statement of the contempt the government has for the integrity of the orders of both Judge Leinenweber and this Court, as well as Mr. Filer's rights.

The government, we believe, has left this Court little choice. The Statement submitted bears the signature of the United States Attorney of the Western District of Wisconsin. The Criminal Chief of that office witnessed the remarkable January 31 hearing, and undoubtedly approved the Statement. The government, not just two individual prosecutors, fails to appreciate

the gravity of violating court orders, the sanctity of the attorney-client privilege, and a criminal defendant's rights—even though this Court has heretofore done everything possible to impress upon them the importance of those matters. It is clear that watching prosecutors prevaricate (at best) in front of this Court and listening to the Court find that the prosecutors violated fundamental rights of the defendant did not convey any message to the government. Excluding a witness or striking a few paragraphs from an already sweeping indictment will fare no better. Drastic misconduct calls for a drastic remedy.

## I. THE INDICTMENT SHOULD BE DISMISSED.

Dismissal of a criminal indictment mid-trial is an extraordinary remedy. It should be granted only in extraordinary circumstances. The government's conduct here—an intentional and repeated violation of Mr. Filer's attorney-client privilege, a knowing violation of a court order protecting that privilege, an evasive and obstructionist colloquy with the Court in response to the violation, a filing that continues to quarrel with the merits of Judge Leinenweber's and this Court's orders, and the cumulative effect of actions designed to obtain a conviction at all costs—meets that high bar. *United States v. Filer,* No. 19-CR-565, 2025 WL 97269, at *6 (N.D. Ill. Jan. 14, 2025) (Seeger, J.) ("a district court may dismiss an indictment 'pursuant to its supervisory powers, such as when the government exhibits outrageous misconduct in prosecuting the indictment, causing prejudice to the defendant; such a dismissal is a prophylactic tool used to discourage future deliberate governmental impropriety.'") (quoting *United States v. Linder*, No. 12 CR 22, 2013 WL 812382, at *31 (N.D. Ill. Mar. 5, 2013)).

The government[1] violated one of the most fundamental and long-standing rights of a criminal defendant: his attorney-client privilege. That right is so sacred that the United States

---

[1] As discussed herein, Mr. Filer seeks only to redress the violation of his rights. So, this motion will not name names, save one: AUSA Pinkston was not at the interview and is a relative newcomer to the case.

3

Attorney's Office ordinarily exerts tremendous effort to avoid abrogating it. Approval from Main Justice is required before even subpoenaing an attorney.[2] Prosecutors understand that exposure to any attorney-client material typically leads to recusal and may lead to dismissal. *See, e.g., United States v. Wahi,* 3:11-cr-30043-CRL (C.D. Ill.), Dkt. 77 (motion **by the government** to dismiss its own indictment because its agents inadvertently discovered privileged emails between the defendant and his criminal defense attorney, even though the prosecutors themselves had not read the privileged emails and the "extent of the breach was likely minimal and unintentional" because the prosecutors recognized that "[w]hile the agent may not have explicitly or intentionally conveyed privileged material to the attorneys or other members of the prosecution team, his active participation in the trial preparation precludes any possibility that the United States can show the information did not taint the prosecution."); *id.* at Dkt. 78 (granting the government's motion to dismiss with prejudice). The attorney-client privilege is so valued and protected by the government that taint teams are routinely employed when there is even a hint that prosecutors on the case might be exposed to attorney-client material—despite that drain on scarce resources. *See* Justice Manual § 9-13.420 ("[T]o protect the attorney-client privilege and to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy,

---

References herein to "the prosecutors" or "the government" are not intended to include her. Mr. Filer also notes that throughout the case, it appears that the investigating agents have scrupulously and accurately recorded the subjects discussed during interviews. There are multiple examples where statements that are helpful to the defense are set forth in the agents' reports. Indeed, it is only because of the agents' description of the topics covered with Mr. Hartmann that defense counsel was alerted to the violation of Mr. Filer's privilege.

[2] Privilege violations are so disruptive to a prosecution that in 2020, the Department of Justice created a Special Matters Unit within the Criminal Division's Fraud Section "to focus on issues related to privilege and legal ethics." The unit "(1) conducts filter reviews to ensure that prosecutors are not exposed to potentially privileged material, (2) litigates privilege related issues in connection with Fraud Section cases, and (3) provides training and guidance to Fraud Section prosecutors." *See* U.S. Dep't of Justice, Fraud Section Year in Review 2020, at 4.

a 'privilege team' should be designated, consisting of agents and lawyers not involved in the underlying investigation.").

This background informs the issue before the Court. These prosecutors well understood the sensitivity involved in interviewing Mr. Filer's attorney in preparation for the first trial—after all, they had charged Mr. Filer with **multiple crimes related to the very matters he discussed with Mr. Hartmann**.[3] Despite being on notice, they did not put any safeguards in place and personally elicited attorney-client protected material they could not unhear. That was egregious, made even more so because the breach was disclosed only on the morning of Mr. Hartmann's testimony on June 24, 2021, buried in pages of new witness interview reports. Because the information obtained was privileged, Judge Leinenweber excluded Mr. Hartmann's testimony about the subject of those communications.

This misconduct pales compared to that now before the Court. These same prosecutors not only trampled on Mr. Filer's rights—again—they did so in willful disregard of a court order. Judge Leinenweber unequivocally held that the privilege attached to Mr. Filer's conversations with Mr. Hartmann, and limited Mr. Hartmann's testimony *on that basis*. Given the sensitivity of privilege issues in criminal prosecutions, it is impossible that Judge Leinenweber's order escaped the prosecutors' minds.[4] Indeed, as it turns out, Mr. Filer *did* remind the government before this trial

---

[3] *See* Second Superseding Indictment, Dkt. 64, at 33 (Count Eight, charging Mr. Filer with knowingly and fraudulently withholding documents in response to bankruptcy trustee's subpoena); at 43-46 (Counts Fourteen and Fifteen, charging Mr. Filer with bankruptcy fraud and perjury for allegedly making false statements in the deposition at which he was represented by Mr. Hartmann). Mr. Filer was acquitted of those charges.

[4] The government, in a single sentence, claims the violation was not deliberate but was caused by their "failure to properly appreciate the full nature…and implications of same, and a failure to hereafter bring any questions about the scope of the ruling" to Judge Leinenweber or this Court. Statement, at 7. This cryptic comment echoes positions taken by the government at the beginning of the January 31, hearing that, the undersigned thought, were abandoned under questioning by the Court. Judge Leinenweber's ruling was clear and unambiguous. It is simply implausible that seasoned prosecutors did not think to ask this Court

about Judge Leinenweber's ruling and Mr. Filer's continued assertion of attorney-client privilege over communications with Mr. Hartmann. *See* Motion *in Limine* No. 2, Dkt. 281, at 7 n.2 ("[J]ust minutes before Mr. Hartmann took the witness stand, the government produced a memorandum memorializing an interview between the government and Mr. Hartmann. Shockingly, Mr. Hartmann's statements in the interview disclosed conversations he had with Filer ***when he was acting as Filer's attorney***. Filer never authorized this waiver of privilege by Mr. Hartmann. Defense counsel immediately raised the issue with Judge Leinenweber, who rightly precluded Mr. Hartmann from testifying about privileged conversations with Filer. *See* Exhibit B, Tr. at 1675:11–1683:2. Thus ruling should also be enforced consistent with law-of-the-case.") (emphasis in original). Though it did not explicitly discuss the privilege, this Court granted the portion of Mr. Filer's Motion *in Limine* No. 2 in which the argument appears, and affirmed Judge Leinenweber's ruling as law of the case on the prior motion *in limine* no. 2(C). *See* Dkt. 420, at 3. Thus, the government's conduct here not only violated Judge Leinenweber's order, it violated this Court's order as well.

This alone would justify dismissal, and there is more. When Mr. Filer filed his privilege motion before this Court, and the government saw again the transcripts of Judge Leinenweber's ruling and Mr. Filer's deposition, the tone and content of the prosecutors' response revealed the intentionality behind their actions. *See* Dkt. 436. The government did not profess ignorance of the ruling, contrition for their "accidental" violation of Mr. Filer's rights, confusion over the order's content, or suggest a remedy for their actions. Instead, the government responded with indignation and an attack on both defense counsel and Judge Leinenweber's ruling. *Id.* at 7 (arguing defense counsel "misspoke or misunderstood the facts when he represented to Judge Leinenweber that Mr.

---

for clarification if they had any doubts about the issue. The government's argument to the contrary is further evidence of a lack of contrition.

6

Hartmann represented the defendant 'personally'"); *id.* (arguing that "Defense counsel did not thereafter correct the misunderstanding" and instead made statements to the court that were "factually incorrect"); *id.* at 10 ("The defendant has no basis to argue that his conversations with Mr. Hartmann in July 2015 are within the coverage of *any privilege held by the defendant*.") (emphasis in original). In short, the government was not in doubt as it now claims. It arrogated to itself the right to violate a court order it did not like, as well as Mr. Filer's rights.

And there is more. When confronted with the Court's reading of the situation, the prosecutors prevaricated, refused to answer direct questions from the Court, and, in at least one instance, contradicted each other's statements about the factual circumstances of the privilege violation. While one prosecutor responded "yes," another shook his head "no."

Mr. Filer is cognizant that "[t]he issue of dismissal of the indictment is not an easy one." *United States v. Omni Int'l Corp.,* 634 F. Supp. 1414, 1436–37 (D. Md. 1986); *accord Linder*, 2013 WL 812382, at *29 (dismissal of an indictment is an extraordinary remedy). But under these circumstances, it is incumbent upon this Court to exercise its "general supervisory power with respect to the administration of justice in federal judicial proceedings" to deter illegal conduct by government officials, protect and preserve the integrity of the judicial process, and implement a remedy for violation of recognized rights. *Id.*; *Filer*, 2025 WL 97269, at *6 (Seeger, J.). Just as courts have dismissed prosecutions because of serious government abuse in the investigation leading to the indictment, so too have courts dismissed because of serious government misconduct following the indictment. *Omni,* 634 F. Supp. at 1437; *see also United States v. Wilson*, 715 F.2d 1164, 1169 (7th Cir. 1983), cert. denied, 464 U.S. 986 (1983) (dismissal of an indictment for prosecutorial misconduct is warranted where "a substantial right of the defendant has been jeopardized"). The intentionality of the government's conduct, and the prejudice to Mr. Filer,

compels dismissal here. *Filer*, 2025 WL 97269, at *6 (Seeger, J.) (requiring a showing of prejudice); *Linder*, 2013 WL 812382 (same); *Omni*, 634 F. Supp. at 1438 ("[T]he magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown.").

Nor do the actions described above take place in a vacuum. This knowing violation of a court order and corresponding privilege violation is the latest in a string of actions taken by the prosecutors to achieve a conviction at all costs.[5] The remedy for that misconduct must be tailored to address the harm to Mr. Filer and to our system of justice. Merely rebuking the conduct of the government will not accomplish that goal.

The government's Statement chose to virtually ignore its misconduct—except to deny it in a lengthy footnote. The focus of the Statement is prejudice and its argument is odd. It argues that the first incursion into Mr. Filer's rights was so impactful that the second hardly matters. That is not so. The government received information ***during this trial*** about Mr. Filer's state of mind with regard to a portion of the alleged scheme. Some of that information is new, and highly prejudicial. The government elicited Mr. Hartmann's state of mind about Mr. Filer's statements and conduct

---

[5] Throughout this case—starting all the way back at the grand jury—the prosecutors have demonstrated that their desire to obtain a conviction rises above a search for the truth. For example, after representing to this Court they would not argue the assignment agreements to the K Family Trust were legally effective, they have repeatedly asked questions and tried to elicit answers (with conflicting success) suggesting that the assignment did in fact take place. Tr. at 44:9-22 ("[Prosecutor]: So how many days after BWC Capital was formed did Mr. Gereg ***assign his interests of it over to The K Family Trust***?") (emphasis added); Tr. 243:16-21 ("[Prosecutor]: Okay. And at this time did the incorporation documents show that Mr. Gereg is the sole member of Barsanti Woodwork? [Mr. Kelly]: They did. [Prosecutor]: Okay. ***But there's also been an assignment***. ") (emphasis added). Moreover, the government has repeatedly suggested to the jury that Mr. Gereg believed the agreements were enforceable when the government ***knows that is not true***. Mr. Gereg—a cooperating government witness—explicitly told the government he was never provided the compensation necessary to effectuate the transfer, which he says would have been over $200,000. *See* May 20, 2021 Memorandum of Interview, at 3. There are many more examples of the government's win-at-all-costs approach to this case, too numerous to list here. These are undoubtedly "drops in the bucket" to the jury, as this Court aptly noted in a different context, but this conduct evinces an ethos that is violative of Mr. Filer's rights and contrary to the ethic of the office of the U.S. Attorney in the Northern District of Illinois.

during the time Mr. Hartmann represented Mr. Filer. And a new conversation between Mr. Hartmann and Mr. Filer was disclosed, referencing Mr. Brandt's activities. These communications undoubtedly provide the government with a road map of how to question Mr. Hartmann and Mr. Brandt to elicit the substance, if not the form, of the privileged information. More concerningly, it provides a road map to cross-examine Mr. Filer, if he testifies. And although the government may have previously covered the same general topic with Mr. Hartmann, the report is not a verbatim transcript of what was said on January 27, 2025. It is impossible to describe the same events the same way twice. The government proposes that it now cross-examine Mr. Filer, within a week of their talking with his counsel about privileged conversations. Even if it was a perfect duplicate of the previous conversation—an impossibility—the refresher course prejudices Mr. Filer.

Mr. Filer's rights are not protected if the prosecutors are internally reprimanded, reported to the Office of Professional Responsibility, or sanctioned by this Court. Mr. Filer has lived under the cloud of criminal investigation and indictment for almost a decade. Now forced to stand trial a second time (a new trial ordered by Judge Leinenweber, an order the government did not appeal, because of error the government injected in the first trial), he has been substantially prejudiced by the government's repeated incursion into his privileged communications about ***the subject of the very crime with which he was originally charged, which is now being presented to the jury as a pillar of the alleged "scheme" to defraud.*** The only adequate remedy for misconduct of this magnitude is dismissal. *See, e.g., United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (if the government, having hold over an attorney, extracts client secrets from him and then uses them in a criminal trial to the client's substantial prejudice, that might be the "kind of serious governmental misconduct that would violate a criminal defendant's rights under the due process clause of the Fifth Amendment."); *Omni Int'l Corp.*, 634 F. Supp. at 1436–37 (dismissing

indictment based on prosecutorial misconduct and violations of the defendants' attorney-client privilege and condemning the prosecutors' "lack of candor in colloquies with and testimony before court" about the privilege violations, noting that the court was "extremely disturbed by the Government's cavalier attitude with regard to a surprise interview of an attorney's secretary, when the purpose of the interview will be to discover communications between the attorney and his clients"); *accord United States v. Valencia*, 541 F.2d 618, 621 (6th Cir. 1976) (discussing the district court's correct dismissal of indictment as to four defendants based on outrageous governmental intrusion into the attorney-client privilege where the government directly elicited attorney-client information about the charged crime from the lawyer defendant's secretary, noting that even though the attorney was directly involved in a criminal conspiracy with his clients, "the law in its majesty ... [cannot] be equally slimy."). Nor would some lesser sanction vindicate the fairness of the system of justice these prosecutors are sworn to uphold.

This Court regularly demonstrates inexhaustible patience with attorneys (the undersigned has tested and been the beneficiary of that trait) and litigants, as well as a proclivity to attribute good intentions to those who appear in its courtroom. Our justice system and all its participants benefit from those attributes. But sometimes, circumstances arise that require lines to be drawn to protect defendants' rights and the justice system itself. No less than the integrity of the justice system is at stake. If the cumulative effect of the prosecutors' misconduct in this case does not warrant dismissal, it is difficult to imagine conduct that does.

Mr. Filer respectfully urges this Court to send a message protecting the justice system and those who stand before it, presumed to be innocent. As Attorney General Robert H. Jackson foreshadowed when he opened his address to the Second Annual Conference of United States Attorneys almost a century ago, "[t]he prosecutor has more control over life, liberty, and reputation

than any other person in America…While the prosecutor at his best is one of the most beneficent forces in our society, when he acts with malice or other base motives, he is one of the worst." *See* Speech to the U.S. Department of Justice, The Federal Prosecutor (Apr. 1, 1940), available at https://www.justice.gov/ag/speeches-attorney-general-robert-houghwout-jackson.

This case represents the worst. The prosecutors intentionally violated a criminal defendant's attorney-client privilege, willfully violated a court order protecting that privilege, indignantly claimed they were justified in doing so because they did not agree with the basis for the order, sought to evade responsibility when questioned by this Court, and then belatedly expressed tepid regret. There is no case (at least, that defense counsel is aware of) that approaches that level of disregard for a defendant's rights and a court's orders. If the Court does not impose the ultimate sanction—dismissal—it will send a powerful message that a prosecutor willing to violate a defendant's rights and court orders can still achieve their ultimate goal: conviction.

## II. IF THE COURT DECIDES THE TRIAL CAN PROCEED, THE PROSECUTORS CANNOT BE PERMITTED TO ELICIT ANY EVIDENCE OR TESTIMONY RELATED TO THE SUBJECT MATTER OF THE ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS.

At minimum, the remedy for the prosecutors' misconduct must be to sever the part of the government's case that relates to the subject matter of the improperly obtained attorney-client communications: the alleged withholding of documents from the bankruptcy trustee in response to the subpoena, and Mr. Filer's deposition related to the same.[6] The entirety of the prosecution team has been exposed to the improperly obtained privileged information on these topics, including statements between Mr. Filer and his lawyer and their respective mental impressions

---

[6] The transcript of the deposition at which Mr. Hartmann represented Mr. Filer is in the bucket of evidence that must be excluded as part of these topics. Given the prosecutors' knowledge of privileged conversations between Mr. Hartmann and Mr. Filer leading up to and about the subject of the deposition, it would be improper to allow the government to use the transcript for any purpose, especially to impeach Mr. Filer.

about his culpability for actions the government says are "part of the scheme charged in Counts 1 and 2." *See* Dkt. 443, at ¶¶ 4–6; *see also* Dkt. No. 266, at 24. This knowledge has and will continue to taint the prosecution's presentation of witnesses and evidence on these topics. The prosecutors cannot unlearn what they know, and their questioning of upcoming witnesses—in particular Mr. Filer, if he decides to testify—will, whether consciously or subconsciously, be infected by information they now improperly possess. It is not enough to merely bar or limit the testimony of Mr. Hartmann[7] (the remedy imposed at Mr. Filer's first trial). Any evidence or testimony that has been poisoned by the prosecutors' misconduct must be excluded. *See generally United States v. Segal*, 313 F. Supp. 2d 774, 780 (N.D. Ill. 2004) (noting that the violation of a defendant's attorney-client privilege will violate due process if the violation was caused by serious governmental misconduct that is outrageous enough to shock the conscience of the court and suppressing the privileged communications, implying that more serious sanctions should be imposed in a case where the government "engage[s] in serious misconduct by affirmatively eliciting privileged information," as opposed to mere "sloppy handling of [a defendant's] electronic information").

Rule 403 also provides an independent basis to exclude evidence from Mr. Hartmann and other evidence related to the alleged withholding of documents and Mr. Filer's deposition. As the Court knows, Mr. Filer moved pretrial to exclude evidence and argument related to these topics under both the Double Jeopardy Clause and Rule 403. *See* Motion *in Limine* No. 1, Dkt. 280, at 20-21. This Court thoughtfully considered the issue based on the facts as they existed at the time

---

[7] Mr. Hartmann, too, was complicit in the government's violation of Mr. Filer's attorney-client privilege. He provided evidentiary material to the government designed to inculpate his own client. He surely knew about Judge Leinenweber's ruling in the first trial—he must have been warned before he took the stand not to delve into topics deemed off limits by the Court. He is a sophisticated attorney whose job at Freeborn & Peters includes addressing privilege issues and counseling his partners regarding the same. It is inconceivable that Mr. Hartmann did not understand that telling the government about Mr. Filer's state of mind involving the very subject matter of this criminal prosecution, was improper. This act taints his entire testimony. He cannot take the stand in this case.

and decided that the Double Jeopardy Clause did not apply and Rule 403 did not bar the evidence related to the withholding of documents. *See* Memorandum Opinion and Order, Dkt. 428. Now, with the government's recent misconduct as another weight on the scale, the Rule 403 balancing test tips in favor of exclusion.

The Government cannot fairly examine their own witnesses (namely, Ashley Brandt and Steve Hartmann), let alone fairly cross-examine Mr. Filer on the subject, given what it knows about Mr. Filer's privileged communications. As the government's interview memorandum discloses, all three prosecutors on this trial team now have knowledge of Mr. Filer's alleged statements concerning not only his conduct in responding to the trustee's subpoena, but his state of mind about his conduct. Dkt. 443, at 5–6 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████). The government also learned *Mr. Hartmann's* state of mind and his beliefs regarding the veracity of what Mr. Filer disclosed to him in privileged conversations. *Id.* at 4 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); *id.* at 6 (Hartmann expressing, in a privileged conversation with Mr. Filer, that ████████████████████████████████████████).

The government itself tacitly concedes the unfair advantage this tainted information will provide in cross-examining Mr. Filer, should he choose to testify. *See* Statement, Dkt. 444, at 4 ("While knowledge of the statements ***could theoretically afford the government an advantage in cross-examining the defendant should he decide to testify in his own defense***…") (emphasis added). The government's proposed solution to this impropriety—it says it will put the information

out of its mind and "not use it"—is not only practically unworkable, but impossible. Any evidence related to the alleged withholding of documents from the bankruptcy trustee and Mr. Filer's deposition must be excluded.

**III.     CONCLUSION**

For all the above reasons, Mr. Filer respectfully requests the remedy of dismissal of the indictment. In the alternative, if this Court allows trial to proceed, any evidence or testimony related to the alleged withholding of documents from the bankruptcy trustee in response to the subpoena, and Mr. Filer's related deposition, must be excluded.

Dated: February 2, 2025                                Respectfully submitted,

<span style="margin-left: 3em;">*/s/ Ronald S. Safer*</span>
<span style="margin-left: 3em;">Ronald S. Safer</span>
Robert H. Riley
Eli J. Litoff
Mary A. Laird
RILEY SAFER HOLMES & CANCILA LLP
1 S. Dearborn St., Suite 2200
Chicago, Illinois 60603
(312) 471-8700 (Telephone)
(312) 471-8701 (Facsimile)
rsafer@rshc-law.com
rriley@rshc-law.com
elitoff@rshc-law.com
mlaird@rshc-law.com

*Attorneys for Defendant Edward Filer*